Exhibit "A"

Court File No.

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE

BETWEEN:

### MICHAEL FRANK

Plaintiff

-and-

### FARLIE, TURNER & CO., LLC, BAYSHORE PARTNERS, LLC, R. PATRICK CALDWELL, STEPHEN GIORDANELLA, LARRY MOELLER, NEIL E. SCHWARTZMAN, JASON A. WILLIAMS, BRIAN L. STAFFORD, HENRY H. SHELTON, FRANK E. JAUMOT, KEITH J. ENGEL, RICHARD P. TORYKIAN, SR., CHARLES E. PETERS, JR., and DEON VAUGHAN

Defendants

Proceeding under the *Class Proceedings Act, 1992*

## STATEMENT OF CLAIM

### TO THE DEFENDANTS:

**A LEGAL PROCEEDING HAS BEEN COMMENCED AGAINST YOU** by the plaintiff. The claim made against you is set out in the following pages.

**IF YOU WISH TO DEFEND THIS PROCEEDING,** you or an Ontario lawyer acting for you must prepare a statement of defence in Form 18A prescribed by the Rules of Civil Procedure, serve it on the plaintiff's lawyers or, where the plaintiff does not have a lawyer, serve it on the plaintiff, and file it, with proof of service, in this court office, WITHIN TWENTY DAYS after this statement of claim is served on you, if you are served in Ontario.

If you are served in another province or territory of Canada or in the United States of America, the period for serving and filing your statement of defence is forty days. If you are served outside Canada and the United States of America, the period is sixty days.

Instead of serving and filing a statement of defence, you may serve and file a notice of intent to defend in Form 18B prescribed by the Rules of Civil Procedure. This will entitle you to ten more days within which to serve and file your statement of defence.

2

**IF YOU FAIL TO DEFEND THIS PROCEEDING, JUDGMENT MAY BE GIVEN AGAINST YOU IN YOUR ABSENCE AND WITHOUT FURTHER NOTICE TO YOU. IF YOU WISH TO DEFEND THIS PROCEEDING BUT ARE UNABLE TO PAY LEGAL FEES, LEGAL AID MAY BE AVAILABLE TO YOU BY CONTACTING A LOCAL LEGAL AID OFFICE.**

**IF YOU PAY THE PLAINTIFF'S CLAIM,** and $5,000.00 for costs, within the time for serving and filing your statement of defence, you may move to have this proceeding dismissed by the court. If you believe the amount claimed for costs is excessive, you may pay the plaintiff's claim and $400.00 for costs and have the costs assessed by the court.

Date:                                    Issued by

Local Registrar

Address of                              393 University Avenue
court office:                           10th Floor
                                        Toronto, Ontario
                                        M5G 1E6

TO:         Bayshore Partners, LLC
            401 E. Las Olas Boulevard, Ste. 1160
            Fort Lauderdale, FL 33301
            U.S.A.

AND TO:     Farlie Turner & Co., LLC
            401 E. Las Olas Boulevard, Ste. 1160
            Fort Lauderdale, FL33301
            U.S.A.

AND TO:     Larry Moeller
            232 Hamptons Green N.W.
            Calgary, AB  T3A 5A8
            CANADA

AND TO:     Stephen Giordanella
            6250 NW 96th Terrace
            Parkland, FL 33076-1812
            U.S.A.

AND TO:     Neil E. Schwartzman
            5757 NW 50th Street
            Coral Springs, FL  33067-4010
            U.S.A.

3

AND TO: R. Patrick Caldwell
191 SE 20th Avenue
Deerfield Beach, FL 33441-6120
U.S.A.

AND TO: Brian L. Stafford
1537 Hillsboro Blvd
Deerfield Beach, FL 33441
U.S.A.

AND TO: Jason A. Williams
5800 Camino Del So, Unit 2071
Boca Raton, FL 33433-6593
U.S.A.

AND TO: Deon Vaughan
1227 Weston Pass
Germantown, TN 38138
U.S.A.

AND TO: Henry H. Shelton
331 Holly Lane
Newport, NC 28570
U.S.A.

AND TO: Frank E. Jaumot
2851 N. Palm Aire Drive
Pompano Beach, FL 33069
U.S.A.

AND TO: Charles E. Peters, Jr.
26 Loch Ridge Drive
Greensboro, NC 27408
U.S.A.

AND TO: Keith J. Engel
389 Valley Road
Kelowna, BC V1V 2E5
CANADA

AND TO: Richard P. Torykian, Sr.
1 Rockefeller Plaza
New York, New York 10020
U.S.A.

4

**DEFINED TERMS**

1. The following definitions apply for the purpose of this Statement of Claim:

a) **"APA"** means the asset purchase agreement dated January 12, 2010 and subsequent amendments thereto between PPA and PPE in respect of the Transaction;

b) **"August 2009 Conference Call"** means a conference call held by PPA and certain other Individual Defendants, among others, on August 14, 2009;

c) **"Bayshore"** means the defendant Bayshore Partners, LLC;

d) **"Caldwell"** means the defendant R. Patrick Caldwell;

e) **"Carter Enterprises"** means Carter Enterprises, LLC;

f) **"CIBC"** means the Canadian Imperial Bank of Commerce;

g) **"Class"** or **"Class Members"** means all persons, other than Excluded Persons, who voluntarily or involuntarily disposed of PPA shares during the Class Period;

h) **"Class Period"** means the period from and including August 14, 2009 to and including March 5, 2010 or such other period as the Court finds appropriate;

i) **"Closing"** means the closing of the Transaction on March 5, 2010;

j) **"CJA"** means *Courts of Justice Act*, R.S.O. 1990, c. C.43;

k) **"CPA"** means *Class Proceedings Act*, 1992, S.O. 1992, c. 6;

5

l) **"Defendants"** means collectively Bayshore, Farlie Turner, and the Individual Defendants;

m) **"disclosure"** means full, true and plain disclosure in accordance with the reporting issuer's continuous disclosure obligations to report and publish material changes under Part XVIII of the *Securities Act* and the Regulations;

n) **"Engel"** means the defendant Keith J. Engel;

o) **"Excluded Persons"** means PPA's past or present subsidiaries, officers, directors, affiliates, legal representatives, heirs, predecessors, successors and assigns, and all members of the Individual Defendants' families, and any entity in which any of the Individual Defendants has or had a controlling interest;

p) **"Farlie Turner"** means the defendant Farlie, Turner & Co., LLC;

q) **"Forbearance Agreement"** means the forbearance agreement entered into between PPA and CIBC in or around January 2009;

r) **"Fundamental Change Event"** means one of the following events that the Class Members allege fundamentally changed the nature of their investment in PPA:

  i. The U.S. Bankruptcy Court's approval of the Transaction on February 22, 2010; or

  ii. the Closing of the Transaction on March 5, 2010.

s) **"Giordanella"** means the defendant Stephen Giordanella;

t) **"HUBZones"** means highly under-utilized business zones;

6

u)    "**Ibiley Manufacturing**" means Ibiley Manufacturing Corp.;

v)    "**ID/IQ**" means "Indefinite Delivery, Indefinite Quantity"

w)    "**Individuals Defendants**" means the defendants Caldwell, Giordanella, Schwartzman, Williams, Moeller, Stafford, Shelton, Engel, Jaumot, Peters, Torykian, and Vaughn;

x)    "**IOTV**" means Improved Outer Tactical Vest;

y)    "**IOTV Contract**" means the contract awarded to PPA on or about December 4, 2009 by the U.S. Army under its US$1.0 billion IOTV Program;

z)    "**IOTV Program**" means the solicitation by the U.S. Army for IOTV issued in early 2008 for the production of up to 736,000 IOTV, which would represent US$1.0 billion of industry revenue over three to five years;

aa)   "**Jaumot**" means the defendant Frank E. Jaumot;

bb)   "**LOI**" means the Non-Binding Letter of Intent entered into between PPA and Sun Capital on December 21, 2009 in respect of the Transaction;

cc)   "**Material Change**" means one or more of the following:

i.    PPA's decision to file a formal protest with the U.S. Army, on or after August 14, 2009, following the awarding of the IOTV Contract to a competing bidder;

ii.   PPA's filing of a formal protest with the U.S. Army, on or after August 14, 2009, following the awarding of the IOTV Contract to a competing bidder;

7

iii.     The awarding of the IOTV Contract to PPA on December 4, 2009;

iv.     The execution of the LOI by PPA and Sun Capital in respect of the Transaction on December 21, 2009;

v.     The conflicts of interest of certain Individual Defendants, including Caldwell, Schwartzman, and Williams, in respect of the Transaction arising from their negotiations to secure future compensation from and/or equity interests in PPE;

vi.     The execution by PPA and CIBC of a second amending agreement to the Forbearance Agreement on or about December 24, 2009 under which CIBC provided an additional US$700,000 in financing to PPA and extended its forbearance through January 8, 2010; and

vii.     The execution of the APA in respect of the Transaction between PPA and PPE on January 12, 2010;

dd)     "**MD&A Q2/09**" means PPA's Management Discussion and Analysis for the quarter ended June 30, 2009, prepared and released at August 14, 2009;

ee)     "**MD&A Q3/09**" means PPA's Management Discussion and Analysis for the quarter ended September 30, 2009, prepared and released at November 16, 2009;

ff)     "**Misrepresentation**" means one or more of the following:

8

    i.     the omissions of material facts in PPA core and non-core documents, and public oral statements of Caldwell and Williams, in August 2009 and November 2009, namely that PPA had reasonable grounds to file, had decided to file and/or had filed one (or more) formal protest(s) with the U.S. Army in respect of the awarding of the IOTV Contract to a competing bidder;

    ii.   the omissions of material facts in PPA core and non-core documents, and public oral statements of Caldwell and Williams, in August 2009, that PPA had secured partnership agreements with HubZone companies Carter Enterprises and Ibiley Manufacturing on July 15, 2009 and July 23, 2009, respectively, under which PPA would serve as the exclusive ballistics provider to these companies;

gg)   "**Moeller**" means the defendant Larry Moeller;

hh)   "**MTV**" means Modular Tactical Vests;

ii)   "**MTV Contracts**" means the contracts with the U.S. Marines obtained by two corporate partners of PPA, Carter Enterprises and Ibiley Manufacturing, in respect of which PPA, as exclusive ballistics provider to these two companies, would serve as sub-contractor;

jj)   "**November 2008 Conference Call**" means a conference call held by PPA and certain other Individual Defendants, among others, on November 17, 2008;

kk)   "**November 2009 Conference Call**" means a conference call held by PPA and certain other Individual Defendants, among others, on November 6, 2009;

9

ll) "**Peters**" means the defendant Charles E. Peters, Jr.;

mm) "**Point Blank**" means Point Blank Solutions, Inc.

nn) "**PPA**" or the "**Company**" means Protective Products of America Inc. (and "PPOA Holding, Inc.", to which PPA changed its name on or about March 8, 2010 after the closing of the Transaction pursuant to a term of the APA);

oo) "**PPE**" means Protective Products Enterprises, Inc., an affiliate of Sun Capital;

pp) "**PPI**" means Protective Products International Inc.;

qq) "**Schwartzman**" means the defendant Neil E. Schwartzman;

rr) "**SEC**" means the Securities & Exchange Commission;

ss) "**Secured Debentures**" means, collectively, Secured C Debentures and Secured Non-C Debentures;

tt) "**Secured C Debentures**" means secured subordinated, convertible debentures;

uu) "**Secured Non-C Debentures**" means secured subordinated, non-convertible debentures;

vv) "*Securities Act*" means the *Securities Act*, R.S.O. 1990 c. S.5, as amended;

ww) "**SEDAR**" means the system for electronic document analysis and retrieval used for electronically filing most securities related information with the Canadian Securities Administrators;

xx) "**Shelton**" means the defendant Henry H. Shelton;

10

yy)    "**Stafford**" means the defendant Brian L. Stafford;

zz)    "**Sun Capital**" means Sun Capital Partners Group V, Inc., an affiliate of private equity firm Sun Capital Partners, Inc.;

aaa)    "**Torykian**" means the defendant Richard P. Torykian, Sr.;

bbb)    "**Transaction**" means PPA's sale of substantially all of its assets to PPE;

ccc)    "**TSX**" means the Toronto Stock Exchange;

ddd)    "**Vaughan**" means the defendant Deon Vaughan; and

eee)    "**Williams**" means the defendant Jason A. Williams.

2.    All monetary amounts below are in Canadian dollars unless otherwise specified.

**RELIEF SOUGHT**

3.    The Plaintiff claims on his own behalf and on behalf of the other Class Members:

a)    an order pursuant to the *CPA* certifying this action as a class proceeding and appointing him as representative plaintiff;

b)    a declaration that the Individual Defendants authorized, permitted and acquiesced in the release of core documents (as that term is defined in Part XXIII.1 of the *Securities Act*) and other (non-core) documents (as that term is defined in Part XXIII.1 of the *Securities Act*) by PPA that contained misrepresentations (as that term is defined in section 1(1) of the *Securities Act*);

c)    a declaration that the defendants Caldwell and Williams made public oral statements that they are alleged herein to have made, that they made such statements with actual, implied and apparent authority to make such statements on behalf of PPA, that such statements related to the business and affairs of PPA, and that such statements contained misrepresentations (as that term is defined in section 1(1) of the *Securities Act*);

d)    a declaration that the Individual Defendants authorized, permitted, and acquiesced in the making of the public oral statements referred to in clause (c) above;

e)    a declaration that, prior to the making of the Misrepresentations alleged herein, the Individual Defendants: (i) failed to conduct, and did not cause to be conducted, a reasonable investigation; and (ii) had reasonable grounds to believe that the documents and public oral statements referred to in clauses (b) and (c) above contained one or more misrepresentations;

f)    a declaration that the Individual Defendants are liable for the Misrepresentations;

g)    a declaration that the Misrepresentations were made negligently, or, in the alternative, recklessly, or, in the further alternative, fraudulently;

h)    a declaration that the Individual Defendants are liable for failures to make timely disclosure of the Material Changes;

i)    a declaration that the Individual Defendants permitted or acquiesced in, or influenced, PPA's failures to make timely disclosure of the Material Changes while knowing that there were failures to make such disclosure;

12

j)    a declaration that one of the following events (the Fundamental Change Event) fundamentally changed the nature of shareholders' investment in PPA:

i.    The U.S. Bankruptcy Court's approval of the Transaction on February 22, 2010; or

ii.    the Closing of the Transaction on March 5, 2010.

k)    a declaration that the Fundamental Change Event constituted or resulted in an involuntary disposition of PPA shares held by the Plaintiff and other Class Members;

l)    a declaration that Part XXIII.1 of the *Securities Act* applies to the involuntary disposition of the PPA shares held by the Plaintiff and other Class Members upon the Fundamental Change Event;

m)    a declaration that one or more of the Misrepresentations and/or one or more of the failures to make timely disclosure of the Material Changes caused or contributed to the involuntary disposition of PPA shares for the purpose of Part XXIII.1 of the *Securities Act;*

n)    a declaration that Bayshore, Farlie Turner, and the Individual Defendants conspired to conceal from PPA's shareholders positive material information relating to PPA's business, affairs, and operations (which information was required to be disclosed under the *Securities Act*) in order to cause harm to the Plaintiff and other Class Members;

13

o)    a declaration that Bayshore and Farlie Turner intentionally and unlawfully interfered with the Plaintiff's and other Class Members' economic relations with and interests in PPA;

p)    a declaration that the Defendants are jointly and severally liable for the full amount of the damages assessed in this action;

q)    assessment of damages in the amount of $100,000,000.00 or such other amount as this Court finds appropriate at the trial of the common issues or at a reference or references;

r)    assessment of punitive damages in the amount of $20,000,000;

s)    an order directing a reference or giving such other directions as may be necessary to determine issues not determined in the trial of the common issues;

t)    pre-judgment interest and post-judgment interest, compounded, or pursuant to sections 128 and 129 of the *CJA*;

u)    costs of the action on a substantial indemnity basis or in an amount that provides full indemnity, plus, pursuant to section 26(9) of the *CPA*, the costs of notice and of administering the plan to distribute the recovery in this action, plus applicable taxes; and,

v)    such further and other relief as this Honourable Court deems just.

14

## THE NATURE OF THIS ACTION

4. PPA was, at all material times, a public company and a reporting issuer, as defined in s. 1(1) of the *Securities Act*, in Ontario and other provinces in Canada. Its shares traded on the TSX under the symbol "PPA" until January 14, 2010, on which date the TSX suspended the trading of PPA's shares immediately following the Company's announcement that it had made a voluntary assignment into bankruptcy for the purpose of the Transaction. Trading in PPA's shares never resumed and its shares were subsequently delisted on or about February 19, 2010 following an expedited delisting review process by the TSX.

5. At all material times up to January 13, 2010, PPA was carrying on its business of designing and manufacturing concealable and tactical body armour. Its primary customers and target market included agencies of the U.S. Government such as the U.S. Marines and the U.S. Army.

6. During the Class Period, the Individual Defendants conspired with Bayshore and Farlie Turner to make the Misrepresentations and to conceal the Material Changes from the Company's shareholders in order to artificially deflate PPA's share price throughout the Class Period and cause an involuntary disposition of PPA shares at a value of nil, thus harming the Plaintiff and other Class Members. The Misrepresentations were never corrected nor were the Material Changes ever disclosed as required by the *Securities Act* and its regulations.

7. One of the most significant Material Changes, which PPA never disclosed at all, or in a full, true, and plain manner consistent with its obligations under the *Securities Act*, was the U.S. Army's awarding of the IOTV Contract to PPA on December 4, 2009. Throughout 2008 and 2009, PPA and the defendants Caldwell, Williams, and Giordanella had touted the IOTV

15

Contract as a highly valuable opportunity, potentially worth up to US$300,000,000 that would have a significant impact on the Company's revenue and outlook. Indeed, during that time

8. period, PPA structured its business and operations and made certain expenditures in anticipation of receiving the IOTV Contract.

9. On August 13, 2009, Point Blank Solutions, Inc., one of PPA's competitors, announced that it been awarded an IOTV contract by the US Army to produce up to 736,000 IOTV. That day, PPA's shares opened at $0.60 and closed at $0.425.

10. The next day, on August 14, 2009, PPA announced that it had not received the IOTV Contract. Following the announcement, PPA's share price continued to fall hitting a near-term low of $0.28 on August 19, 2009, a more than 50% decline from its price prior to any announcement of the awarding of contracts under the U.S. Army's IOTV Program.

11. Though PPA's share price subsequently rebounded in late September following PPA's announcement regarding MTV Contracts awarded to two corporate partners, the Plaintiff and Class Members expressly plead that the making of the Misrepresentations and failures to disclose the Material Changes caused PPA's shares to be artificially deflated throughout the Class Period. Moreover, the making of the Misrepresentations and failures to disclose the Material Changes caused or contributed to the involuntary disposition of PPA shares at a value of nil upon the Fundamental Change Event.

12. At no time during the Class Period did PPA disclose that it had decided to launch a formal protest of the U.S. Army's awarding of the IOTV Contract to a competing bidder or that it had in fact already filed one or more such protests. More significantly, PPA never disclosed during the

16

Class Period that, as a result of its protest(s), the U.S. Army had ultimately awarded the lucrative IOTV Contract to PPA.

13.     The Individual Defendants, with the assistance of Bayshore and Farlie Turner, carried on a scheme to delay or conceal the disclosure of positive material information, including the formal protest(s) to the US Army and ultimate awarding of the IOTV Contract to PPA, for their own self-interest and financial gain.   By hiding this highly material and very positive information from shareholders, the values of PPA's shareholder equity and PPA's assets were deflated.   In turn, PPA and its assets became more attractive targets for private equity firms and reduced PPA's prospects for refinancing and/or recapitalization.   Taking PPA private would benefit certain Individual Defendants owning secured debt of PPA and certain Individual Defendants who could secure favourable compensation arrangements with and/or equity interests in the acquiring entity while having the effect of unnecessarily wiping out shareholder value and causing massive losses to individual Class Members.

14.     The Misrepresentations and the failures to make timely disclosure of the Material Changes artificially deflated PPA's share price during the Class Period and caused or contributed to the Fundamental Change Event.   The Plaintiff and the other Class Members voluntarily disposed of their shares at artificially deflated prices and, upon the Fundamental Change Event, involuntarily disposed of their PPA shares at a value of nil and thus suffered damages.

**THE PLAINTIFF**

15.     The Plaintiff, Michael Frank, resides in Thornhill, Ontario.   He first acquired PPA shares in 2003 and continued to accumulate shares through late 2009.   He voluntarily disposed of

17

10,000 shares on October 7, 2009 (during the Class Period) and involuntarily disposed of 209,565 upon the Fundamental Change Event.

16. The Plaintiff expressly pleads that the Fundamental Change Event constituted or resulted in an involuntary disposition of his PPA shares.

**THE DEFENDANTS**

17. The defendant Farlie Turner is an investment bank based in Fort Lauderdale, Florida.

18. The defendant Bayshore is the broker dealer affiliate of Farlie Turner. Bayshore and Farlie Turner share the same principals and the same corporate headquarters. At all material times, Bayshore was under the direction of Farlie Turner, which had legal and/or de facto control of Bayshore.

19. The defendant Caldwell was CEO and a director of PPA between in and around July 2009 through January 20, 2010. He joined PPA in or around January 2009 as Senior Vice President, Sales and Marketing. As CEO, he signed Multilateral Instrument 52-109 certifying, among other things, that core documents of PPA did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." As a director and officer, he had control over, and authorized, permitted and/or acquiesced to the release of all documents issued by PPA to the market, the making of all public oral statements relating to PPA that contained a Misrepresentation, and all disclosures and non-disclosures of material information, including the Material Changes, during the Class Period. As described below, he also made certain public oral statements that contained misrepresentations

18

during the Class Period. He had actual, or, in the alternative, apparent or implied, authority to make those statements.

20. The defendant Giordanella was at all material times a promoter of PPA, as defined in section 1(1) of the *Securities Act* and an influential person, as defined by section 138(1) of the *Securities Act*. From on or about May 13, 2009, he was a consultant for PPA and, during the Class Period, held US$2,950,600.90 in Secured Debentures against PPA. He previously served as CEO from September 2006 to March 2009. He was also a director of PPA from in or around September 2006 to on or about June 17, 2009. Giordanella received and had access to undisclosed material information in the ordinary course and, directly or indirectly, exercised, or had the ability to exercise, significant power or influence over the business, operations, capital or development of PPA. He acted in conjunction with the Individual Defendants and, directly or indirectly, took the initiative in substantially reorganizing the business of PPA. During the Class Period, Giordanella knowingly influenced:

a) PPA and the other Individual Defendants acting on behalf of PPA to release documents containing the Misrepresentations;

b) the other Individual Defendants to authorize, permit or acquiesce in the release of documents containing the Misrepresentations;

c) Caldwell and Williams, who made the public oral statements containing the Misrepresentations, to make those public oral statements;

19

d)      the other Individual Defendants to authorize, permit or acquiesce in the making of
the public oral statements containing the Misrepresentations by Caldwell and
Williams; and

e)      PPA and the other Individual Defendants acting on behalf of PPA in the failure to
make timely disclosure of the Material Changes.

21.    The defendant Schwartzman was the Chief Operating Officer of PPA, which position he
had held since in or around July 2009 and became Acting CEO on January 20, 2010. He joined
PPA in April 2007 as its Chief Information Officer. As an officer of PPA, he had control over,
and authorized, permitted and/or acquiesced to the release of all documents issued by PPA to the
market, the making of all public oral statements relating to PPA that contained a
Misrepresentation, and all disclosures and non-disclosures of material information, including the
Material Changes, during the Class Period.

22.    The defendant Williams was at all material times the CFO of PPA, which position he had
assumed in or around May 2008. He joined PPA in August 2007 as the Corporate Controller.
As CFO, he signed Multilateral Instrument 52-109 certifying, among other things, that core
documents of PPA did "not contain any untrue statement of a material fact or omit to state a
material fact necessary to make the statements made, in light of the circumstances under which
such statements were made, not misleading with respect to the period covered by this report."
As an officer of PPA, he had control over, and authorized, permitted and/or acquiesced to the
release of all documents issued by PPA to the market, the making of all public oral statements
relating to PPA that contained a Misrepresentation, and all disclosures and non-disclosures of
material information, including the Material Changes, during the Class Period. As described
below, he also made certain public oral statements that contained misrepresentations during the

20

23. Class Period. He had actual, or, in the alternative, apparent or implied, authority to make those statements.

24. The defendant Vaughan was, at all material times, Senior Vice President, General Counsel and Secretary of PPA. She joined the Company in March 2008. As an officer of PPA, she had control over, and authorized, permitted and/or acquiesced to the release of all documents issued by PPA to the market, the making of all public oral statements relating to PPA that contained a Misrepresentation, and all disclosures and non-disclosures of material information, including the Material Changes, during the Class Period.

25. The defendant Moeller was, at all material times, a director of PPA, which position he had held since November 1995, and had formerly served as the Chairman of the Board. As a director, he had control over, and authorized, permitted and/or acquiesced to the release of all documents issued by PPA to the market, the making of all public oral statements relating to PPA that contained a Misrepresentation, and all disclosures and non-disclosures of material information, including the Material Changes, during the Class Period.

26. The defendant Stafford was, at all material times, a director of PPA. He also served as Chairman of the Board from on or about August 30, 2008 to March 18, 2009 and re-assumed this position on September 9, 2009. He also served as acting CEO of PPA for the period March 18, 2009 through July, 2009. As a director, he had control over, and authorized, permitted and/or acquiesced to the release of all documents issued by PPA to the market, the making of all public oral statements relating to PPA that contained a Misrepresentation, and all disclosures and non-disclosures of material information, including the Material Changes, during the Class Period.

21

27. The defendant Shelton was, at all material times, a director of PPA. Between March 18, 2009 and September 9, 2009 he served as Chairman of the Board for PPA. As a director, he had control over, and authorized, permitted and/or acquiesced to the release of all documents issued by PPA to the market, the making of all public oral statements relating to PPA that contained a Misrepresentation, and all disclosures and non-disclosures of material information, including the Material Changes, during the Class Period.

28. The defendant Engel was, at all material times, a director of PPA, which position he had held since May 2005. As a director, he had control over, and authorized, permitted and/or acquiesced to the release of all documents issued by PPA to the market, the making of all public oral statements relating to PPA that contained a Misrepresentation, and all disclosures and non-disclosures of material information, including the Material Changes, during the Class Period.

29. The defendant Jaumot was a director of PPA, which position he had held since January 2009. As a director, he had control over, and authorized, permitted and/or acquiesced to the release of all documents issued by PPA to the market, the making of all public oral statements relating to PPA that contained a Misrepresentation, and all disclosures and non-disclosures of material information, including the Material Changes, during the Class Period.

30. The defendant Torykian was, at all material times, a director of PPA, which position he had held since May 2007. As a director, he had control over, and authorized, permitted and/or acquiesced to the release of all documents issued by PPA to the market, the making of all public oral statements relating to PPA that contained a Misrepresentation, and all disclosures and non-disclosures of material information, including the Material Changes, during the Class Period.

22

31.    The defendant Peters was, at all material times, a director of PPA which position he had

held since January 2009.  As a director, he had control over, and authorized, permitted and/or

acquiesced to the release of all documents issued by PPA to the market, the making of all public

oral statements relating to PPA that contained a Misrepresentation, and all disclosures and non-

disclosures of material information, including the Material Changes, during the Class Period.

32.    All of the Individual Defendants resigned on the Closing Date.  On or about the Closing

Date, the defendant Jaumot accepted the role of Chief Restructuring Officer of PPA.

## PPA'S DISCLOSURE OBLIGATIONS

33.    PPA was, at all material times, a "reporting issuer" in Ontario as defined in the *Securities*

*Act* and, as such, it was required to file, *inter alia*, with SEDAR:

a)    quarterly interim financial statements, within 60 days from the end of the previous

quarter, that must include a comparative statement to the corresponding period in

the previous year;

b)    annual consolidated financial statements, within 140 days from the end of its last

financial year, including a comparison to the period covered by the preceding

financial year; and

c)    contemporaneously with each of the above, management's discussion and

analysis of each of the above financial statements.

34.    As a "reporting issuer" in accordance with section 1(1) of the *Securities Act*, PPA is

subject to the continuous disclosure provisions of Part XVIII of the *Securities Act*.

23

35.   PPA was, at all material times, a "responsible issuer" in accordance with section 138(1) of the *Securities Act* and is therefore, along with its directors, officers, and influential persons, subject to civil liability provisions for secondary market disclosure of Part XXIII.1 of the *Securities Act.*

**PPA'S HISTORY**

36.   PPA, together with its subsidiaries, was, at all material times prior to January 13, 2010, engaged in the design, manufacture and marketing of advanced products, including lightweight ceramic armour, composite-based products, and concealable soft body armour, used to provide ballistic protection for personnel and vehicles in the military and law enforcement markets.

37.   PPA was originally formed on November 1, 1995, in Alberta through the amalgamation of two Canadian companies and was named "Ceramic Protection Corporation." Prior to 2004, PPA's principal business activities were the manufacture and distribution of alumina and alumina-bonded silicon carbide products and the distribution of polyethylene materials to the industrial wear management and ballistic protection markets.

38.   In 2005, PPA expanded its sales of armour products to include ceramic personal armour plates and vehicle armour panels.

39.   In May 2006, PPA acquired PPI located in Sunrise, Florida for US$35,000,000 The purchase price was funded by a US$25,000,000 term loan and a US$10,000,000 share issuance. The acquisition of PPI expanded PPA's product portfolio to include a variety of soft armor products and provided PPA with an increased geographic scope and the opportunity for significant growth in the military and police armor markets. Thus, following the acquisition of

PPI, PPA shifted its focus toward soft armour and away from its traditional focus of ceramic armor.

40. Following the acquisition, PPA expanded its sales and marketing efforts to military and law enforcement channels and received significant orders, including an order valued at US$36,200,000 for MTVs from the U.S. Marines. In 2007, PPA received orders totalling US$63,000,000 from various branches of the U.S. military for soft armour.

41. On July 31, 2008, PPA completed a U.S. domestication process and incorporated in the State of Delaware. The domestication was completed by way of a Plan of Arrangement, pursuant to which PPA (then Ceramic Products Corporation) discontinued from the jurisdiction of Alberta into Delaware under the new name "Protective Products of America, Inc". The arrangement was approved by shareholder vote at a special meeting held on July 28, 2008. According to PPA, the purpose of this process was to enhance the Company's ability to participate in future U.S. military and agency contracts and programs.

42. On February 12, 2009, PPA announced that on February 10, 2009 it filed a registration statement on Form 10 with the SEC in order to register its common stock to become a reporting company under the Securities and Exchange Act of 1934.

43. In an "Information Statement" filed with the SEC on April 10, 2009, PPA described its contracting with the U.S. Government as follows:

> We generate the majority of our revenues under contracts with the U.S. Government, including the U.S. military. These contracts generally take one of two forms: a contract that provides for the production and delivery of a fixed quantity of specified products within a fixed timeframe for delivery; or an indefinite delivery/indefinite quantity, or IDIQ, contract, pursuant to which the U.S. Government customer may place orders for certain specified products up to a fixed aggregate dollar value, but which does not specify particular quantities or

provide for a fixed delivery schedule at the time the contract is entered into. We generally enter into contracts following an open, competitive solicitation issued by the U.S. Government. An open solicitation by the U.S. Government generally results in contract awards being allocated to a number of successful bidders and not solely to one company. Following entry into an IDIQ contract, the U.S. Government customer places individual delivery orders for specific quantities of products at prices that are agreed upon following submission of the delivery order; the delivery order also specifies the timetable for delivery of the products. Given the length of time required to conduct an open solicitation, a U.S. Government customer may need to purchase additional products prior to a new solicitation being completed, referred to as bridge buy orders. Under a bridge buy order, which we receive from time to time, the U.S. Government customer is able to continue to purchase products from us under a contract that has previously expired, potentially at different pricing than was in effect under the original terms of the contract. There can be no assurance that we will receive any future bridge buy orders, or as to the dollar value of any bridge buy orders we do receive.

## PPA'S LIQUIDITY AND CAPITAL STRUCTURE

44.   At all material times, PPA's authorized capital stock consisted of 40,000,000 shares of common stock, $0.001 par value per share, and 10,000,000 shares of preferred stock, $0.001 par value per share.   At all material times, there were 13,762,557 shares of common stock outstanding. As of January 14, 2010, PPA had approximately 1000 shareholders.

45.   In 2006, PPA's revenue was $76,877,000 or approximately US$67,793,000.  In 2007 and 2008, PPA reported record annual revenue of US$73,746,000 and US$85,366,000 respectively. For the nine months ended September 30, 2009, PPA's revenue was US$24,164,000 versus US$65,250,000 for the prior year period.

46.   During the year ended December 31, 2008, PPA derived 82% of its revenue directly from the United States military, and 2% of its revenue from other government agencies. During the year ended December 31, 2007, it generated 92% of its revenues directly from the United States military, and 2% of its revenues from other government agencies.

26

47.    Since the beginning of 2007, PPA relied primarily on debt and equity financing to fund its operations, including a senior secured revolving credit facility with CIBC (the "Credit Facility"). Under the terms of the Credit Facility, CIBC held first priority liens on, and security interests in, substantially all of PPA's assets.

48.    Throughout 2008 and 2009, PPA succeeded in paying down a significant portion of amounts owing under the Credit Facility. The outstanding balance of the Credit Facility was US$12,400,000 as of December 31, 2007. The outstanding balance was US$10,600,000 on September 30, 2008 and, by September 30, 2009, was US$6,600,000.

49.    PPA had also secured a term loan of $25 million in or around May 2006 to facilitate its acquisition of PPI, which acquisition was critical to the Company shifting its focus to the soft armour business and securing contracts with the U.S. military. The balance on this secured term loan was nil as of September 30, 2008.

50.    In August and September 2007, PPA issued US$5,100,000 in principal value of Secured Non-C Debentures at an interest rate of 12.0% per annum, due to mature 2 years from the date of issuance. Of this US$5,100,000 total amount, US$3,400,000 was scheduled to mature in August 2009, and US$1,700,000 was scheduled to mature in September 2009, prior to any renegotiation of terms.

51.    In February and March 2008, PPA also issued $6,000,000 of Secured C Debentures at an annual interest rate of 10.0% per annum, due to mature in February 2011. The debentures had a conversion price of US$6.57 per share.

52.    In or around February 2008, PPA also completed a public offering of common stock for net proceeds of US$14,100,000.

53.   The Secured Debentures gave holders a security interest in all of PPA's undertaking, business, property and assets, which security interest was subordinate to CIBC's security interest under the Credit Facility.  The subordination provisions of the Secured Debentures prohibited payment of interest and principal to holders in the event of PPA's default under the Credit Facility.

54.   At all material times, the defendant Giordanella, through the Stephen Giordanella Revocable Trust, held Secured Debentures in the amount of approximately US$2,950,600.90.

55.   The defendant Moeller, through Balinhard Corporation, which he directly controlled, held Secured Debentures in the amount of approximately US$2,950,600.90.

56.   The defendant Stafford and the defendant Shelton each held Secured Debentures in the amounts of approximately US$216,407.81 and US$162,305.86 respectively.

57.   Since at least the time of the issuance of the debt securities in 2008, PPA had been in default of its Credit Facility during certain fiscal quarters and remained in default throughout the Class Period. Due to PPA's defaults with CIBC, the Credit Facility had been amended several times since its inception. In January 2009, the Company and CIBC entered into the Forbearance Agreement which extended the maturity of PPA's credit to on or about June 30, 2009.

58.   On or about June 30, 2009, PPA announced that it had entered into a first amending agreement to the Forbearance Agreement under which CIBC agreed not to exercise any remedies with respect to existing defaults by PPA under the Credit Facility until the earliest of (i) October 31, 2009, (ii) any other default by PPA under the Credit Facility, or (iii) any breach by PPA of the Forbearance Agreement.

59. PPA and CIBC later executed a second amending agreement to the Forbearance Agreement on or about December 24, 2009, under which CIBC provided an additional US$700,000 in financing to PPA and extended its forbearance through January 8, 2010. This second amended agreement to the Forbearance Agreement and additional financing to PPA was never disclosed to PPA's shareholders.

60. As of September 29, 2009, PPA had total assets valued at US$26,600,000 and total liabilities valued at US$29,100,000.

61. As of January 12, 2010, borrowings under the Credit Facility totalled approximately US$7,602,760.

**THE IMPORTANCE OF THE IOTV CONTRACT**

62. In early 2008, the U.S. Army issued a major solicitation for 736,000 IOTV and PPA participated in the bid. PPA estimated that, if it received a contract under the US$1.0 billion IOTV Program, it could receive up to US$300,000,000 over three to five years. Throughout 2008 and 2009, PPA's senior management represented to shareholders that bidding on the IOTV Contract represented a significant and valuable opportunity for the Company.

63. The IOTV Contract is an ID/IQ contract. Under an ID/IQ contract, the issuer is obligated to purchase certain minimum quantities. Each delivery order is issued as a release against a maximum amount, which, as stated above, PPA estimated would be up to US$300,000,000.

64. The importance of the IOTV Contract to PPA was reflected in the following statement by then CEO Giordanella during the November 2008 Conference Call:

> We continue to be very optimistic about the prospect of participating in the IOTV program with the U.S. Army. We've built the infrastructure needed to execute

the program from tight quality control procedures to solid production capabilities. We are a little disappointed to have seen the process delayed due to protests from a manufacturer who was excluded from the competition. We expect that the protest to be resolved shortly and at the Army's request, we extended our bid by 90 days. We are hopeful to receive word on this contract by end of the year. In the meantime, we are prepared to meet the aggressive delivery requirements outlined by the Army. **Our planning for the IOTV award has resulted in higher staffing levels than we would have carried based solely on our third-quarter revenues.** We are also looking out to early 2009 in the expectations of a new and sizable solicitation for the Marines for the next generation of MTV. **While this staffing has a short-term impact of increasing SG&A, we believe it is critical that we remain fully prepared to meet the demands of two significant opportunities that we believe will provide multiyear revenue streams for our Company.**

. . . .

While we appreciate that everyone is waiting to hear about an IOTV award and waiting to hear about a more permanent solution to our working capital needs, we are confident that we will see a resolution in both cases.

. . .

. . . We appreciate that our financial results don't yet demonstrate the progress we are making on repositioning this business. We are in a transition and we know our investors have concerns particularly in this kind of market environment. Even so, we are confident that we are well prepared for the challenges in front of us. The recent activity in the stock has made it clear that the market doesn't really understand how much progress we have made and where we're going. **So let me be very clear about our vision and where we are going. We have exited the ceramic manufacturing business and have repositioned ourselves as an integrator of ceramic plates. We are now going to focus on our core competencies around soft armour. I see a clear future that is made up of continuing MTV business, IOTV business, and a market leading domestic law enforcement and DHS business.** The Company has taken steps to enter the international arena and has very definitive opportunities in the near future. (emphasis added)

65. During the November 2008 Conference Call, the following exchanges in respect of the

IOTV Contract took place between various analysts and Giordanella and Williams:

**Doug Cooper** (Paradigm Capital): Good, just to remind us, the IOTV program is how much and over what period?

30

Giordanella: The IOTV program is – the total program is about $1 billion and it's over a three- to five-year period. And as we noted earlier, the only reason it's been delayed and we heard this from contracting is because of protests in place from another vendor.

. . .

Robert Catellier (Clarus Securities): Okay, then I know it's difficult to really answer this but I'd like a little bit more clarity on your banking situation with CIBC. In your MD&A, I believe you stated that a new maturity date should be finalized shortly and failing the announcement of the IOTV award, I don't see a big probability of being able to replace that facility. So I'm curious on two points. One, what are they hearing to be able to have the confidence to leave your line of credit outstanding with no encumbrances. And two, what level of confidence could they possibly have that the line would be replaced?

Williams: We are working with CIBC in terms of laying out a very specific plan. In essence a milestone-driven plan to either further reduce our outstanding balances and continue the relationship or to replace the relationship. So it is – we've engaged in active dialogue there. They are aware of the fact that we've brought in investment professionals to assist us in the replacement facility process. And are again confident or we are expressing our confidence in our ability to participate in future revenue streams, i.e., the IOTV program as well as the MTV program and just demonstrating past performance and our ability to secure programs to lend to our credibility for our future confidence there.

. . .

Robert Catellier (Clarus Securities): So it is the combination of your proven ability to bring down the bank debt even in difficult circumstances and your positioning vis a vis some of the new awards that is giving them that comfort?

Giordanella: They understand the plan in the event – and I clearly understand your position of without an IOTV, where does the company go? We have shared that plan with CIBC or are in a process of sharing it with them, showing them that we will be with a positive EBITDA and positive profits along that way. Fortunately, I truly do not believe that's going to be the case at all. I feel very, very confident in IOTV. But in the event that something does happen, we are sharing our go-forward plan with the bank.

. . .

Pierre Boucher (Analyst): Okay. Last question, in terms of the IOTV, if you won a portion of that contract, what kind of an operating line do you think you would need to be able to deal with that contract?

Williams: Again, estimating I would say something similar to what we've had, what we've maintained in the past, something between, say, a $15 million, $20 million range.

**Pierre Boucher:** Okay.

> **Williams:** Pierre, I would guess $15 million would be sufficient. Like I said earlier, we have very, very good working relationships with our vendors and in an award like this, the payment schedule is very quick. We deliver, we get paid in 30 days. So cash flow would be very strong.

(emphasis added)

66. Further, throughout 2008 and 2009 while PPA awaited the U.S. Army's decision regarding the awarding of the IOTV Contract, PPA issued news releases to update its shareholders on the status of its bid for the IOTV Contract. For example, it issued the following release on December 13, 2008 to disclose to shareholders that the U.S. Army had requested an extension of the proposal acceptance period for the IOTV Program:

> **Protective Products Of America, Inc. Announces Corporate Update And Senior Management Promotion**
>
> Protective Products of America, Inc. (PPA:TSX), a leading manufacturer and distributor of advanced products in ballistics protection, today announced the following update on its corporate strategic initiatives:
>
> The Company announced that it has received notification from the U.S.Army of an extension of the proposal acceptance period for the Improved Outer Tactical Vest (IOTV) Program until March 30, 2009. The delay is the result of a dispute from a competing manufacturer that had been previously disqualified.

67. PPA issued another release on March 13, 2009 to disclose to shareholders that the U.S. Army had requested a further extension of the proposal acceptance period for its IOTV Program:

> SUNRISE, FL, March 13 /PRNewswire-FirstCall/ - Protective Products of America, Inc. (PPA:TSX), a leading manufacturer and distributor of advanced products in ballistics protection, today announced that it has received notification from the U.S. Army of an extension of the proposal acceptance period for the Improved Outer Tactical Vest (IOTV) Program until July 31, 2009.
>
> Stephen Giordanella, Chief Executive Officer, said, "Although we are disappointed by the delay in the bidding process, we are still very optimistic about the outcome, as we believe we are one of the few companies that can manufacture the IOTV to U.S. Army specifications. As the sole supplier of the Modular

32

> Tactical Vest (MTV) to the U.S. Marine Corps, we have had a successful record
> with the military and we can quickly ramp up to meet demand once the IOTV
> contracts are awarded."

68.   PPA issued a release on August 3, 2009, to advise that the U.S. Army had again requested

an extension of the proposal acceptance period for its IOTV Program:

> SUNRISE, FL, Aug. 3 /CNW/ - Protective Products of America, Inc. (PPA:TSX),
> a leading manufacturer and distributor of advanced products in ballistics
> protection, today reported that the U.S. Army has requested an extension of the
> proposal acceptance period for the Improved Outer Tactical Vest (IOTV) Program
> until August 15, 2009. PPA will provide a further update on the outcome of its
> proposal subsequent to the acceptance deadline. . .

## THE RETAINER OF FARLIE TURNER AND BAYSHORE

69.   On or about June 16, 2009, in face of the continuing defaults under the Credit Facility and

delays in the awarding of the IOTV Contract, PPA engaged Farlie Turner and Bayshore.  PPA

issued a press release on or about June 22, 2009 advising that Farlie Turner and Bayshore had

been retained "to help the [C]ompany pursue strategic alternatives intended to maximize its

value."  In this press release, the defendant Williams stated:  "We have selected Farlie Turner &

Co., LLC given their success in providing valuable advisory expertise and the firm's local

presence here in South Florida. We believe they will help us identify and implement the best

strategic option to guide our Company through the next phase of our business development."

70.   According to materials filed with the U.S. Bankruptcy Court by PPA on January 13, 2010,

Farlie Turner and Bayshore were purportedly retained by PPA "to assist [PPA] in evaluating [its]

strategic options with respect to the sale or recapitalization of [its] businesses and related assets

both as a going concern outside of bankruptcy or in the context of a potential chapter 11

bankruptcy filing."  These materials further indicated that Farlie Turner and Bayshore's mandate

"included **conducting an extensive marketing process to** potential strategic buyers operating within PPA's industry as well as to private equity firms, various lending institutions, and **PPA's existing debt holders and shareholders.**" (emphasis added)

71. According to materials filed with the U.S. Bankruptcy Court by PPA on January 13, 2010, Farlie Turner and Bayshore were significantly involved in various due diligence activities including creating management presentations, assembling data requests, and answering specific requests by potential buyers and capital providers. It also prepared a confidential investment memorandum with detailed information on PPA's business, strategy, market position, growth opportunities, and historical and projected financial performance.

## MISREPRESENTATIONS IN AUGUST 2009

72. In early August 2009, PPA's securities were trading between $0.55 and $0.65. On August 13, 2009, PPA opened at $0.60 and closed at $0.425. That same day, one of PPA's main competitors, Point Blank Solutions, announced that it been awarded an IOTV contract by the US Army to produce up to 736,000 IOTV.

73. On August 14, 2009, PPA announced that it had not been awarded the IOTV Contract. On this news, the price of PPA shares plummeted from its previous days' close of $0.425 to $0.28 by August 19, 2009. PPA's shares continued to fall, hitting a low of $0.175 on September 29, 2009.

74. In the MD&A Q2/09, PPA stated that its failure to obtain the IOTV negatively impacted PPA's revenue, outlook, and ability to continue as a going concern. It did not mention, however, that PPA had reasonable grounds to file, had decided to file, or had in fact filed one or more

formal protest(s) with the U.S. Army in respect of the awarding of the IOTV Contract to a

competing bidder.

75.   The "Outlook" section of the MD&A Q2/09 provided:

> In early 2008, a major solicitation was issued by the U.S. Army for the IOTV. We
> bid on the solicitation in April 2008 and recently, upon written request from the
> U.S. Army, provided an extension of the proposal acceptance period through
> August 15, 2009. On August 13, 2009, we received written notice from the Army
> that we were not selected for an award under this solicitation. As a result, we
> expect our current year revenues from the U.S. military will be substantially lower
> than 2008 levels.
>
> We currently supply soft armour and other products to federal, state and local law
> enforcement agencies throughout the United States. With the recent change in the
> National Institute of Justice standard for ballistic resistance of body armour, we
> anticipate that the domestic law enforcement market will expand in the latter part
> of 2009 and beyond. Furthermore, we believe that we will be able to capture
> additional market share through our expanded sales representation across the
> United States. We continue to supply protective products to the Department of
> Homeland Security. We plan to build on this strategic relationship and seek
> similar opportunities with other federal agencies.

76.   Under "Going Concern", the MD&A Q2/09 provided:

> For the six months ended June 30, 2009, we incurred a net loss from continuing
> operations of $4.5 million. Additionally, for the same period, cash used in
> operating activities of our continuing operations was $1.3 million. We have relied,
> in part, upon debt financing to fund our operations. As of June 30, 2009, we were
> not in compliance with any of the financial covenants in our Amended and
> Restated Credit Agreement. Further, we had outstanding indebtedness of $17.1
> million including $5.9 million outstanding under our line of credit, and $0.8
> million in cash on hand.
>
> In early 2008, a major solicitation was issued by the U.S. Army for the IOTV. We
> bid on the solicitation in April 2008 and recently, upon written request from the
> U.S. Army, provided an extension of the proposal acceptance period through
> August 15, 2009. On August 13, 2009, we received written notice from the Army
> that we were not selected for an award under this solicitation. As a result, we
> expect our current year revenues from the U.S. military will be substantially lower
> than 2008 levels.

77. Under "Revenue", the August MD&A provided:

> In early 2008, a major solicitation was issued by the U.S. Army for the IOTV. We bid on the solicitation in April 2008 and recently, upon written request from the U.S. Army, provided an extension of the proposal acceptance period through August 15, 2009. On August 13, 2009, we received written notice from the Army that we were not selected for an award under this solicitation. As a result, we expect our current year revenues from the U.S. military will be substantially lower than 2008 levels.

78. Under "Risks Relating to Our Business and Operations", the August MD&A stated as follows:

> We depend on the U.S. Government for a substantial amount of our sales, and the loss of, or a significant reduction in, U.S. military business could have a material adverse effect on our business, financial condition, results of operations and liquidity.
>
> . . .
>
> In early 2008, a major solicitation was issued by the U.S. Army for the IOTV. We bid on the solicitation in April 2008 and recently, upon written request from the U.S. Army, provided an extension of the proposal acceptance period through August 15, 2009. On August 13, 2009, we received written notice from the Army that we were not selected for an award under this solicitation. As a result, we expect our current year revenues from the U.S. military will be substantially lower than 2008 levels.
>
> Additionally, the U.S. military funds much of its contracts in annual increments, which require subsequent authorization and appropriation that may not occur or that may be greater than or less than the total amount of the contract. Changes in the U.S. military's budget, spending allocations and the timing of such spending could adversely affect our ability to receive future contracts. Due to our relatively modest size, our winning or losing a large contract may have the effect of substantially changing or distorting our overall financial results.
>
> Reductions in our sales under government contracts, unless offset by other military and commercial opportunities, could have a material adverse effect on our business, financial condition, results of operations and liquidity.

79. In a press release issued on August 14, 2009 in conjunction with PPA's Q2/09 financial results, Caldwell made the following statement:

> We have been notified by the U.S. Army that we were not a recipient of the Improved Outer Tactical Vest (IOTV) Program contract. While this was not the outcome we had hoped for, we remain confident that the strategies we are implementing to diversify our sales mix will position us to increase market share in higher margin areas of the business. We have made notable progress with other near-term military contracts as well as government agency domestic and international programs, which we believe could generate considerable revenue in the coming quarters. . . As we move through the second half of the year, we are beginning to see signs of an improved sales environment supported by our expanded sales force and aggressive marketing efforts. We are further escalating our presence in the ballistics market through several key strategic distribution partnerships with multinational security providers. We believe these relationships will bolster our ability to capture additional sales at the local law enforcement level, with government agencies, and in certain commercial sectors where we continue to see opportunity.

80. During the August 2009 Conference Call, Caldwell had the following exchange with an analyst from Nicusa Capital:

> Paul Johnson (Nicusa Capital): I guess my last question is on IOTV. I know the Company was very keen on at least winning part of the business. Obviously, you've got the announcement they weren't. I just want to make sure I've calibrated this. It sounds like, the best we can tell, is that price became a bit of a driver in this and perhaps, as they often say, it would've been -- the good news, bad news. Given your other efforts, winning the contract, obviously, would've been nice, particularly at the pricing you submitted. I get the sense, though, that some of the competitors were awfully aggressive in their bids. I assume you'd just as soon not win it at their price. You would've been happy to win it at your price.
>
> Caldwell: I think that's a pretty good assessment, Paul, even though we don't have all of the information yet. But, in all candour, we were very aggressive when we submitted our bid. We priced our vests in such a way that we could earn a reasonable level of profit and help the return for our shareholders. We believe our price was a fair price to the Army and to our Company and, equally as important, to our shareholders. Our analysis suggests, right now, that one of the factors in the award is that other vendors submitted bids that were significantly lower than ours. We don't have any particular information to back it up, but we think that's what happened. And while not having a significant, if any cost advantage, to us, it would've been challenging for our organization to earn a reasonable profit, or any profit, at the price that we believe where the award came in. And so, although we are somewhat disappointed, I guess, to a small degree,

**not to be selected, we feel strongly that we followed a strategy that was in the best interests of all of our stakeholders. And we just look forward to the opportunities that are coming down the road.** (emphasis added)

81.    During the August 2009 Conference Call, Caldwell and Williams had the following

exchange with Patrick Potvin, an analyst with Fiera Capital:

> **Patrick Potvin (Fiera Capital):** Second question, still on the balance sheet. The inventory got increased by not quite but very close to $1 million. Could you explain how come you increased your inventory, even though the contracts were -- it's not IOTV, obviously. You didn't start before you, if you were, awarded the contract or not. So how come the inventory is increasing?
>
> **Williams:** Very fair. Very good question, Patrick. The increase is principally attributable to the sales order that got pushed quarter over quarter, in terms of timing. We had a shipment that went out at the end of second-quarter 2009. But because of revenue recognition rules here in the States, we could not confirm delivery in advance of the period close. So we had to push that revenue into the third quarter. So, as such, it's shown as inventory in transit, and essentially the reason for the increase there. So we build specific to an order with the Marine Corps, and it does basically represent our cost of – that's shipped in the second quarter, but will be recognized in the third quarter.
>
> **Patrick Potvin:** Pat, you just said -- well, no, we got turned down by one pretty girl, but there are others. And to describe the other ones, you had the domestic market and the international market, and I get the picture of those markets and those opportunities, but do you have still hopes or do you still have some other pretty girls in the military in the U.S.?
>
> **Caldwell:** No question about it. We have opportunities that are coming down the road very shortly, and right now, we are preparing proposals on one opportunity. We've completed a proposal on another opportunity, and are just waiting to hear back, which -- there is no way we can put a date certain on it, as we've already learned through the IOTV process. But we've -- we're excited about the possibilities, but we don't want to count on any particular business coming down the road. We're going to pursue all three markets as hard as we can -- the military, domestic, and international, and just continue to develop our business.

82.    Based on the facts particularized in paragraphs (70) through (79) above, PPA had

represented to its shareholders that it had failed to receive the IOTV Contract and, with no

further prospect of receiving the IOTV Contract, the Company was turning the corner. However,

38.

it omitted the material fact that PPA had reasonable grounds to file, had decided to file or had in fact filed one or more formal protests with the U.S. Army in respect of the awarding of the IOTV Contract to a competing bidder. This positive material fact was necessary to make PPA's statements regarding its inventory levels, revenue, financial condition and outlook not misleading in the light of the circumstances in which those statements were made.

83. Further, the "Outlook" section of the MD&A Q2/09 also provided:

> Our contract with the U.S. Marine Corps is expected to be substantially completed during the third quarter of 2009. As such, we have **identified a number of opportunities for sales of our, or complimentary, product lines under U.S. military programs. These opportunities include open bid solicitations with the U.S. militaries, and subcontractors thereof, for products related, or similar, to the MTV.** We cannot provide assurances as to the timing or quantity of new orders that may materialize from our initiatives. (emphasis added)

84. PPA omitted the material fact that it had secured potentially lucrative partnership agreements with HUBZone-certified companies Carter Enterprises and Ibiley Manufacturing on July 15, 2009 and July 23, 2009 respectively. Certain contracts for U.S. Government agencies are only available to contracting companies located in HUBZones in order to promote job growth, capital investment and economic development in those areas. Since PPA did not operate in a HUBZone, it sought out partnerships with certified HUBZone companies. The positive material facts that it had successfully entered into such partnerships were necessary to make PPA's statements regarding its financial condition and outlook not misleading in light of the circumstances in which those statements were made. Full particular's of PPA's agreements with Carter Enterprises and Ibiley Manufacturing are unknown to the Plaintiff.

39

## CARTER AND IBILEY ARE AWARDED THE MTV CONTRACTS

85.    On or about September 29, 2019, after markets had closed, PPA announced that the two companies with whom it had partnered under previously undisclosed partnership agreements, Carter Enterprises and Ibiley Manufacturing. would be participating in the U.S. Marine's MTV Program. The value of Carter Enterprises' MTV Contract was US$414,427,770 and it received an initial delivery order in the amount of US$78,936,987.  Ibiley also received a significant initial delivery order.

86.    Based on its partners Carter Enterprises and Ibiley Manufacturing having received the MTV Contracts, PPA estimated that it could receive up to a maximum value of US$289,000,000 through 2014 by acting as the sub-contractor to the MTV Contracts.  Based on its partnership agreements with Carter Enterprises and Ibiley Manufacturing, under which PPA would serve as the exclusive ballistics provider to each company, PPA estimated that it would receive between US$50,000,000 and US$60,000,000 in revenue on these orders over a twelve to twenty-four month period commencing in the early portion of 2010.  Full particulars of the MTV Contracts are unknown to the Plaintiff.

87.    As a result of the announcement, PPA's shares rocketed from its closing price of $0.33 on September 29, 2009 (having hit an intraday low of $0.175) to a high of $2.20 by October 5, 2009.

## MISREPRESENTATIONS IN NOVEMBER 2009

88.    In its MD&A Q3/09, PPA again represented that its failure to obtain the IOTV Contract had negatively impacted PPA's revenue, outlook, and ability to continue as a going concern.  It did not state, however, that PPA had decided to file or had in fact filed one or more formal

40

protests with the U.S. Army in respect of the awarding of the IOTV Contract to a competing

bidder.

89.   Both the "Outlook" and "Revenue" sections of the MD&A Q3/09 provided:

> In early 2008, a major solicitation was issued by the U.S. Army for the IOTV. We
> bid on the solicitation in April 2008 and on August 13, 2009, we received written
> notice from the U.S. Army that we were not selected for an award under this
> solicitation.

90.   Under "Risks Relating to Our Business and Operations", the August MD&A stated as

follows:

> We depend on the U.S. Government for a substantial amount of our sales, and the
> loss of, or a significant reduction in, U.S. military business could have a material
> adverse effect on our business, financial condition, results of operations and
> liquidity.
>
> • • •
>
> In early 2008, a major solicitation was issued by the U.S. Army for the IOTV. We
> bid on the solicitation in April 2008 and recently, upon written request from the
> U.S. Army, provided an extension of the proposal acceptance period through
> August 15, 2009. On August 13, 2009, we received written notice from the Army
> that we were not selected for an award under this solicitation. As a result, we
> expect our current year revenues from the U.S. military will be substantially lower
> than 2008 levels.
>
> Additionally, the U.S. military funds much of its contracts in annual increments,
> which require subsequent authorization and appropriation that may not occur or
> that may be greater than or less than the total amount of the contract. Changes in
> the U.S. military's budget, spending allocations and the timing of such spending
> could adversely affect our ability to receive future contracts. Due to our relatively
> modest size, our winning or losing a large contract may have the effect of
> substantially changing or distorting our overall financial results.
>
> Reductions in our sales under government contracts, unless offset by other military
> and commercial opportunities, could have a material adverse effect on our
> business, financial condition, results of operations and liquidity.

41

91.   Based on the facts particularized in paragraphs (87) and (88) above, PPA had represented to its shareholders that it had failed to receive the IOTV Contract, had absolutely no prospect of receiving it, and that this would have a materially adverse effect on its business, financial condition and outlook. However, PPA omitted the material fact that it had decided to file or had in fact filed one or more formal protests with the U.S. Army in respect of the awarding of the IOTV Contract to a competing bidder. This fact was necessary to make PPA's statements regarding its business, financial condition and outlook not misleading in the light of the circumstances in which those statements were made.

## PPA IS AWARDED THE IOTV CONTRACT

92.   On or about December 4, 2009, PPA was notified by the U.S. Army that it had been awarded the IOTV Contract.   PPA never disclosed this significant positive information to its shareholders. The U.S. Army awarded the IOTV Contract to PPA after having received one or more formal protests from the Company on or after August 14, 2009.   Full particulars of the IOTV Contract are unknown to the Plaintiff.

## PPA AND SUN CAPITAL EXECUTE A LETTER OF INTENT

93.   On December 21, 2009, PPA and Sun Capital executed the LOI pursuant to which Sun Capital proposed to acquire, subject to due diligence, substantially all of PPA's assets, including the IOTV Contract and PPA's subcontracting rights under the MTV contracts, for approximately US$8,000,000 in cash.   The LOI permitted PPA to retain its interest in several tax refunds valued at approximately US$5,500,000.   The execution of the LOI by Sun Capital was never disclosed to PPA's shareholders.

## PPA'S FORBEARANCE AGREEMENT IS EXTENDED

94. Following the expiry of the Forbearance Agreement on or about October 31, 2009, PPA did not provide its shareholders with any update on material developments in respect of PPA's financing situation, including the status of its Credit Facility with CIBC.

95. Unbeknownst to PPA's shareholders, PPA and CIBC executed a second amending agreement to the Forbearance Agreement on or about December 24, 2009 under which CIBC provided an additional US$700,000 in financing to PPA and extended its forbearance through January 8, 2010. This extension of the Forbearance Agreement and additional financing to PPA was never disclosed to PPA's shareholders.

## THE INCORPORATION OF PROTECTIVE PRODUCTS ENTERPRISES

96. On January 7, 2010, Sun Capital incorporated an affiliate company, PPE, in Delaware to serve as the acquiring entity of PPA. The defendant Schwartzman is the President, Secretary and a Director of PPE. The defendant Williams is the Vice President and Treasurer of PPE. Thomas Taylor and and Donald Mueller, both of Sun Capital, are also directors of PPE. At no time during the Class Period did PPA or the Individual Defendants disclose the potential or actual conflicts of interest of certain Individual Defendants, including Caldwell, Schwartzman, and Williams, arising from their negotiations for future compensation from or equity interests in PPE, which negotiations were collateral to negotiations relating to the Transaction.

43

**PPA AND PPE ENTER INTO THE ASSET PURCHASE AGREEMENT**

97.   On January 12, 2010, PPA entered into an APA with PPE pursuant to which they agreed to enter into the Transaction. PPE entered the APA as a "stalking horse" bidder, and the purchase of the assets was subject to PPA's solicitation of higher or otherwise better offers pursuant to specified bidding procedures and an auction process to be conducted under the supervision of the U.S. Bankruptcy Court.

98.   The APA for the sale of substantially all of PPA's assets to PPE was not subjected to a vote of the common shareholders.

99.   The existence of the APA was not disclosed to PPA's shareholders until on or about January 14, 2010, the day after PPA's voluntary assignment into bankruptcy for the purpose of the Transaction.

**PPA'S VOLUNTARY ASSIGNMENT INTO BANKRUPTCY**

100.   On January 13, 2010, PPA and each of its four subsidiaries filed a voluntary petition for Chapter 11 reorganization and obtained approval for the Transaction from the U.S. Bankruptcy Court for the Southern District of Florida. The terms of the Transaction were for PPA to sell substantially all of its assets and businesses as a going concern for approximately US$8,000,000. Excluded from the sale were certain tax refunds valued by PPA at US$5,500,000. These refunds were to remain with PPA for the benefit of its creditors, including the defendants Giordanella, Moeller, Shelton, and Stafford who held Secured Debentures, subordinate to CIBC's security interest, in the total amount of approximately US$6,279,915. The Transaction was subject to any higher bid that PPA might receive within 35 days via a stalking horse auction process:

44

101. On January 13, 2010, PPA shares closed at approximately $0.59. On January 14, 2010, PPA issued a press release in which it announced that it had filed for Chapter 11 the previous day. Upon PPA's announcement, the TSX suspended the trading of PPA shares effective immediately and announced an expedited delisting review of PPA's shares.

102. In support of the bankruptcy filing on January 13, 2010, the defendant Schwartzman swore an 87-paragraph declaration on January 12, 2010, only one paragraph of which addressed the IOTV Contract under the heading "Prior Cost-Cutting Initiatives" as follows (at para. 27):

> In early 2008 a major solicitation was issued by the U.S. Army for the IOTV. PPA bid on the solicitation in April 2008 and on August 13, 2009, PPA received written notice from the U.S. army that PPA was not selected for an award under this solicitation. **After the filing of protest(s) concerning such award, on December 4, 2009, PPA was notified by the U.S. Army that PPA would be participating in the IOTV award. Since the award would be pursuant to an IDIQ (Indefinite Delivery Indefinite Quantity) contract, PPA is unable to estimate the amount, if any, that would be awarded to PPA.** (emphasis added)

103. The awarding of the IOTV Contract to PPA was never disclosed to PPA shareholders. PPA released the body of the APA but did not release the schedules thereto that described the acquired assets (and would have revealed that PPA had been awarded the IOTV Contract) and indicated that, for purposes of the Transaction, PPA had refused to value the IOTV Contract and its exclusive partnership agreements with Carter Enterprises and Ibiley Manufacturing. These schedules were only filed with the U.S. Bankruptcy Court on February 22, 2010, on which date the U.S. Bankruptcy Court approved the Transaction. In any event, they were never disclosed to the Plaintiff or the other Class Members during the Class Period.

## POST-FILING ARRESTS OF CALDWELL AND GIORDANELLA

104. On January 18, 2010, five days after the Company's voluntary bankruptcy filing, Caldwell and Giordanella, along with twenty other executives and employees of companies in the military

45

and law enforcement products industry, were arrested and indicted for engaging in schemes to bribe foreign government officials to obtain and retain business between in or around May 2009 through in or around September 2009. The indictments stemmed from an FBI undercover operation that focused on allegations of foreign bribery in the military and law enforcement products industry.

105. Following his arrest and indictment, Caldwell was placed on administrative leave from his position as CEO and as a member of the Board of Directors. Schwartzman assumed the position of Acting CEO as of January 20, 2010.

106. As a result of the indictments of Caldwell and Giordanella, and the increased risk of the Transaction, PPA and PPE executed an amended and restated APA on February 4, 2010, under which PPE would pay the same purchase price of approximately US$8,000,000 and, in addition to the assets PPE would have received under the original APA, it would also receive the first US$2,000,000 of tax refunds and 57% of any additional refunds in excess of US$2,000,000. PPA would no longer retain all of the tax refunds (estimated at $5.5 million) as contemplated by the original APA.

**PPA SELLS SUBSTANTIALLY ALL OF ITS ASSETS TO PPE**

107. Following a stalking horse auction process held on February 18, 2010, PPA and PPE executed a further amended APA on February 19, 2010 under which PPE agreed to pay an increased purchase price of approximately US$10,700,000 for substantially all of PPA's assets including its previously agreed upon share of PPA's tax refunds. Under the terms of the further amended APA, PPE was able to offset the purchase price of US$10,700,000 with some (unknown) amount to be determined after closing.

46

108.  The further amended APA was subsequently approved by the U.S. Bankruptcy Court on or about February 22, 2010.  In support of the approval motion, PPA filed for the first time certain schedules to the APA which revealed

a)    PPA had refused to place a value on its partnership agreements with Carter Enterprises and Ibiley Manufacturing, indicating that their value was "not known until orders placed".  PPA refused to value these partnership agreements despite the fact that it had previously represented that, as exclusive ballistics provider thereunder, PPA could generate revenue of up to US$289,000,000 through 2014 and would receive between US$50,000,000 and US$60,000,000 in revenue over a twelve to twenty-four month period commencing in the early portion of 2010 because of the MTV Contracts awarded to its partners Carter Enterprises and Ibiley Manufacturing.

b)    PPA had refused to value the IOTV Contract because its value was "not known until orders placed."  It refused to value the IOTV Contract despite the fact that PPA and certain Individual Defendants had touted the IOTV Contract as a highly valuable opportunity for the Company and represented to shareholders that the IOTV Contract could result in up to US$300,000,000 of revenue to PPA over three to five years.

109.  The approved APA and the schedules thereto filed with the U.S. Bankruptcy Court on February 22, 2010 were never disclosed to shareholders during the Class Period.

110.  The Closing of the Transaction occurred on March 5, 2010.

111.  On or about March 8, 2010, the acquiring entity PPE issued the following press release regarding its purchase of PPA's assets, which includes a statement by the defendant Schwartzman:

Sun Capital Partners, Inc. ("Sun Capital"), a leading private investment firm specializing in leveraged buyouts and investments in underperforming companies, today announced that its affiliate Protective Products Enterprises has acquired substantially all of the assets of Protective Products of America through a 363 bankruptcy sale. The sale was approved by the Bankruptcy Court of the Southern District of Florida on February 19, 2010. The company, which ranks among the top qualified U.S. providers of soft body armour for military and law enforcement personnel, will continue to operate under its recognized brand, "Protective Products".

"We are delighted with our agreement to be acquired by an affiliate of Sun Capital" said Neil Schwartzman, Acting CEO, Protective Products Enterprises [the acquiring entity]. "As a result of the reorganization, our company re-enters the market with a simplified business model and stronger capital structure, and is better positioned overall to continue to supply our customers with the highest quality, certified protective ballistic products. With Sun Capital's financial support and extensive manufacturing experience, Protective Products now has the necessary resources to invest in our business and pursue the numerous domestic and international growth opportunities that exist in the current marketplace. (emphasis added)

112.   On or about November 3, 2010, PPA filed a Plan of Liquidation with the U.S. Bankruptcy

Court.

## TRADING OF PPA SHARES

113.   As a result of the Misrepresentations and failures to disclose the Material Changes, PPA's shares were artificially deflated during the Class Period.

114.   Following PPA's announcement on January 14, 2010 that it had filed a voluntary assignment into bankruptcy the previous day, the TSX immediately suspended the trading of PPA shares and commenced an expedited delisting review process. PPA's shares had closed at $0.59 the day prior to this announcement.

115.   On January 21, 2010, the TSX issued a "Delisting Review" Notice indicating that it had determined to delist the common shares of PPA at the close of market on February 19, 2010 for

48

failure to meet the continued listing requirements of TSX and that, for the interim, PPA shares

would remain suspended from trading.

## MISREPRESENTATION AND NON-DISCLOSURE

116.  The Individual Defendants were in a special relationship with the Plaintiff and other Class

members.  The Misrepresentations and non-disclosures of the Material Changes were intended to

discourage the investing public from purchasing PPA shares and encourage the sale by existing

shareholders.  It was reasonably foreseeable that such statements and omissions would be relied

upon by the Plaintiff and other Class Members in making the decision to purchase or sell PPA's

shares.  It was reasonable, and in fact expected, that the Plaintiff and other Class Members would

rely on the Misrepresentations and non-disclosures of the Material Changes.  The Individual

Defendants owed the Plaintiff and Class Members a duty to ensure that the documents and public

oral statements were accurate and truthful.

117.  The Plaintiff pleads, on his own behalf and on behalf of the other Class Members, that the

Individual Defendants were under an obligation to disclose the Material Changes to them and

they further state that, under such circumstances, their failure to disclose the Material Changes

amounts to negligent or, in the alternative, fraudulent misrepresentation or non-disclosure at

common law.

118.  PPA's news releases, quarterly reports, and MD&A contained the Misrepresentations,

whether implicitly or explicitly, and such Misrepresentations were materially false and/or

materially misleading when made.

119.  The Individual Defendants made the Misrepresentations by issuing, or authorizing,

permitting, and/or acquiescing in the issuance of the documents and statements referenced above,

and, in the case of Caldwell and Williams, by signing certifications on Multilateral Instrument 52-109 Form F2 for PPA's quarterly filings that contained the Misrepresentations.

120. The Individual Defendants acted negligently, recklessly, or fraudulently in making the Misrepresentations and not disclosing the Material Changes, as particularlized above. The Defendants knew or ought to have known or were grossly negligent or reckless in not knowing the Misrepresentations were false and/or materially misleading.

121. As further particularized below, as a result of their reliance on the Misrepresentations, the Plaintiff and other Class Members suffered damages and loss.

**THE MISREPRESENTATIONS, FAILURES TO DISCLOSE, AND THE PRICE OF PPA'S SECURITIES**

122. PPA's securities were publicly traded on the TSX, which is a highly efficient and automated market. Any and all public information regarding PPA was promptly incorporated into, and had a direct effect upon, the price of PPA's shares. As such, the price of PPA's publicly-traded securities was directly affected by the news releases, quarterly reports, MD&A and public oral statements described herein.

123. The disclosure documents and statements referenced above, and all the information contained therein, which included the Misrepresentations, were immediately made available to the Plaintiff, other Class Members, other members of the investing public, financial analysts, and the financial press. The Individual Defendants were aware of this fact at all material times, as evidenced by the following:

    a)   The disclosure documents were filed with SEDAR and the TSX and were immediately accessible to the public; and

50

b)      PPA and certain Individual Defendants regularly communicated with the
investing public and financial analysts through news releases on newswire
services and other established market communication mechanisms.

124.  Any and all analysis undertaken by the Plaintiff and other Class Members in determining
whether to purchase, hold, or sell PPA securities was directly influenced by the disclosure
documents and statements referenced above, which incorporated the Misrepresentations and
failed to incorporate the Material Changes.

125.  The Material Changes were changes in the business, operations or affairs of PPA that
would be considered important by a reasonable investor in determining whether to purchase, sell,
or to hold PPA's shares.

126.  The Misrepresentations were omissions of material facts that were necessary in order to
make statements (both in documents and in public oral statements) about PPA's business, affairs,
operations, revenue, outlook, and ability to continue as a going concern, not misleading in light
of the circumstances in which those statements were made.   As such, they constituted
Misrepresentations under section 1(1) of the Securities Act.

127.  Therefore, as a result of the Misrepresentations and the failures to make timely or any
disclosure of the Material Changes, the PPA's shares were artificially deflated throughout the
Class Period.

128.  The Plaintiff, on behalf of himself and the other Class Members, expressly plead that the
Misrepresentations and the failures to make timely disclosure of the Material Changes caused or
contributed to the Fundamental Change Event which constituted or resulted in an involuntary

disposition of the shares of PPA held by the Plaintiff and the other Class Members as of January

14, 2010.

129. The Individual Defendants are liable to the Plaintiff and the other Class Members who

disposed of or were forced to dispose of their shares during the Class Period, without regard to

whether the Plaintiff or other Class Members relied on the Misrepresentations or the failures to

disclose the Material Changes, pursuant to s. 138.3 of the *Securities Act.*

## CONSPIRACY

130. PPA retained Farlie Turner and Bayshore in order to to help it pursue strategic alternatives

intended to maximize its value.

131. Under their engagement with PPA, the defendants Farlie Turner and Bayshore were to,

among other things, prepare a confidential investment memorandum to assist in the marketing of

PPA and PPA's assets for sale or in raising additional debt or equity capital.

132. As part of their engagement, Farlie Turner and Bayshore also were required to conduct an

extensive marketing process to potential strategic buyers operating within PPA's industry as well

to seek out options for refinancing and recapitalization through private equity firms, lending

institutions, and PPA's existing debt holders and shareholders.

133. As such, Farlie Turner and Bayshore had knowledge of the Misrepresentations and

Material Changes yet, during the Class Period, did not market appropriately or at all PPA to

existing shareholders in accordance with its engagement by PPA, and knowingly assisted the

Individual Defendants in carrying out their unlawful object and common design to deflate the

52

value of PPA shares by making the Misrepresentations and by not disclosing the Material
Changes to the Plaintiff and the Class Members in violation of the *Securities Act.*

134. Prior to and during the Class Period, at Fort Lauderdale and Sunrise, Florida, and in other
locations currently unknown to the Plaintiff, Farlie Turner, Bayshore and PPA, and its servants
and agents, including the Individual Defendants, wrongfully, unlawfully, maliciously, and
lacking *bona fides*, agreed together, the one with the other and with persons unknown to, among
other things, conceal from PPA's shareholders positive information relating to PPA's business,
affairs, and operations, which information was required to be disclosed under the *Securities Act.*

135. Some, but not all, of the Defendants' predominant purposes, concerns, and motivations
were to:

    a)    injure the Plaintiff and the other Class Members;

    b)    artificially deflate PPA's share price in the secondary market in circumstances
        where they knew or ought to have known that injury to the Plaintiff and the other
        Class members would result;

    c)    authorize, permit, acquiesce in, or assist with, the violation of the provisions of
        the *Securities Act* relating to secondary market disclosure, where they knew or
        ought to have known that injury to the Plaintiff and the other Class Members
        would result;

    d)    artificially deflate PPA's share price to prevent or reduce the prospect of a
        refinancing or recapitalization of the Company, where they knew or ought to have
        known that injury to the Plaintiff and the other Class Members would result; and

e)    artificially deflate PPA's equity value to make the Company a more attractive
target for prospective bidders in order to "go private" for the benefit of certain
Individual Defendants holding secured debt in PPA and to provide an opportunity
for certain Individual Defendants, including Caldwell, Schwartzman, and
Williams, to secure favourable compensation arrangements with or equity
interests in the acquiring entity, where they knew or ought to have known that
injury to the Plaintiff and the other Class Members would result.

136.  In furtherance of the conspiracy, the following are some, but not all, of the intentional acts
carried out or caused to be carried out by the Defendants, or some of them:

a)    they made the Misrepresentations and failed to disclose the Material Changes;

b)    they authorized statements, announcements, press releases, filings, and other
documents containing the Misrepresentations;

c)    they refused to disclose the Material Changes;

d)    they concealed positive material information about PPA and its assets from
shareholders;

e)    they prevented a valuation of PPA's equity based on the wide dissemination to all
market participants of all material information that the Company was required to
disclose on a timely basis pursuant to the *Securities Act*;

f)    they did not take any or appropriate steps to market PPA to its existing
shareholders inconsistent with the purported mandate for which PPA had retained
Farlie Turner and Bayshore; and

54

g)   they did not take any or appropriate steps to refinance or recapitalize PPA inconsistent with the purported mandate for which PPA retained Farlie Turner and Bayshore.

137. The Defendants, by carrying out the above conspiracy, were aware that their actions would or were likely to harm PPA itself by hindering the Company's prospects for refinancing or recapitalization (by suppressing PPA's share price) and preventing the Company from maximizing its value.

138. The Plaintiff and other Class Members have suffered damages as a result of the above conspiracy, which had the effect of artificially deflating the value of their shares in PPA during the Class Period.

## INTENTIONAL INTERFERENCE WITH ECONOMIC RELATIONS

139. The Plaintiff, on behalf of himself and the other class members, pleads that the acts particularized in paragraphs (128) through (136) in respect of the alleged participation of Farlie Turner and Bayshore in a conspiracy, constituted a breach of an express or implied agreement between Farlie Turner and Bayshore, on the one hand and PPA, on the other hand, in respect of Farlie Turner and Bayshore's mandate to assist the Company in pursuing strategic alternatives intended to maximize its value.

140. The acts particularized in paragraphs (128) through (136) were unlawful acts against PPA that were undertaken by Farlie Turner and Bayshore with the significant, predominant, or exclusive intent to injure the Plaintiff and the Class, or Farlie Turner and Bayshore knew that

such injury would be a necessary consequence of their interference, and they are liable for the tort of intentional interference with the Class Members' economic relations with the Company and their economic interests and expectancy as shareholders.

141. Farlie Turner and Bayshore knew or ought to have known that the Plaintiff and the other Class Members, as shareholders of PPA, had an expectancy interest that the value of their equity would be based on a wide dissemination to all market participants of all material information that PPA was required to disclose on a timely basis pursuant to the *Securities Act* and the Defendants intentionally interfered with that expectancy.

142. The Class suffered damages as a direct or proximate result of the Defendants' intentional and unlawful interference with their economic interests and expectancy as shareholders of PPA.

**DAMAGES**

143. As a result of the Misrepresentations and failures to disclose, in a timely manner or at all, the Material Changes, the Plaintiff and other Class Members voluntarily disposed of their PPA shares at artificially deflated prices and, upon the Fundamental Change Event, involuntarily disposed of their shares at a value of nil during the Class Period. The Misrepresentations were never corrected, nor were the Material Changes ever disclosed, and there was never an upward adjustment in the price of PPA's shares to reflect the Company's true value.

144. As a result of the facts pleaded above, the Plaintiff and other Class Members have suffered damages equivalent to the increase in the market value that would have occurred had PPA corrected the Misrepresentations and made timely disclosure of the Material Changes.

56.

145. The Plaintiff and Class Members claim damages calculated pursuant to sections 138.5 and 138.6 of the *Securities Act*. The Plaintiff and Class Members further plead and rely on section 138.1 of the *Securities Act* in support of their claim for damages.

146. The Plaintiff and other Class Members are also entitled to recover, as damages or costs in accordance with the *CPA*, the costs of administering the plan to distribute the recovery in this action.

147. In addition, the Plaintiff and Class Members claim punitive and exemplary damages against the Defendants. The conduct of the Defendants was of a reprehensible nature, deserving of the sanction of this Honourable Court to deter other directors, officers and executive members of other companies, publicly-traded on a Canadian stock exchange, from engaging in similar misconduct. The Defendants deliberately placed their financial self-interests above the interests of the Plaintiff and other Class Members in maintaining artificially low share prices and causing an involuntary disposition to the detriment of the interests of shareholders. The Defendants' actions were wanton, outrageous, disgraceful and showed a callous disregard for the rights of ordinary investors. The Defendants acted in a high-handed manner towards the Plaintiff and the other Class Members, deserving a civil sanction aimed at specific deterrence.

148. Furthermore, certain Individual Defendants, including Caldwell, Schwartzman, Williams, Moeller, Giordanella, Stafford, and Shelton, placed themselves in a conflict of interest when they chose not to disclose the Material Changes. The Individual Defendants carried on this scheme to cover up and delay disclosures in order to take the Company private for their own self-interest and financial gain.

57

149. By concealing positive material information from PPA's shareholders and deflating the value of PPA's equity, PPA became a more attractive target for private equity firms. Moreover, a low share price prevented or reduced the prospect of refinancing or recapitalization.

150. Through the Defendants' efforts to take PPA private, the defendants Moeller, Giordaniella, Stafford, and Shelton sought to recover most or all of their secured debt in PPA and certain Individual Defendants, including Caldwell, Schwartzman, and Williams, sought to secure favourable compensation arrangements with or equity interests in the acquiring entity.

## PART XXIII.1 OF THE SECURITIES ACT

151. The Plaintiff intends to deliver a notice of motion seeking, among other things, an order for leave to assert the statutory causes of action particularized in Part XXIII.1 of the *Securities Act.*

## REAL AND SUBSTANTIAL CONNECTION WITH ONTARIO

152. This action has a real and substantial connection with Ontario because, among other things:

a)    PPA is a reporting issuer in Ontario;

b)    the shares of PPA traded on the TSX, which is located in Toronto;

c)    the Misrepresentations were disseminated in Ontario;

d)    a substantial proportion of the Class Members reside in Ontario; and

e)    a substantial portion of the damages sustained by the Class were sustained by persons and entities domiciled in Ontario.

58

## SERVICE OUTSIDE OF ONTARIO

153. This originating process may be served without court order outside Ontario in that the claim is:

    a)    in respect of a tort committed in Ontario (rule 17.02(g));

    b)    in respect of damages sustained in Ontario arising from a tort wherever committed (rule 17.02(h)); and

    c)    authorized by statute to be made against a person outside Ontario by a proceeding commenced in Ontario (rule 17.02(n)).

## THE RELEVANT LEGISLATION

The Plaintiff pleads and relies on the *Securities Act*, the *CJA* and the *CPA*, all as amended.

## PLACE OF TRIAL

154. The Plaintiff proposes that this action be tried in the City of Toronto, in the Province of Ontario.

Date:   December 6, 2010

          **ROCHON GENOVA LLP**
          Barristers • Avocats
          121 Richmond Street West
          Suite 900
          Toronto, ON  M5H 2K1

          **John Archibald (LSUC#: 48221L)**
          Tel: 416.363.1867
          Fax: 416.393.0263

          Lawyers for the Plaintiff

**Exhibit "B"**

# BAYSHORE PARTNERS, LLC

## CONFIDENTIAL

June 16, 2009

Brian Stafford
Chief Executive Officer
Protective Products of America, Inc.
1649 Northwest 136th Avenue
Sunrise, FL 33323

Dear Mr. Stafford:

This letter will confirm the understanding and agreement (the "Agreement") between Bayshore Partners, LLC ("Bayshore") and Protective Products of America Inc., its wholly owned subsidiaries Protective Products International Corp., CPC Holding Corp., Ceramic Protection Corporation of America, and Protective Products of North Carolina LLC and any affiliates of each or any entity formed for the purposes of a Transaction (collectively, the "Company").

1.    Scope of Engagement

The Company hereby engages Bayshore as its exclusive financial advisor and investment banker in connection with the financial restructuring, recapitalization, reorganization, or one or more merger and/or acquisition Transaction (as defined below) of the Company. If requested by the Company, in accordance with the terms of this Agreement, Bayshore shall:

(a)    Assist the Company in evaluating its strategic options with respect to the sale or recapitalization of its business and related assets both as a going concern outside of bankruptcy and in the context of a potential Chapter 11 bankruptcy filing;

(b)    Assist the Company, as requested, in preparing a written Confidential Information Memorandum (CIM) describing its business, strategy, market position, growth opportunities, and historical and projected financial information;

(c)    Solicit and evaluate proposals from potential parties to a Transaction;

(d)    Coordinate gathering of due diligence materials to be provided to selected potential parties to a Transaction; and

(e)    Assist in the negotiation and documentation of a transaction with one or more parties.

2.    Definition of Transaction

For the purposes of this Agreement, "Transaction" shall mean one or more transactions involving the sale, transfer or other disposition of all or a portion of the assets or Securities of the Company to any entity including, without limitation, any of the

401 E. Las Olas Blvd., Ste 1160 • Fort Lauderdale, FL 33301 • P. 954.358.3800 • F. 954.358.3838

Exhibit A

Protective Products of America, Inc.
June 16, 2009
Page 2

Company's existing owners, shareholders, employees, creditors, lenders or affiliates; any exchange or tender offer, merger, consolidation, purchase, sale or other business combination involving the Company; or any recapitalization, reorganization, restructuring, confirmed Chapter 11 Plan, joint venture, issuance of new Securities, partnership, minority investment or other similar transaction (including, without limitation, negotiated repurchases of the Company's Securities, an issuer tender offer, an extraordinary dividend or distribution, a credit bid, or a spin-off or split-off or debt restructuring), regardless of whether the Company is the surviving corporations or entities.

3.   Compensation

As compensation for the services rendered by Bayshore hereunder, the Company shall pay Bayshore as follows:

(a)   Initial Fee:   In addition to the other fees provided for herein, upon the execution of this Agreement (the "Effective Date"), the Company shall pay Bayshore a nonrefundable cash fee of $25,000, which shall be deemed fully earned upon Bayshore's receipt thereof, in advance of services being performed, in consideration of Bayshore accepting this engagement ("Initial Fee"); plus

(b)   Monthly Advisory Fee:   The Company shall pay and Bayshore shall earn a monthly advisory fee of $25,000 (prorated for any partial month period), with the first payment due and payable commencing on the date of this Agreement and each additional payment due and payable on the monthly anniversary of the Effective Date until the termination of this Agreement ("Monthly Advisory Fee"). The Monthly Advisory Fee shall be fully earned upon Bayshore's receipt thereof, in advance of services being performed, in consideration of Bayshore accepting this engagement and performing services as described herein.  The Monthly Advisory Fee shall be deemed paid in the ordinary course of Bayshore and the Company's business.  The Monthly Advisory Fee shall be paid in advance of services being provided and not on account of antecedent debt; plus

(c)   Transaction Fee:   A nonrefundable cash fee (the "Transaction Fee") deemed earned upon the closing of a Transaction, and payable immediately and directly from the proceeds of such Transaction, as a necessary and reasonable cost of such Transaction, equal to greater of the following:

        i)   $300,000; or

        ii)  3.0% of the Consideration (as defined in subparagraph 3(d) below).

Consideration shall be calculated based on the aggregate cash and non-cash consideration paid or debt assumed, or to be paid or assumed, irrespective of the number of Transactions or tranches of Transactions.  The Transaction Fee shall be

Protective Products of America, Inc.
June 16, 2009
Page 3

---

deemed paid reasonably equivalent value in respect of the services being provided and paid in the ordinary course of the Company's and Bayshore's business.

To the extent that the Company requests that Bayshore perform additional services not contemplated by this Agreement, fees for such services shall be mutually agreed upon by Bayshore and the Company, in writing, in advance.

(d)     "Consideration" shall mean the total value of all cash, securities, repurchase or buy-out of any stock options or warrants, property and any other consideration paid or payable, directly or indirectly, or committed, in connection with a Transaction, including, without limitation, consideration paid or payable to, or for the benefit of, the Company or to any equity, debt or other security holder of the Company, including any consideration held in escrow, future payments which are contingent upon the performance of the Company or any successor to the Company, and any dividends or distributions paid to the holders of the Company's equity securities after the date hereof, other than usual recurring cash dividends in amounts not materially greater than currently paid, or any other consideration paid or payable, directly or indirectly, in connection with a Transaction. Any consideration held pursuant to an escrow account established before or in connection with the consummation of a Transaction shall be deemed Consideration hereunder irrespective of whether such consideration is being held in escrow to satisfy future claims. If the Transaction provides for the transfer of only a portion of the assets or business of the Company and the retention of other assets relating to such entity or business, including, but not limited to, cash, cash equivalents, real property, leasehold interests, securities, investments, inventories or receivables, such retained assets shall be deemed to be part of the Consideration received in connection with such a Transaction. If the Transaction provides for the transfer of only a portion of the capital stock or comparable equity interests of the Company, then the value of the capital stock or equity interests not transferred shall also be deemed to be a part of the Consideration, and the value thereof shall be based on the same value per share or other unit as used in the Transaction. The value of any securities constituting part of the Consideration (whether debt, equity, stock options, stock warrants or other equity equivalents) or other property shall be determined as follows: (i) the value of securities that are freely tradeable in an established public market shall be the average of the last sale prices for such securities on the five trading days ending one day prior to the consummation of the Transaction (the "Closing"); and (ii) the value of securities which are not freely tradeable or which have no established public market, or if the consideration consists of property or contingent payments other than securities, the value of such securities, other property, or contingent payments shall be the fair market value thereof as mutually agreed by the Company and Bayshore. Consideration shall also include the conversion of any of the Company's debt securities to equity securities, but shall not include any debt which is restructured or forgiven.

Protective Products of America, Inc.
June 16, 2009
Page 4

_____

> If the parties are not able to agree on a fair market valuation of the Consideration prior to Closing, then within five days after Closing, the parties will mutually select one independent accounting firm to determine the fair market value. If the parties are unable to agree on an independent accounting firm, then each party will select one independent accounting firm and both of these firms will then select one nationally recognized independent accounting firm (the "Neutral Auditor"). The Neutral Auditor will determine the fair market valuation of the Consideration and such determination shall be final, binding, and conclusive. All fees and expenses relating to the selection of accounting firms pursuant to subparagraph 3(d) and work performed by the Neutral Auditor shall be borne equally by the parties to this Agreement.

> (e)    Except for compensation which is payable to Bayshore in respect of Consideration which is contingent upon the occurrence of some future event (*e.g.*, the realization of earnings projections), compensation payable to Bayshore pursuant to subparagraph 3(c) shall be paid by the Company to Bayshore in wired funds at Closing, as a condition of such Closing. With respect to compensation payable to Bayshore in respect of contingent Consideration, such compensation shall be paid by the Company to Bayshore at the time that the amount of such Consideration can be determined. The Company agrees that the definitive agreements relating to a Transaction will contain a covenant stating that the Transaction Fee payable to Bayshore pursuant to subparagraph 3(c) will be paid at the Closing, except as provided herein, and that the surviving entity of any Transaction is responsible for all fees and expenses due Bayshore. Should the Company file bankruptcy, the Transaction Fee shall be subject to Court approval under Section 328(a) of the Bankruptcy Code, however, Bayshore shall not be required to maintain time records or file fee applications with the Court.

4.    Reasonableness of Fees

The parties acknowledge that a substantial professional commitment of time and effort will be required of Bayshore and its professionals hereunder, and that such commitment may foreclose other opportunities for the firm. Moreover, the actual time and commitment required for the engagement may vary substantially, creating "peak load" issues for the firm. Given the numerous issues which may arise in engagements such as this, Bayshore's commitment to the variable level of time and effort necessary to address such issues, the expertise and capabilities of Bayshore that will be required in this engagement, and the market rate for Bayshore's services of this nature, whether in-court or out-of-court, the parties agree that the fee arrangement provided for herein is reasonable, fairly compensates Bayshore, and provides the requisite certainty to the Company.

5.    Reimbursable Expenses

In addition to any fees payable to Bayshore hereunder and regardless of whether a Transaction is consummated, the Company shall reimburse Bayshore for its out-of-pocket

Protective Products of America, Inc.
June 16, 2009
Page 5

and incidental expenses incurred in connection with its engagement hereunder promptly as
requested, including the fees and expenses of its legal counsel and those of any advisor
retained by Bayshore, which expenses shall not exceed $7,500 without the prior consent of
the Company and provided that such limitation shall in no way affect the obligations of the
Company with respect to indemnification as set forth on Exhibit A attached hereto.

6.    Coordination

In order to coordinate the parties' efforts with respect to a Transaction, during the period of
Bayshore's engagement hereunder, neither the Company, its management, its advisors, or
any other representative of the Company will initiate or solicit any discussions or offers
related to a possible Transaction, directly or indirectly, with prospective parties to the
Transaction, without the express written consent of Bayshore. In the event the Company,
its other affiliates, or its management receives any inquiry regarding a Transaction from
any party, the Company shall promptly inform Bayshore of such inquiry so that Bayshore
can assist the Company in evaluating such party and its interest in a Transaction and in any
resulting negotiations. The Company and its advisors and Bayshore each will inform and
consult with the other on a regular basis regarding any inquiries or proposals received from
potential parties to a Transaction.

7.    Indemnification

Because Bayshore will be acting for the benefit of the Company in connection with this
engagement, the Company agrees to indemnify Bayshore and certain other persons as set
forth in the indemnification provisions attached hereto as Exhibit A, the provisions of
which are incorporated herein in their entirety. The indemnification provision will
survive termination of this Agreement.

8.    Company's Responsibilities, Representations and Warranties

In connection with Bayshore's engagement, the Company will furnish Bayshore with all
information which Bayshore reasonably requests and will provide Bayshore with access
to the Company's officers, directors, accountants, legal counsel and other advisors. The
Company represents and warrants to Bayshore that: (a) all such information is and will
be true and accurate in all material respects on the date it is given to Bayshore and does
not and will not contain any untrue statement of a material fact or omit to state a material
fact necessary in order to make the statements made, in the light of the circumstances
under which they were made, not misleading; and (b) any projected financial information
or other forward looking information which the Company provides to Bayshore will be
made by the Company in good faith, based on management's best estimates then
available and based on facts and assumptions which the Company believes to be
reasonable. The Company acknowledges and agrees that Bayshore will be using and
relying upon such information supplied by the Company and its officers, agents and
others and any other publicly available information concerning the Company and any
prospective Transaction party without conducting, or being required to conduct, any
independent investigation or verification thereof or independent appraisal by Bayshore of

Protective Products of America, Inc.
June 16, 2009
Page 6

the Company or its business or assets or any other Transaction party or its business or assets. If any information provided to Bayshore by the Company becomes inaccurate, incomplete or misleading in any material respect during Bayshore's engagement hereunder, the Company shall so advise Bayshore in writing. The Company shall provide Bayshore with any updates regarding any material change to the Company's business. The Company further represents that it has the authority to enter into a Transaction.

9.    Other Terms and Conditions

The Company further represents and warrants to Bayshore that:

(a)    The Company has taken no action that would give any brokers, representatives, finders or other persons an interest in the compensation due to Bayshore in connection with any Transaction contemplated herein and there are no other financial advisors or similar persons entitled to receive compensation from the Company in connection with any Transaction contemplated herein;

(b)    This Agreement does not violate or constitute a breach or default under any charter document, contract, agreement, arrangement or understanding, whether written or oral, to which the Company or any of its subsidiaries is a party or by which its or their assets are bound. The Company has the corporate authority, ability, and authorization to enter into this Agreement.

10.    Application for Retention

In the event that the Company becomes a debtor or debtor in possession under Chapter 11 of the Bankruptcy Code, whether by way of a voluntary or involuntary petition, the Company shall use its best efforts to promptly apply to the bankruptcy court having jurisdiction over the Chapter 11 case or cases (the "Bankruptcy Court") for approval of this agreement pursuant to sections 327 and 328(a) of the Bankruptcy Code, nunc pro tunc to the date of commencement of such Chapter 11 case, for Bayshore's retention by the Company pursuant to this agreement, and for this agreement to be subject to review under section 328(a) of the Bankruptcy Code and not subject to review under section 330 of the Bankruptcy Code. The Company shall provide Bayshore and its counsel with a draft of such application and a proposed order authorizing such retention sufficiently prior to the filing thereof with the Bankruptcy Court for review and comment by Bayshore and its counsel. Bayshore shall have no obligation to render any services hereunder if the Company commences a case under the Bankruptcy Code unless Bayshore's retention is approved on the terms and conditions set forth herein pursuant to section 328(a) of the Bankruptcy Code by a final order of the Bankruptcy Court that is acceptable to Bayshore in its sole discretion and which is not subject to appeal, rehearing, reconsideration or petition for certiorari. If Bayshore's engagement hereunder is approved by the Bankruptcy Court, the Company shall pay all fees and expenses of Bayshore hereunder as promptly as possible. In agreeing to seek approval of Bayshore's retention under section 328(a) of the Bankruptcy Code, the Company acknowledges and agrees that Bayshore's restructuring expertise and experience will inure to the benefit of

Protective Products of America, Inc.
June 16, 2009
Page 7

the Company, that the value of the services to be provided hereunder derive substantially from such expertise and experience and that the fees provided for herein are reasonable regardless of the number of hours expended by Bayshore in performance of services hereunder. Prior to commencing a Chapter 11 case, the Company shall pay all undisputed amounts due to Bayshore in cash. Bayshore's obligations to provide the services described herein post-bankruptcy are contingent upon, and expressly subject to, the execution of a waiver, subordination, carve-out, or similar agreement, in form and substance satisfactory to Bayshore pursuant to which the Company's secured lenders consent to the performance of the Company's obligations under this Agreement, including, without limitation, the Company's payment of Bayshore's fees and expenses described herein, free and clear of such lenders' security interests in the Company's assets.

Subject to the immediately preceding paragraph and other terms and conditions of this Agreement, we will request payment of our fees and reimbursement of our actual and necessary expenses related to this engagement, in accordance with the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the rules and orders of the Bankruptcy Court.

11.  Disclosure to Third Parties

Except as required by law, or pursuant to order of a court of competent jurisdiction, no written or oral advice provided by Bayshore pursuant to this Agreement shall be disclosed, in whole or in part, to any third party, or circulated or referred to publicly, without the prior written consent of Bayshore. The fact of Bayshore's engagement hereunder may be disclosed to prospective parties to a Transaction, but the Company may not publicly announce or advertise Bayshore's engagement without the prior consent of Bayshore, unless such engagement becomes a matter of public record by virtue of the Company seeking relief under the Bankruptcy Code.

In the event of consummation or public disclosure of any Transaction, Bayshore shall have the right to disclose its participation in such Transaction, including, without limitation, the placement at its cost of "tombstone" advertisements in financial and other newspapers and journals.

12.  Successors and Assigns

The benefits of this Agreement, together with the separate indemnity agreement, shall inure to the respective successors and permitted assigns of the parties hereto and of the indemnified parties under such indemnity agreement and their respective successors, permitted assigns and representatives, and the obligations and liabilities assumed in this Agreement by the parties hereto shall be binding upon their respective successors and assigns. Notwithstanding the foregoing, this Agreement and the related indemnity agreement may not be assigned without the prior written consent of the nonassigning party (or parties).

Protective Products of America, Inc.
June 16, 2009
Page 8

13.   Amendment or Modification

This Agreement may not be amended or modified except in writing signed by both parties and shall be governed by and construed in accordance with the laws of the State of Florida, without regard to its principles of conflicts of laws.

14.   Arbitration of Disputes

Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association in accordance with the Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) shall be entered in any court having jurisdiction over such matters.   Within fifteen (15) days after the commencement of arbitration, the Company and Bayshore shall each select one person to act as an arbitrator and the two selected arbitrators shall select a third arbitrator within ten (10) days of their appointment. If the two arbitrators selected are unable or fail to agree upon the third arbitrator, the third arbitrator shall be selected by the American Arbitration Association.   The place of arbitration shall be in Broward County, Florida. This Agreement shall be governed by the laws of the State of Florida, without giving effect to the principles of conflicts of laws. The arbitrators shall award to the prevailing party, if any, as determined by the arbitrators, all of its costs and fees. "Costs and fees" shall mean all reasonable pre-award expenses of the arbitration, including the arbitrators' fees, administrative fees, travel expenses, out-of-pocket expenses, such as copying and telephone, court costs, witness fees and attorneys' fees.   Except as may be required by law, neither a party to this Agreement nor an arbitrator may disclose the existence, content or results of any arbitration hereunder without the prior written consent of both parties. The award of the arbitrators shall be in writing, shall be signed by a majority of the arbitrators, and shall include a statement regarding the reasons for the disposition of any claim.

15.   Limitation of Bayshore's Engagement to the Company

Bayshore services are limited to those specifically provided in this Agreement, or subsequently agreed-upon, in writing, by the parties hereto.   Bayshore shall have no obligation or responsibility for any other services including, without limitation, any crisis management or business consulting services related to, among other things, the implementation of any operational, organizational administrative, cash management, or similar activities. The Company acknowledges that Bayshore has been retained only by the Company, that Bayshore is providing services hereunder as an independent contractor (and not in any fiduciary or agency capacity) and that the Company's engagement of Bayshore is not deemed to be on behalf of, and is not intended to confer rights upon any shareholder, owner or partner of the Company or any other person not a party hereto as against Bayshore or any of its affiliates, or any of its or their respective officers, directors, controlling persons (within the meaning of Section 15 of the Act or Section 20 of the Securities Exchange Act of 1934), employees or agents.   Unless otherwise expressly agreed in writing by Bayshore, no one other than the Company is authorized to rely upon

Protective Products of America, Inc.
June 16, 2009
Page 9

this engagement or any other statements or conduct of Bayshore, and no one other than
the Company is intended to be a beneficiary of this Agreement.   The Company
acknowledges that any recommendation or advice, written or oral, given by Bayshore to
the Company in connection with Bayshore's engagement is intended solely for the
benefit and use of the Company's shareholders and directors in considering a possible
Transaction, and any such recommendation or advice is not on behalf of, and shall not
confer any rights or remedies upon, any other person or be used or relied upon for any
other purpose.   To the extent Bayshore is requested by the Company to perform any
financial advisory or investment banking services which are not within the scope of this
engagement (such as rendering a fairness opinion), the Company shall pay Bayshore such
fees as shall be mutually agreed upon by Bayshore and the Company in writing, in
advance, depending on the level and type of services required, and shall be in addition to
the fees and expenses described hereinabove.

16.    Termination

Bayshore's engagement hereunder shall terminate one year from the date hereof unless
extended in writing by both parties. This Agreement may be terminated at any time by
either party upon thirty days' prior written notice to the other party. Notwithstanding the
foregoing, this Agreement may not be canceled by either party within the first sixty days
after its execution without cause.  The expiration or termination of this Agreement shall
not affect Bayshore's right to receive, and the Company's obligation to pay, any and all
fees, expenses and other amounts due, whether or not any Transaction shall be
consummated prior to or subsequent to the effective date of expiration or termination, as
more fully set forth in this Agreement. In addition, notwithstanding the expiration or
termination of this Agreement, Bayshore shall be entitled to full payment by the
Company of the Transaction Fee described in this Agreement: (i) so long as a Transaction
is consummated or announced during the term of this Agreement, or within 12 months
after the date of expiration or termination of this Agreement ("Tail Period"), and/or (ii) if
an agreement in principle to consummate a Transaction is executed by the Company
during the term of this Agreement, or within the Tail Period.  A termination of this
agreement does not alter the Company's obligations to indemnify Bayshore pursuant to
paragraph 7 of this Agreement.

17.    Survival of Terms of Agreement

The provisions of this Agreement shall survive and remain in full force and effect
notwithstanding any termination of Bayshore's engagement under paragraph 16 of this
Agreement and shall survive the Company's filing bankruptcy, reorganization, or
liquidation of the Company's assets under Chapter or 11 of the Bankruptcy Code, or
otherwise.

Protective Products of America, Inc.
June 16, 2009
Page 10

In acknowledgment that the foregoing correctly sets forth the understanding reached by Bayshore and the Company, please sign in the space provided below, whereupon this letter shall constitute a binding Agreement as of the date indicated above.

Very truly yours,

BAYSHORE PARTNERS, LLC

By: _____

Name:   Michael Turner

Title:   Partner

Accepted and Agreed:

Protective Products of America, Inc.

By: _____

Dated: _____

Protective Products of America, Inc.
June 16, 2009
Page 11

## EXHIBIT A

In connection with Bayshore's engagement to advise and to assist the Company pursuant to the Agreement dated June 16, 2009 which this Exhibit A is attached, the Company agrees to indemnify and to hold harmless Bayshore and each of its affiliates, and their respective officers, directors, controlling persons (within the meaning of Section 15 of the Securities Act of 1933 or Section 20 of the Securities Exchange Act of 1934), employees, affiliates, agents, counsel and other advisors (hereinafter collectively referred to as an "Indemnified Party"), to the fullest extent allowed by law or equity, from and against any and all judgments, losses, claims (whether or not valid), damages, costs, fees, expenses or liabilities, joint or several, to which an Indemnified Party may become subject, related to or arising out of Bayshore's engagement or performance under the Agreement, the transaction contemplated thereby, the services rendered by Bayshore under the Agreement, or any actual or threatened claim, litigation, investigation, proceeding or action in any court or before any regulatory, administrative or other body relating to any of the foregoing (hereinafter referred to collectively as a "Claim"), and shall, upon request, reimburse an Indemnified Party for all legal and other costs, fees and expenses as they are incurred in connection with investigating, preparing or defending a Claim, whether or not such Indemnified Party is ever made party to any legal proceedings or such Claim arose before or after the date hereof; provided, however, that no such indemnification shall be required to be paid to an Indemnified Party with respect to a Claim that is finally determined by a court of competent jurisdiction (after exhaustion of all appeals) or in an arbitration conducted in accordance with this Agreement to have resulted solely from the gross negligence or willful misconduct of such Indemnified Party.

In the event that the foregoing indemnity is unavailable or insufficient for any reason (other than by reason of the terms hereof) to hold any Indemnified Party harmless, then the Company shall contribute to any amounts paid or payable by an Indemnified Party in such proportion as appropriately reflects the relative benefits received by such Indemnified Party and to the Company in connection with the matters to which the Claim relates. If an allocation solely on the basis of benefits is judicially determined to be impermissible, then the Company shall contribute in such proportion as appropriately reflects the relative benefits and relative fault of the Company and such Indemnified Party, as well as any other equitable considerations. In no event shall the Company contribute less than the amount necessary to ensure that the aggregate liability of Bayshore and any other Indemnified Party for contribution pursuant to this paragraph in connection with all Claims does not exceed the amount of fees actually received by Bayshore under the Agreement. For purposes hereof, relative benefits to the Company and Bayshore of the Transaction shall be deemed to be in the same proportion that the total value received or contemplated to be received by the Company and/or its security holders in connection with the Transaction bears to the fees paid to Bayshore under the Agreement in respect of such Transaction, and other relative fault of each Indemnified Party and the Company shall be determined by reference to, among other things, whether the actions and omissions to act were by such Indemnified Party or the Company and the parties' relative intent, knowledge, access to information, and opportunity to correct or prevent such action or omission.

All amounts due to an Indemnified Party hereunder shall be payable by the Company promptly upon request by such Indemnified Party. In addition, the Company agrees to pay all costs and expenses (including attorneys' fees) incurred by an Indemnified Party to enforce the

Protective Products of America, Inc.
June 16, 2009
Page 12

terms of this Exhibit A.

The Company agrees not to enter into any waiver, release or settlement of any Claim (whether or not Bayshore or any other Indemnified Party is a formal party to such Claim) in respect of which indemnification may be sought hereunder without the prior written consent of Bayshore (which consent will not be unreasonably withheld), unless such waiver, release or settlement includes an unconditional release of Bayshore and each Indemnified Party from all liability arising out of such claim.

The provisions of this Exhibit A shall be in addition to any liability which the Company may otherwise have to Bayshore; shall not be limited by any rights that Bayshore or any other Indemnified Party may otherwise have; shall remain in full force and effect regardless of the expiration or any termination of Bayshore's engagement; and shall be binding upon any successors or assigns of Bayshore and the Company.

## Addendum to Engagement Letter

### January 7, 2010

On or about June 16, 2009, Bayshore Partners, LLC ("Bayshore")[1] entered into an engagement agreement (the "Engagement Agreement") with Protective Products of America, Inc., and its wholly owned subsidiaries Protective Products International, Inc., Protective Products International Corp., CPC Holding Corp., Ceramic Protection Corporation of America, and Protective Products of North Carolina LLC (collectively, the "Company"). Pursuant to the Engagement Agreement, Bayshore has been providing investment banking and financial advisory services to the Company since mid-June, 2009. The Company is contemplating seeking relief under the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court") and has requested that Bayshore continue providing the investment banking and financial advisory services contemplated by the Engagement Agreement to the extent such services have not already completed.

In consideration of Bayshore agreeing to continue providing services to the Company post-bankruptcy, the Company shall provide Bayshore with a $50,000 retainer (the "Retainer) prior to seeking relief under the Bankruptcy Code. The Company shall file an application with the Bankruptcy Court seeking authority to employ Bayshore as its financial advisor and investment banker, pursuant to the terms of the Engagement Agreement (as modified by this Addendum) and sections 327 and 328 of the Bankruptcy Code. Bayshore will apply the Retainer to any fees and expenses incurred post-bankruptcy in accordance with terms of the Engagement Agreement and Bayshore's court approved retention. The Retainer is being paid in advance of services being performed and not on account of antecedent debt, and shall be deemed paid in the ordinary course of Bayshore and the Company's business. The Retainer shall be deemed reasonably equivalent value in respect of the services being provided. The Retainer will be held in a trust account on your behalf. At the conclusion of this matter, the remaining Retainer will be applied to you're the last monthly bill or Transaction Fee, as the case may be, and to the extent it has not been utilized in fees and costs related to your representation, upon conclusion of our representation and the entry of a final order awarding Bayshore final compensation, the remaining portion of the Retainer shall be returned to you.

Unless specifically modified herein, all terms and conditions contained in the Engagement Agreement shall remain in full force and effect. In acknowledgment that the foregoing correctly sets forth the understanding reached by Bayshore and the Company, please

---

[1] All capitalized terms shall have the meaning ascribed to them in the Engagement Agreement.

sign in the space provided below, whereupon this letter shall constitute a binding Addendum to
the Engagement Agreement as of the date indicated above.

Very truly yours,

BAYSHORE PARTNERS, LLC

By: _____

Name:   Michael Turner

Title:   Partner

Accepted and Agreed:

Protective Products of America, Inc. et. al.

By: _____
Dated:   1/8/10

**Exhibit "C"**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION
### www.flsb.uscourts.gov

In re:                                              Case No. 10-10711-BKC-JKO

PPOA HOLDING, INC., *et al.*,                       Chapter 11 Cases

        Debtors.                 (Jointly Administered)

_____/

## (I) FIRST INTERIM[1] APPLICATION OF BAYSHORE PARTNERS, LLC FOR APPROVAL AND ALLOWANCE OF PAYMENT OF INDEMNIFICATION FEES AND COSTS INCURRED FOR THE PERIOD DECEMBER 6, 2010 THROUGH AND INCLUDING FEBRUARY 8, 2011

### AND

## (II) MOTION FOR AN ORDER CONDITIONING ALL PLAN DISTRIBUTIONS UPON THE PRIOR ALLOWANCE AND PAYMENT TO BAYSHORE PARTNERS, LLC OF INDEMNIFICATION FEES AND COSTS

Bayshore Partners, LLC ("Bayshore"),[2] investment banker to the Debtors, by and through

undersigned counsel and pursuant to sections 105, 328, 330, 331 and 503(b) of title 11 of the

United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), Rule 2016 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Local Rule 2016-1 and this Court's

*Interim* and *Final Order Approving Debtors' Application for Approval of Employment of*

*Bayshore Partners, LLC as Investment Bankers to the Debtors Nunc Pro Tunc to the Petition*

*Date* (the "Retention Orders") [ECF Nos. 52 and 126 respectively], files this *(I) First Interim*

*Application for Approval and Allowance of Payment of Indemnification Fees and Costs Incurred*

---

[1] To the extent the Court deems this First Interim Fee Application a final fee application, Bayshore reserves the right to file a supplemental fee application including fees and costs incurred up to and including the confirmation hearing.

[2] Bayshore is the broker-dealer affiliate of Farlie Turner & Co. For purposes of this Application and Motion, all representations regarding Bayshore shall incorporate by reference Farlie Turner.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

{Firm Clients/5386/5386-1/00849406.DOC.}

*for the Period December 6, 2010 Through and Including February 8, 2011* (the "Application")
*and (II) Motion for an Order Conditioning All Plan Distributions Upon the Prior Allowance and*
*Payment to Bayshore Partners, LLC of Indemnification Fees and Costs* (the "Motion").   In
support, Bayshore states as follows:

## PRELIMINARY STATEMENT

Pursuant to this Application and Motion, Bayshore seeks its first payment for
indemnification fees and costs pursuant to the express terms of the Indemnification Procedures
(defined below) previously approved by this Court in its Retention Orders.   Specifically, the
Retention Orders require Bayshore to submit interim and final applications for reimbursement of
indemnification fees and costs *as incurred.*   Accordingly, this First Interim Application is
submitted pursuant to the express terms of the Retention Orders.   Relatedly, Bayshore seeks an
order of the Court conditioning Plan distributions upon the allowance and payment in full of all
indemnification fees and costs to Bayshore, including any other costs or expenses related to or
arising out of Bayshore's engagement as investment banker to the Debtors.[3]   Since the Plan is
silent with respect to priority of payment of Bayshore's indemnification fees and costs vis-à-vis
Plan distributions, Bayshore respectfully submits that conditioning payment of Plan distributions
upon the allowance and payment in full of Bayshore's indemnification fees and costs, including
allowance of any and all future indemnification fees and costs, as approved by this Court,

---

[3]   Although Bayshore is not liable in law or fact for any damages alleged in the Frank Litigation
(defined herein), Bayshore reserves the right to seek indemnification from the Debtors, pursuant
to the terms of the Indemnification Provisions, from any judgments, losses, claims (whether or
not valid), damages, costs fees, expenses or liabilities, joint or several, to which Bayshore may
become subject, related to or arising out of Bayshore's engagement or performance under the
Bayshore Agreement, or any actual or threatened claim as further set forth in the Indemnification
Provisions set forth in Exhibit A to the Engagement Letter.

upholds the priority scheme of the Bankruptcy Code by paying Bayshore's valid administrative claims ahead of the claims of inferior classes.

## JURISDICTION

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157 and 11 U.S.C. §§ 105, 328, 330, 331 and 503(b).  This is a "core" proceeding under 28 U.S.C. § 157.

2.     Venue of this motion is proper under 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

3.     The Debtors designed, manufactured and marketed advanced products that provided ballistic protection for personnel and vehicles in the military and law enforcement markets.  Their product portfolio included a full line of soft armor police and military protective products, including vests, special purpose armor plates, shields, helmets and law enforcement vehicle door protection systems.  One of their signature products was the Modular Tactical Vest, or MTV, which was selected in 2006 by the U.S. Marine Corps in a competitive process to replace its previous Interceptor body armor system.  The Debtors were capable of providing customers with an integrated armoring system of soft ballistic material, vests and plates for military personnel.

4.     The Debtors' customers included agencies of the U.S. Government, international militaries, prime government contractors who integrated the Debtors' products into their armor systems, distributors and law enforcement agencies.  During the nine months ended September 30, 2009, approximately 95% of the Debtors' products were sold to customers in the United States.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

{Firm Clients/5386/5386-1/00849406.DOC.}

5.    The Debtors maintained their headquarters and primary manufacturing and research and development facilities in Sunrise, Florida. Protective Products of America, Inc. ("PPA") was a publicly traded company on the Toronto Stock Exchange

6.    PPA, as borrower, the other Debtors, as guarantors, and Canadian Imperial Bank of Commerce ("CIBC" or "Lender"), as lender, were parties to a credit agreement dated as of September 21, 2004, as amended and restated pursuant to an amended and restated credit agreement dated as of January 30, 2009, and further amended by a second amending agreement executed December 29, 2009 (collectively, the "Credit Agreement"). Pursuant to the Credit Agreement, CIBC provided working capital and term loans to the Debtors. As of the Petition Date, the Debtors were indebted to CIBC in the approximate amount of $7,400,000, which was secured by senior liens in and upon substantially all of the assets of the Debtors. In addition to the senior secured CIBC credit facility, the Debtors issued subordinated debentures to a number of investors to generate liquidity. More specifically, in August and September 2007, PPA issued $5.1 million in principal value of subordinated, nonconvertible debentures ("Sub NC Debentures") at an interest rate of 12.0% per annum, due to mature 2 years from the date of issuance. In February and March 2008, PPA issued an additional $6.0 million of subordinated, convertible debentures ("Sub C Debentures") at an annual interest rate of 10.0% per annum, due to mature in February 2011, and completed a public offering of common stock issued pursuant to Canadian securities regulations for net proceeds of $14.1 million. After the issuance of these debt securities, the Debtors were in default with CIBC during most fiscal quarters prior to the Petition Date.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.

3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

{Firm Clients/5386/5386-1/00849406.DOC.}

## BAYSHORE'S ENGAGEMENT AND INDEMNIFICATION TERMS

7.       On June 16, 2009, the Debtors retained Bayshore in order to assist the Debtors in evaluating their strategic options with respect to the sale or recapitalization of their businesses and related assets both as a going concern outside of bankruptcy or in the context of a potential chapter 11 bankruptcy filing. *See* Engagement Letter attached hereto as "Exhibit A."

8.       On January 7, 2010, in contemplation of a bankruptcy filing, and in consideration of Bayshore agreeing to continue providing services to the Debtors post-petition, the Debtors and Bayshore executed an Addendum to Engagement Letter (the "Addendum" and with the Engagement Letter, the "Bayshore Agreement") which modified the terms of the Engagement Letter to address Bayshore's retention by the Debtors pursuant to section 327 and 328 of the Bankruptcy Code.

9.       A material component of the Bayshore Agreement is the Debtors' agreement to indemnify Bayshore pursuant to the terms of the indemnification agreement (the "Indemnification Provisions") attached as Exhibit A to the Engagement Letter.  Among other things, the Indemnification Provisions require the Debtors to pay Bayshore's fees and expenses, including counsel fees, *as they are incurred* in defending any such claim except as otherwise provided in any order entered by a bankruptcy court approving Bayshore's retention.

10.      After experiencing several years of significant operating losses, On January 13, 2010 (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code in order to gain much needed breathing room to monetize certain of their assets and to facilitate an orderly reorganization or sale of their enterprise.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

{Firm Clients/5386/5386-1/00849406.DOC.}

11.     Concurrent with the filing of the Petitions, the Debtors' filed their *Application for Interim and Final Order Approving the Employment of Bayshore Partners, LLC as Investment Bankers to the Debtors in Possession Nunc Pro Tunc to the Petition Date* (the "Retention Motion") [ECF No. 8], pursuant to which the Debtors sought authorization to employ and retain Bayshore as investment bankers to the Debtors pursuant to the terms of the Bayshore Agreement.

12.     On January 19, 2010, the Court entered its *Interim Order Approving Debtors' Application for Approval of Employment of Bayshore Partners, LLC as Investment Bankers to the Debtors Nunc Pro Tunc to the Petition Date* (the "Interim Order") [ECF No. 52]. In the Interim Order, the Court specifically acknowledged and approved the Indemnification Provisions as follows:

The indemnification provisions (the "Indemnification Provisions") attached to the Bayshore Agreement are approved, subject to the following modifications:

i.     All requests of Bayshore, its affiliates or any of its or their respective officers, directors, controlling persons, employees, affiliates, agents, counsel and other advisors (hereinafter collectively referred to as an "Indemnified Party") for payment of indemnification Agreement shall be made by means of an interim or final fee application and shall be subject to the approval of, and review by, the Court to ensure that such payment conforms to the terms of the Bayshore Agreement, the Bankruptcy Code, the Bankruptcy Rules, and Local Rules and the others of this Court;

ii.    Notwithstanding the foregoing, in no event shall an Indemnified Party be indemnified or receive contribution or other payment under the Indemnification Agreement if the Debtor, their estate or the official committee of unsecured creditors appointed in this chapter 11 case asserts a claim, to the extent that the Court determines by final order that such claim arose out of bad-faith, gross negligence, self-dealing, breach of fiduciary duty, or willful misconduct on the part of that or any other Indemnified Party; and, for the avoidance of any doubt, to the extent of such finding, the provisions of the Indemnification Agreement shall not be applicable, such that Bayshore's potential liability for such acts shall not be limited to the amounts received by Bayshore for services rendered in these chapter 11 cases; and

6

{Firm Clients/5386/5386-1/00849406.DOC.}

iii.   In the event an Indemnified Party seeks reimbursement for attorneys' fees from the Debtor pursuant to the Indemnification Provision, the invoices and supporting time records from such attorneys shall be subject to the United States Trustee's Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses and the approval of this Court under the standards of 11 U.S.C. 330 without regard to whether such attorney has been retained under 11 U.S.C. 327.

Interim Order at ¶ 8.

13.   On February 17, 2010, the Court entered its *Final Order Approving Debtors' Application for Approval of Employment of Bayshore Partners, LLC as Investment Bankers to the Debtors Nunc Pro Tunc to the Petition Date* (the "Final Order" and collectively with the Interim Order the "Retention Orders") [ECF No. 126].

## THE MARKETING PROCESS

14.   Pursuant to the terms of the Bayshore Agreement, Bayshore, among other things, prepared a confidential investment memorandum (the "CIM") to assist in marketing the Debtors' assets for sale or in raising additional debt or equity capital. The CIM contained detailed information on the Debtors' business, strategy, market position, growth opportunities, and historical and projected financial performance.

15.   Bayshore conducted an extensive marketing process, contacting over 100 parties, including potential strategic buyers operating within the Debtors' industry as well as private equity firms, various lending institutions, and certain of the Debtors' existing debt and equity security holders.   As a result of these efforts, approximately 28 parties entered into confidentiality agreements with the Debtors and were provided with the CIM. Bayshore was significantly involved in various due diligence activities, including creating and attending management presentations, assembling data requests, and answering specific requests by potential buyers and capital providers. Several parties conducted extensive due diligence, visited

7
LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

{Firm Clients/5386/5386-1/00849406.DOC.}

the Debtors' facilities, and had discussions with various members of the Debtors' management team and board of directors. Thereafter, Bayshore transmitted detailed bid instructions to interested parties, and 6 parties submitted written indications of interest contemplating the acquisition of substantially all of the Debtors' assets to be effected in a bankruptcy setting, while 2 parties indicated an interest in providing subordinated debt capital to the Debtors outside of bankruptcy.

16.     Bayshore, throughout its retention, played an important role negotiating on behalf of the Debtors with CIBC, the Debtors' senior lender. The Debtors were in default on their credit facility for at least the two fiscal quarters prior to Bayshore's retention and afterward, and required immediate additional liquidity to continue operations. Bayshore was instrumental in negotiating with CIBC a "bulge" financing pre-bankruptcy and a debtor in possession credit facility post-bankruptcy ("DIP Loan") totaling approximately $1.3 million, both of which were designed to fund the Debtors' operations through a sale in accordance with an expedited timeline. Absent this additional liquidity, the Debtors would have likely liquidated their assets at depressed prices, rather than selling their business as a going concern, since they were consistently operating on a cash flow negative basis.

17.     After analyzing the offers, the Debtors in consultation with their advisors and CIBC, determined that Sun Capital Partners Group V, Inc.'s ("Sun Capital") offer provided the greatest value to the Debtors and their key constituents. On December 21, 2009, the Debtors and Sun Capital executed a non-binding letter of intent (the "Letter of Intent") pursuant to which Sun Capital proposed to acquire, subject to due diligence, certain of the Debtors' assets for approximately $8,000,000 in cash plus the assumption of specified liabilities. Importantly, the

8

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

{Firm Clients/5386/5386-1/00849406.DOC.}

Letter of Intent permitted the Debtors to retain certain assets, including their interest in several tax refunds valued by the Debtors at approximately $5.5 million.

18.     To ensure that the assets were appropriately marketed and that the Debtors received the highest and best price, the Letter of Intent contemplated that the assets would ultimately be sold through a Court approved auction and sale process under section 363 of the U.S. Bankruptcy Code.

19.     Following entry into the Letter of Intent, the Debtors and Sun Capital moved forward with the negotiation and documentation of a purchase and sale agreement (the "Original Agreement").

## APPROVAL OF SALE AND BID PROCEDURES

20.     On January 13, 2010, (the "Petition Date") the Debtors filed their motion to approve sale and bid procedures [ECF No. 19] (the "Bid Procedures Motion") in connection with the proposed sale of substantially all of their operating assets to Protective Products Enterprises, Inc., an affiliate of Sun Capital ("Sun Capital" or the "Proposed Purchaser").

21.     On January 19, 2010, the Court entered an order granting the Bid Procedures Motion (the "Bidding Procedures Order") [ECF No. 46]. Pursuant to the Bidding Procedures Order, the Court, *inter alia*, approved the Original Agreement between the Debtors and Sun Capital, approved competitive sale procedures, and authorized the Debtors to conduct an auction sale (collectively, the "Bid Procedures"). Pursuant to the Original Agreement, Sun Capital proposed to acquire certain of the Debtors' assets, excluding the Debtors' tax refunds and certain avoidance actions, for $8,000,000 in cash, and assume specific liabilities.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

{Firm Clients/5386/5386-1/00849406.DOC.}

## THE ARREST AND INDICTMENT OF THE DEBTORS' CEO

22.     On January 25, 2010, the Court conducted a status conference in the Debtors' cases. At the status conference, the Debtors apprised the Court that the Debtors' acting Chief Executive Officer (along with approximately 21 other executives from different companies who provide goods or services to the military and law enforcement agencies) had been arrested in connection with an ongoing federal investigation of violations of the Foreign Corrupt Practices Act ("FCPA"). As the Debtors reported, the Debtors' Board of Directors placed the acting Chief Executive Officer, Patrick Caldwell, on administrative leave and directed the Board's audit committee to conduct an investigation of the Debtors' policies, procedures and compliance with FCPA.

23.     The arrest of Mr. Caldwell and ensuing investigation by the U.S. Department of Justice was immediately publicized in major newspapers, including *The New York Times* and *The Wall Street Journal*, and caused significant concern among the Debtors' customers and vendors. Indeed, one of the Debtors' major customers, Ibiley Manufacturing Corporation, sought to cancel its contract with the Debtors which accounted for over $10 million in revenue. These events immediately created the perception of substantial increased risk associated with the acquisition of the Debtors' assets.

24.     Sun Capital asserted that the federal investigation and arrest constituted a material adverse change in the business of the Debtors, thereby permitting it to terminate the Original Agreement. A condition of the Sun Capital's obligation to close under the Original Agreement was its employment of the Debtors' senior management team, including its acting Chief Executive Officer. Likewise, the Debtors' senior secured Lender, CIBC, asserted that these circumstances constituted an event of default under the DIP Loan previously approved by the

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

{Firm Clients/5386/5386-1/00849406.DOC.}

Court. The situation was desperate and it appeared at the time that the Debtors may have to liquidate its assets immediately which would have likely resulted in a compromised recovery for all creditors, including the Debtors' senior lender.

25. Commencing on January 19, 2010, when the Debtors first learned of the federal investigation, until the closing of the sale of the Debtors' assets to the affiliate of Sun Capital, Bayshore played a leading role in discussions with Sun Capital and CIBC regarding these events. Bayshore negotiated extensively with Sun Capital regarding the terms under which it would proceed with its proposed acquisition of substantially all of the Debtors' assets. Bayshore also led negotiations with key vendors and customers in order to ensure continued support for the Debtors.

26. These negotiations culminated in the execution of the Amended and Restated Asset Purchase Agreement dated as of February 4, 2010 between the Debtors and the Sun Capital affiliate (the "Amended Agreement"). Remarkably, due in large part to Bayshore's efforts, Sun Capital agreed to advance an acquisition on essentially the same terms and time line proposed in the Original Agreement; provided, however, that it retained the Debtors' anticipated tax refunds which was not originally contemplated. Instead of assigning all of the proceeds of the anticipated tax refunds as initially demanded by Sun Capital, Bayshore successfully negotiated an agreement to split the tax proceeds between the Sun Capital affiliate and the Debtors' estates. More specifically, to the extent that the aggregate amount of all cash tax refunds actually received by the Sun Capital affiliate exceeded Two Million Dollars ($2,000,000), this affiliate would pay to the Debtors' estates an amount equal to 42.858% of such refunds in excess of two million dollars.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

{Firm Clients/5386/5386-1/00849406.DOC.}

27.    The Amended Agreement also contemplated an auction process consistent with, and on the timeline established by the Bidding Procedures, and allowed the Debtors to seek a higher and better purchase offer for the Acquired Assets.

28.    The Amended Agreement did not modify or extend the previously approved and expedited timeline set forth in the Bidding Procedures:

- February 15, 2010 Bid Deadline;
- February 18, 2010 Auction; and
- February 19, 2010 Sale Hearing

29.    Notwithstanding around-the-clock negotiations with Sun Capital, CIBC, and other constituents of the Debtors following Mr. Caldwell's arrest, Bayshore never stopped marketing the Debtors' assets and facilitating diligence by other potential buyers in an effort to preserve, and perhaps increase, Sun Capital's stalking horse bid. In the face of formidable odds, Bayshore was able to secure another qualifying bid only 11 days after the execution of the Amended Agreement and less than 30 days after Mr. Caldwell's arrest. As such, Bayshore conducted a spirited auction on February 18, 2010 resulting in a significant increase in the purchase price for the Debtors' assets. The purchase price was increased from $8,000,000 to $9,900,000 – approximately 25%.

30.    As a direct result of Bayshore's efforts, CIBC, the Debtors' senior lender, has been paid $8,471,192.01 on account of its secured claim – a 100% recovery and other creditors will receive a meaningful distribution. In the absence of a spirited auction which started with a purchase price of $8,000,000 in cash ($471,192 less than CIBC's claim) and Bayshore's negotiation of a splitting arrangement on the anticipated tax refunds, the unsecured creditors of the Debtors' estates would likely have achieved *no recovery whatsoever*. In fact, in recognition

12

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

{Firm Clients/5386/5386-1/00849406.DOC.}

of Bayshore's incredible accomplishment in this case, it was recently nominated for distressed

M&A deal of the year by a leading professional finance, turnaround and merger and acquisition

organization.

31.     On February 22, 2010, the Court entered its *Order (I) Authorizing the Sale of*

*Substantially All of the Debtor's Assets Free and Clear of Liens, Claims, Encumbrances and*

*Other Interests; (II) Authorizing and Approving the Asset Purchase Agreement; (III) Approving*

*Procedures and Rights Related to Assumption and Assignment of Certain Executory Contracts*

*and Unexpired Leases; and (IV) Granting Related Relief* (the "Sale Order") [ECF No. 133].

Among other things, the Court found and concluded that "[a]ctual written notice of and a

reasonable opportunity to object or be heard with respect to, the Sale Hearing, the Auction, the

Motion and the Transactions has been afforded to all known interested entities." Sale Order at ¶

I. In addition, the Court found and concluded:

> [T]he Asset Purchase Agreement and the Transactions contemplated thereby
> constitute the highest and best offer for the Acquired Assets, and will provide a
> greater recovery for the Debtors' estates than would be provided by any other
> available alternative.     The Debtors' determination that the Asset Purchase
> Agreement constitutes the highest and best offer for the Acquired Assets
> constitutes a valid and sound exercise of the Debtors' business judgment.

Sale Order at ¶ P.

## THE INDEMNIFICATION PROVISIONS HAVE BEEN TRIGGERED

32.     Notwithstanding (1) the incredible results achieved for these Debtors by Bayshore

as described above, (2) the fact that creditors and parties in interest had notice and an opportunity

to object to the terms of the sale, and (3) the Court's findings and conclusions regarding the

propriety and benefit to the estate of the sale, Bayshore has nonetheless been subjected to a

frivolous lawsuit filed on December 6, 2010 by a disgruntled former shareholder (Michael Frank,

13
LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

{Firm Clients/5386/5386-1/00849406.DOC.}

"Plaintiff").[4]   In his Complaint, Frank alleges that Bayshore, among other things, conspired to conceal positive material information and that Bayshore interfered with the Plaintiff's and other class members' economic relations and interest in PPA.   A true and correct copy of the Frank Complaint is attached hereto as "Exhibit B."

33.     Bayshore has and will continue to vigorously defend itself from the specious allegations in the Frank Complaint.   However, the veracity of the allegations in the Frank Complaint and Bayshore's valid defenses thereto are not germane for the purposes of this Application and Motion; rather, the simple *existence* of the Frank Lawsuit, which has required Bayshore to incur fees and expenses defending the Frank Lawsuit since December 6, 2010 has triggered the Indemnification Provisions of the Bayshore Agreement as approved by this Court.

34.     Accordingly, pursuant to the express terms of the Retention Orders, Bayshore hereby makes its First Interim Application for payment of its indemnification fees and costs.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

---

[4] *Frank v. Farlie, Turner & Co., LLC et al.*, Court File No. CV-10-415821-CP00, Ontario Sup. Ct. Jus. (the "Frank Lawsuit").

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

{Firm Clients/5386/5386-1/00849406.DOC.}

## I.   FIRST INTERIM APPLICATION OF BAYSHORE PARTNERS, LLC FOR APPROVAL AND ALLOWANCE OF PAYMENT OF INDEMNIFICATION FEES AND COSTS INCURRED FOR THE PERIOD DECEMBER 6, 2010 THROUGH AND INCLUDING FEBRUARY 8, 2011

| | | |
|---|---|---|
| 1. | Name of Applicant: | *Bayshore Partners, LLC* |
| 2. | Role of Applicant: | *Investment Banker to Debtors* |
| 3. | Name of Certifying Professional: | *Peter D. Russin, Esq., as to Meland, Russin & Budwick, P.A., and David W. Kent, Esq. as to McMillan LLP* |
| 4. | Date case filed: | *January 13, 2010* |
| 5. | Date of application for employment: | *1/13/10 [ECF No. 8]* |
| 6. | Date of order approving employment: | *2/17/10 [ECF No. 126] nunc pro tunc to Petition Date* |
| 7. | If debtor's counsel, date of Disclosure of Compensation form: | *N/A* |
| 8. | Date of this application: | *February 8, 2011* |
| 9. | Date of services covered: | *December 6, 2010 through February 8, 2011* |
| 10. | If case is chapter 7, amount trustee has on hand: | *N/A* |
| **Fees...** | | |
| 11. | Total fee requested for this period (from Exhibits C and D): | $23,182.48 |
| 12. | Balance remaining in fee retainer account, not yet awarded: | $    0.00 |
| 13. | Fees paid or advanced for this period, by other sources: | $    0.00 |
| 14. | **Net amount of fee requested for this period:** | $23,182.48 |
| **Expenses...** | | |
| 15. | Total expense reimbursement requested for this period: | $    76.35 |
| 16. | Balance remaining in expense retainer account, not yet received: | $    0.00 |
| 17. | Expenses paid or advanced for this period, by other sources: | $    0.00 |
| 18. | **Net amount of expense reimbursements requested for this period:** | $    76.35 |
| 19. | Gross award requested for this period (#11 + #15): | $23,258.83 |
| 20. | **Net award requested for this period (#14 + #18):** | $23,258.83 |

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

{Firm Clients/5386/5386-1/00849406.DOC.}

## History of Fees and Expenses

| 1. | Dates, sources, and amounts of retainers received: **N/A** | | |
|---|---|---|---|
| Dates | Sources | Amounts | For fees or costs? |
| 2. | Dates, sources, and amounts of retainers received: **N/A** | | |
| Dates | Sources | Amounts | For fees or costs? |
| 3. | Prior fee and expense awards... | | |
| **First interim application...** | | | |
| Dates covered by first application: | | **N/A** | |
| Amount of fees requested: | | | |
| Amount of expenses requested: | | | |
| Amount of fees awarded: | | | |
| Amount of expenses awarded: | | | |
| Amount of fee retainer authorized to be used: | | | |
| Amount of expense retainer authorized to be used: | | | |
| Fee award, net of retainer: | | | |
| Expense award, net of retainer: | | | |
| Date of first award: | | | |
| Amount of fees actually paid: | | | |
| Amount of expense reimbursement actually paid: | | | |
| Portion of fees requested but not awarded, which applicant wishes to defer to final fee application: | | | |
| Portion of expenses requested but not awarded, which applicant wishes to defer to final fee application: | | | |

| **Summary of All Prior Applications and Awards** | |
|---|---|
| Total fees requested: | **N/A** |
| Total fees awarded: | |
| Prior fees awarded but not yet paid, if any (do not include holdbacks in this number) | |
| Total prior fees requested but not awarded, deferred to final fee application: | |
| Total expenses requested: | |
| Total expenses awarded: | |
| Prior expenses awarded but not yet paid, if any (do not include holdbacks in this number) | |
| Total prior expenses requested but not awarded, deferred to final fee application: | |

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

{Firm Clients/5386/5386-1/00849406.DOC.}

## DISCLOSURE OF COMPENSATION AND REQUESTED AWARD

35.     Pursuant to the terms of the Sale Order, at the closing of the transaction with the

Sun Capital affiliate, Bayshore was paid a transaction fee of $341,100 (the "Transaction Fee")

plus reimbursement of unpaid expenses in the amount of $829.47 from the proceeds of the Sale

in accordance with 11 U.S.C. 328(a). In addition to the Transaction Fee, Bayshore also received

monthly fees totaling $212,500 and $4,028.11 in expense reimbursements. Bayshore's total

compensation received in these cases is $558,457.58. Pursuant to the terms of the Sale Order,

Bayshore was not required to file fee applications and the Sale Order constituted a final award of

all fees and expenses owed, and previously paid, to Bayshore in these cases. Bayshore's fees

and expenses were never challenged by any party-in-interest in these cases.

36.     Bayshore requests allowance of $23,182.48 of compensation for indemnification

of fees incurred during the period December 6, 2010 through and including February 8, 2011

(the "Interim Application Period") and $76.35 for reimbursement for actual and necessary

expenses Bayshore incurred during the Interim Application Period, for a total request of

$23,258.83. A summary description of indemnification fees owed to Bayshore and expenses for

which reimbursement is sought is provided in "Exhibit C", "Exhibit D" and "Exhibit E."

37.     This is Bayshore's first interim request for payment of indemnification fees and

costs. No undertaking exists between Bayshore and any other person for the sharing of

compensation sought by Bayshore in this First Interim Application, except that Bayshore will

remit such indemnification fees and costs to its attorneys in the amounts set forth in "Exhibit F"

invoices, which amounts represent the "Indemnification Fees and Costs."

38.     In accordance with the Guidelines for Fee Applications for Professionals in the

Southern District of Florida in Bankruptcy Cases (the "Local Guidelines"), and the United States

17
LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

{Firm Clients/5386/5386-1/00849406.DOC.}

Trustee Guidelines for Reviewing Applications for Compensation (the "UST Guidelines" and together with the Local Guidelines, the "Guidelines"), the following exhibits are attached to this Application:

Exhibit A – Bayshore Agreement

Exhibit B – Complaint

Exhibit C – Summary of Professional and Paraprofessional Time Total per Individual

Exhibit D – Summary of Professional and Paraprofessional Time Total by Activity Code Category

Exhibit E – Summary of Requested Reimbursement of Expenses

Exhibit F – Time Records for the Interim Application Period

Exhibit G – MRB Certification

Exhibit H – McMillan Certification

39.    The summaries described above are not intended to be a detailed description of the work performed, as those day-to-day services and the time expended in performing such services are set forth in the redacted attorney invoices attached as Exhibit F.. Rather, the summaries are merely guidelines offered to the Court and other interested parties with respect to the services and the time expended by Bayshore's attorneys as a direct result of the Frank Litigation.

40.    During the Interim Application Period, McMillan LLP's ("McMillan") services to Bayshore focused on defense of the Frank Litigation in Canada. McMillan logged a total of 13.9 hours at an hourly rate of $808.00[5] for partners.  With respect to Meland Russin & Budwick,

---

[5] McMillan LLP's invoice reflects amounts owed in Canadian dollars.  However, the amounts listed herein reflect U.S. dollars, using a currency exchange rate of $1 U.S. dollar to $1.0099 Canadian dollars as of February 8, 2011.

18

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

{Firm Clients/5386/5386-1/00849406.DOC.}

Orders, the Frank Litigation and preparation of this Application and Motion. MRB logged a total of 32.3 hours at hourly rates ranging from $135.00 for paralegals to $550.00 for partners.

41.     Since Bayshore is unable to provide comment as to whether the requested compensation is based on the customary compensation charged by comparably skilled practitioners in such matters, MRB and McMillan have prepared, reviewed, and executed Certifications attached as Exhibit G and Exhibit H.

42.     Bayshore believes that this First Interim Application, together with the attachments hereto, substantially complies in all material respects with the Guidelines and the Retention Orders. To the extent this First Interim Application does not comply in every respect with the requirements of the Guidelines or Retention Orders, Bayshore respectfully requests a waiver for any such non-technical compliance.[6]

## II.     MOTION FOR AN ORDER CONDITIONING ALL PLAN DISTRIBUTIONS UPON THE PRIOR ALLOWANCE AND PAYMENT TO BAYSHORE PARTNERS, LLC OF INDEMNIFICATION FEES AND COSTS

43.     As described above, as a result of the Frank Litigation, there is no question that the Indemnification Procedures approved by this Court have been triggered. However, neither the Retention Orders which require Bayshore to submit interim and final fee applications for indemnification fees and costs, nor the *Third Amended Plan of Liquidation for the Debtors Proposed by the Official Committee of Unsecured Creditors* (the "Plan") address the priority of such administrative payments vis-à-vis distributions pursuant to the Plan.

---

[6] Although Bayshore has sought to apply the Guidelines to the extent possible, the fact remains that the nature of this Application, for indemnification fees and costs, does not fit neatly within the Guidelines. As a result, after consultation with the United States Trustee, Bayshore has adhered to the Guidelines to the extent possible, and will further supplement this Application to the extent the Court requires.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

{Firm Clients/5386/5386-1/00849406.DOC.}

44.     Accordingly, Bayshore respectfully submits that Bayshore's indemnification fees and costs, as set forth in both interim and final fee applications, as approved by this Court, should be paid *in full* prior to any distributions to unsecured creditors pursuant to the distribution scheme of the Plan.

## THE PLAN IS SILENT WITH RESPECT TO PRIORITY OF PAYMENT OF BAYSHORE'S INDEMNIFICATION FEES AND COSTS

45.     Although the Plan generally discusses the treatment of certain classes of claimants, it does not appear to address the treatment of Bayshore's indemnification fees and costs. Moreover, the Plan gives broad and undefined authority to the Creditor Trustee to determine the timing and manner of distribution payments. Specifically, section 7.2 of the Plan imbues the Creditor Trustee with the sole and absolute discretion as to the timing of Distributions until all Allowed Claims are satisfied under the Plan.[7]   Although the Creditor Trustee is required to maintain a Disputed Claim Reserve, this mechanism is not designed for, nor suited to address treatment of Bayshore's indemnification fees and costs which are required to be repaid *as incurred.*

46.     As an administrative cost of the estate which will survive confirmation (since the Frank Litigation will undoubtedly extend past confirmation) it is imperative that provision be made either by Court Order or in the Plan to ensure that Bayshore's indemnification fees and costs, as valid administrative expenses, are paid prior to any distributions to unsecured creditors. However, since the Plan is silent on the issue, Bayshore respectfully requests that this Court condition distributions pursuant to the Plan on the prior payment in full of Bayshore's indemnification fees and costs as approved by this Court.

---

[7]  Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Plan.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.

3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

{Firm Clients/5386/5386-1/00849406.DOC.}

47.     Interestingly, while the Plan is silent with respect to the timing and priority of payment of Bayshore's indemnification fees and costs, it *does* address how the Creditor Trustee will be paid post-confirmation on its indemnification fees and costs. Specifically, Section 8.6 of the Plan provides in pertinent part:

> Notwithstanding any provision herein to the contrary, the Indemnified Parties shall be entitled to obtain *advances* from the Creditor Trust to cover their expenses of defending themselves in any action brought against them as a result of the acts or omissions, *actual or alleged*, of the Creditor Trustee in its capacity as such; provided however, that the Indemnified Parties receiving such advances shall repay the amounts so advanced to the Creditor Trust upon the entry of a Final Order finding that such Indemnified Parties were not entitled to indemnity under the provisions of Section 8.5 of the Plan.

Plan, section 8.6 (emphasis added).

48.     Just as the Creditor Trustee is entitled to indemnification until such time as this Court determines, by Final Order, that the Creditor Trustee is not entitled to indemnification, so too is Bayshore entitled to indemnification until such time as this Court determines, by Final Order, that Bayshore is not entitled to indemnification. *See* paragraph 12 *supra*.

49.     Accordingly, Bayshore respectfully requests that this Court condition all distributions pursuant to the Plan upon the prior allowance and payment of Bayshore's indemnification fees and costs. By doing so, this Court will enforce the Indemnification Provisions it has previously approved, and will also adhere to the priority scheme of the Bankruptcy Code which requires administrative fees and costs to be paid prior to inferior creditor classes.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

21
LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

{Firm Clients/5386/5386-1/00849406.DOC.}

**WHEREFORE** Bayshore respectfully requests (i) allowance of indemnification fees incurred during the Interim Application Period in the amount of $11,195.47 for McMillan and $11,987.00 for MRB for a total of $23,182.48 in fees, and reimbursement for actual and necessary expenses Bayshore incurred during the Interim Application Period in the amount of $76.35 for MRB for a total of $76.35 in actual and necessary expenses incurred for a total request of $23,258.83; (ii) an Order of the Court conditioning all Plan Distributions upon the prior allowance and payment to Bayshore Partners, LLC of its indemnification fees and costs, as approved by this Court, and (iii) such other and further relief as this Court deems just and proper.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was mailed via U.S. Regular Mail to all parties on the list attached as Exhibit 1 and via the Court's Notice of Electronic Filing upon Registered Users set forth on the list attached as Exhibit 2 on February 8, 2011.

 s/ Peter D. Russin
Peter D. Russin, Esquire
Florida Bar No. 765902
prussin@melandrussin.com
James C. Moon, Esquire
Florida Bar No. 938211
jmoon@melandrussin.com
MELAND RUSSIN & BUDWICK, P.A.
3000 Wachovia Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 358-6363
Telecopy: (305) 358-1221

*Attorneys for Bayshore Partners, LLC and
Farlie Turner & Co.*

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

{Firm Clients/5386/5386-1/00849406.DOC.}

# BAYSHORE PARTNERS, LLC

## CONFIDENTIAL

June 16, 2009

Brian Stafford
Chief Executive Officer
Protective Products of America, Inc.
1649 Northwest 136th Avenue
Sunrise, FL 33323

Dear Mr. Stafford:

This letter will confirm the understanding and agreement (the "Agreement") between Bayshore Partners, LLC ("Bayshore") and Protective Products of America Inc., its wholly owned subsidiaries Protective Products International Corp., CPC Holding Corp., Ceramic Protection Corporation of America, and Protective Products of North Carolina LLC and any affiliates of each or any entity formed for the purposes of a Transaction (collectively, the "Company").

1.    Scope of Engagement

       The Company hereby engages Bayshore as its exclusive financial advisor and investment banker in connection with the financial restructuring, recapitalization, reorganization, or one or more merger and/or acquisition Transaction (as defined below) of the Company. If requested by the Company, in accordance with the terms of this Agreement, Bayshore shall:

       (a)    Assist the Company in evaluating its strategic options with respect to the sale or recapitalization of its business and related assets both as a going concern outside of bankruptcy and in the context of a potential Chapter 11 bankruptcy filing;

       (b)    Assist the Company, as requested, in preparing a written Confidential Information Memorandum (CIM) describing its business, strategy, market position, growth opportunities, and historical and projected financial information;

       (c)    Solicit and evaluate proposals from potential parties to a Transaction;

       (d)    Coordinate gathering of due diligence materials to be provided to selected potential parties to a Transaction; and

       (e)    Assist in the negotiation and documentation of a transaction with one or more parties.

2.    Definition of Transaction

       For the purposes of this Agreement, "Transaction" shall mean one or more transactions involving the sale, transfer or other disposition of all or a portion of the assets or Securities of the Company to any entity including, without limitation, any of the

401 E. Las Olas Blvd., Ste 1160 • Fort Lauderdale, FL 33301 • P. 954.358.3800 • F. 954.358.3838

Exhibit A

Protective Products of America, Inc.
June 16, 2009
Page 2

> Company's existing owners, shareholders, employees, creditors, lenders or affiliates; any exchange or tender offer, merger, consolidation, purchase, sale or other business combination involving the Company; or any recapitalization, reorganization, restructuring, confirmed Chapter 11 Plan, joint venture, issuance of new Securities, partnership, minority investment or other similar transaction (including, without limitation, negotiated repurchases of the Company's Securities, an issuer tender offer, an extraordinary dividend or distribution, a credit bid, or a spin-off or split-off or debt restructuring), regardless of whether the Company is the surviving corporations or entities.

3.    Compensation

> As compensation for the services rendered by Bayshore hereunder, the Company shall pay Bayshore as follows:

> (a)    Initial Fee:    In addition to the other fees provided for herein, upon the execution of this Agreement (the "Effective Date"), the Company shall pay Bayshore a nonrefundable cash fee of $25,000, which shall be deemed fully earned upon Bayshore's receipt thereof, in advance of services being performed, in consideration of Bayshore accepting this engagement ("Initial Fee"); plus

> (b)    Monthly Advisory Fee:    The Company shall pay and Bayshore shall earn a monthly advisory fee of $25,000 (prorated for any partial month period), with the first payment due and payable commencing on the date of this Agreement and each additional payment due and payable on the monthly anniversary of the Effective Date until the termination of this Agreement ("Monthly Advisory Fee"). The Monthly Advisory Fee shall be fully earned upon Bayshore's receipt thereof, in advance of services being performed, in consideration of Bayshore accepting this engagement and performing services as described herein.   The Monthly Advisory Fee shall be deemed paid in the ordinary course of Bayshore and the Company's business.   The Monthly Advisory Fee shall be paid in advance of services being provided and not on account of antecedent debt; plus

> (c)    Transaction Fee:    A nonrefundable cash fee (the "Transaction Fee") deemed earned upon the closing of a Transaction, and payable immediately and directly from the proceeds of such Transaction, as a necessary and reasonable cost of such Transaction, equal to greater of the following:

>> i)    $300,000; or

>> ii)    3.0% of the Consideration (as defined in subparagraph 3(d) below).

> Consideration shall be calculated based on the aggregate cash and non-cash consideration paid or debt assumed, or to be paid or assumed, irrespective of the number of Transactions or tranches of Transactions.   The Transaction Fee shall be

Protective Products of America, Inc.
June 16, 2009
Page 3

_____

deemed paid reasonably equivalent value in respect of the services being provided
and paid in the ordinary course of the Company's and Bayshore's business.

To the extent that the Company requests that Bayshore perform additional
services not contemplated by this Agreement, fees for such services shall be
mutually agreed upon by Bayshore and the Company, in writing, in advance.

(d)    "Consideration" shall mean the total value of all cash, securities, repurchase or
buy-out of any stock options or warrants, property and any other consideration
paid or payable, directly or indirectly, or committed, in connection with a
Transaction, including, without limitation, consideration paid or payable to, or for
the benefit of, the Company or to any equity, debt or other security holder of the
Company, including any consideration held in escrow, future payments which are
contingent upon the performance of the Company or any successor to the
Company, and any dividends or distributions paid to the holders of the
Company's equity securities after the date hereof, other than usual recurring cash
dividends in amounts not materially greater than currently paid, or any other
consideration paid or payable, directly or indirectly, in connection with a
Transaction. Any consideration held pursuant to an escrow account established
before or in connection with the consummation of a Transaction shall be deemed
Consideration hereunder irrespective of whether such consideration is being held
in escrow to satisfy future claims. If the Transaction provides for the transfer of
only a portion of the assets or business of the Company and the retention of other
assets relating to such entity or business, including, but not limited to, cash, cash
equivalents, real property, leasehold interests, securities, investments, inventories
or receivables, such retained assets shall be deemed to be part of the
Consideration received in connection with such a Transaction. If the Transaction
provides for the transfer of only a portion of the capital stock or comparable
equity interests of the Company, then the value of the capital stock or equity
interests not transferred shall also be deemed to be a part of the Consideration,
and the value thereof shall be based on the same value per share or other unit as
used in the Transaction. The value of any securities constituting part of the
Consideration (whether debt, equity, stock options, stock warrants or other equity
equivalents) or other property shall be determined as follows: (i) the value of
securities that are freely tradeable in an established public market shall be the
average of the last sale prices for such securities on the five trading days ending
one day prior to the consummation of the Transaction (the "Closing"); and (ii) the
value of securities which are not freely tradeable or which have no established
public market, or if the consideration consists of property or contingent payments
other than securities, the value of such securities, other property, or contingent
payments shall be the fair market value thereof as mutually agreed by the
Company and Bayshore. Consideration shall also include the conversion of any
of the Company's debt securities to equity securities, but shall not include any
debt which is restructured or forgiven.

Protective Products of America, Inc.
June 16, 2009
Page 4

---

If the parties are not able to agree on a fair market valuation of the Consideration prior to Closing, then within five days after Closing, the parties will mutually select one independent accounting firm to determine the fair market value. If the parties are unable to agree on an independent accounting firm, then each party will select one independent accounting firm and both of these firms will then select one nationally recognized independent accounting firm (the "Neutral Auditor"). The Neutral Auditor will determine the fair market valuation of the Consideration and such determination shall be final, binding, and conclusive. All fees and expenses relating to the selection of accounting firms pursuant to subparagraph 3(d) and work performed by the Neutral Auditor shall be borne equally by the parties to this Agreement.

(e)   Except for compensation which is payable to Bayshore in respect of Consideration which is contingent upon the occurrence of some future event (*e.g.*, the realization of earnings projections), compensation payable to Bayshore pursuant to subparagraph 3(c) shall be paid by the Company to Bayshore in wired funds at Closing, as a condition of such Closing. With respect to compensation payable to Bayshore in respect of contingent Consideration, such compensation shall be paid by the Company to Bayshore at the time that the amount of such Consideration can be determined.   The Company agrees that the definitive agreements relating to a Transaction will contain a covenant stating that the Transaction Fee payable to Bayshore pursuant to subparagraph 3(c) will be paid at the Closing, except as provided herein, and that the surviving entity of any Transaction is responsible for all fees and expenses due Bayshore.   Should the Company file bankruptcy, the Transaction Fee shall be subject to Court approval under Section 328(a) of the Bankruptcy Code, however, Bayshore shall not be required to maintain time records or file fee applications with the Court.

4.   Reasonableness of Fees

The parties acknowledge that a substantial professional commitment of time and effort will be required of Bayshore and its professionals hereunder, and that such commitment may foreclose other opportunities for the firm. Moreover, the actual time and commitment required for the engagement may vary substantially, creating "peak load" issues for the firm. Given the numerous issues which may arise in engagements such as this, Bayshore's commitment to the variable level of time and effort necessary to address such issues, the expertise and capabilities of Bayshore that will be required in this engagement, and the market rate for Bayshore's services of this nature, whether in-court or out-of-court, the parties agree that the fee arrangement provided for herein is reasonable, fairly compensates Bayshore, and provides the requisite certainty to the Company.

5.   Reimbursable Expenses

In addition to any fees payable to Bayshore hereunder and regardless of whether a Transaction is consummated, the Company shall reimburse Bayshore for its out-of-pocket

Protective Products of America, Inc.
June 16, 2009
Page 5

and incidental expenses incurred in connection with its engagement hereunder promptly as
requested, including the fees and expenses of its legal counsel and those of any advisor
retained by Bayshore, which expenses shall not exceed $7,500 without the prior consent of
the Company and provided that such limitation shall in no way affect the obligations of the
Company with respect to indemnification as set forth on Exhibit A attached hereto.

6.   Coordination

In order to coordinate the parties' efforts with respect to a Transaction, during the period of
Bayshore's engagement hereunder, neither the Company, its management, its advisors, or
any other representative of the Company will initiate or solicit any discussions or offers
related to a possible Transaction, directly or indirectly, with prospective parties to the
Transaction, without the express written consent of Bayshore. In the event the Company,
its other affiliates, or its management receives any inquiry regarding a Transaction from
any party, the Company shall promptly inform Bayshore of such inquiry so that Bayshore
can assist the Company in evaluating such party and its interest in a Transaction and in any
resulting negotiations. The Company and its advisors and Bayshore each will inform and
consult with the other on a regular basis regarding any inquiries or proposals received from
potential parties to a Transaction.

7.   Indemnification

Because Bayshore will be acting for the benefit of the Company in connection with this
engagement, the Company agrees to indemnify Bayshore and certain other persons as set
forth in the indemnification provisions attached hereto as Exhibit A, the provisions of
which are incorporated herein in their entirety. The indemnification provision will
survive termination of this Agreement.

8.   Company's Responsibilities, Representations and Warranties

In connection with Bayshore's engagement, the Company will furnish Bayshore with all
information which Bayshore reasonably requests and will provide Bayshore with access
to the Company's officers, directors, accountants, legal counsel and other advisors. The
Company represents and warrants to Bayshore that: (a) all such information is and will
be true and accurate in all material respects on the date it is given to Bayshore and does
not and will not contain any untrue statement of a material fact or omit to state a material
fact necessary in order to make the statements made, in the light of the circumstances
under which they were made, not misleading; and (b) any projected financial information
or other forward looking information which the Company provides to Bayshore will be
made by the Company in good faith, based on management's best estimates then
available and based on facts and assumptions which the Company believes to be
reasonable. The Company acknowledges and agrees that Bayshore will be using and
relying upon such information supplied by the Company and its officers, agents and
others and any other publicly available information concerning the Company and any
prospective Transaction party without conducting, or being required to conduct, any
independent investigation or verification thereof or independent appraisal by Bayshore of

Protective Products of America, Inc.
June 16, 2009
Page 6

the Company or its business or assets or any other Transaction party or its business or
assets. If any information provided to Bayshore by the Company becomes inaccurate,
incomplete or misleading in any material respect during Bayshore's engagement
hereunder, the Company shall so advise Bayshore in writing. The Company shall provide
Bayshore with any updates regarding any material change to the Company's business.
The Company further represents that it has the authority to enter into a Transaction.

9.   Other Terms and Conditions

The Company further represents and warrants to Bayshore that:

(a)   The Company has taken no action that would give any brokers, representatives,
finders or other persons an interest in the compensation due to Bayshore in
connection with any Transaction contemplated herein and there are no other
financial advisors or similar persons entitled to receive compensation from the
Company in connection with any Transaction contemplated herein;

(b)   This Agreement does not violate or constitute a breach or default under any
charter document, contract, agreement, arrangement or understanding, whether
written or oral, to which the Company or any of its subsidiaries is a party or by
which its or their assets are bound. The Company has the corporate authority,
ability, and authorization to enter into this Agreement.

10.   Application for Retention

In the event that the Company becomes a debtor or debtor in possession under Chapter 11
of the Bankruptcy Code, whether by way of a voluntary or involuntary petition, the
Company shall use its best efforts to promptly apply to the bankruptcy court having
jurisdiction over the Chapter 11 case or cases (the "Bankruptcy Court") for approval of
this agreement pursuant to sections 327 and 328(a) of the Bankruptcy Code, nunc pro
tunc to the date of commencement of such Chapter 11 case, for Bayshore's retention by
the Company pursuant to this agreement, and for this agreement to be subject to review
under section 328(a) of the Bankruptcy Code and not subject to review under section 330
of the Bankruptcy Code. The Company shall provide Bayshore and its counsel with a
draft of such application and a proposed order authorizing such retention sufficiently
prior to the filing thereof with the Bankruptcy Court for review and comment by
Bayshore and its counsel. Bayshore shall have no obligation to render any services
hereunder if the Company commences a case under the Bankruptcy Code unless
Bayshore's retention is approved on the terms and conditions set forth herein pursuant to
section 328(a) of the Bankruptcy Code by a final order of the Bankruptcy Court that is
acceptable to Bayshore in its sole discretion and which is not subject to appeal, rehearing,
reconsideration or petition for certiorari. If Bayshore's engagement hereunder is
approved by the Bankruptcy Court, the Company shall pay all fees and expenses of
Bayshore hereunder as promptly as possible. In agreeing to seek approval of Bayshore's
retention under section 328(a) of the Bankruptcy Code, the Company acknowledges and
agrees that Bayshore's restructuring expertise and experience will inure to the benefit of

Protective Products of America, Inc.
June 16, 2009
Page 7

the Company, that the value of the services to be provided hereunder derive substantially from such expertise and experience and that the fees provided for herein are reasonable regardless of the number of hours expended by Bayshore in performance of services hereunder. Prior to commencing a Chapter 11 case, the Company shall pay all undisputed amounts due to Bayshore in cash. Bayshore's obligations to provide the services described herein post-bankruptcy are contingent upon, and expressly subject to, the execution of a waiver, subordination, carve-out, or similar agreement, in form and substance satisfactory to Bayshore pursuant to which the Company's secured lenders consent to the performance of the Company's obligations under this Agreement, including, without limitation, the Company's payment of Bayshore's fees and expenses described herein, free and clear of such lenders' security interests in the Company's assets.

Subject to the immediately preceding paragraph and other terms and conditions of this Agreement, we will request payment of our fees and reimbursement of our actual and necessary expenses related to this engagement, in accordance with the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the rules and orders of the Bankruptcy Court.

11.   Disclosure to Third Parties

Except as required by law, or pursuant to order of a court of competent jurisdiction, no written or oral advice provided by Bayshore pursuant to this Agreement shall be disclosed, in whole or in part, to any third party, or circulated or referred to publicly, without the prior written consent of Bayshore. The fact of Bayshore's engagement hereunder may be disclosed to prospective parties to a Transaction, but the Company may not publicly announce or advertise Bayshore's engagement without the prior consent of Bayshore, unless such engagement becomes a matter of public record by virtue of the Company seeking relief under the Bankruptcy Code.

In the event of consummation or public disclosure of any Transaction, Bayshore shall have the right to disclose its participation in such Transaction, including, without limitation, the placement at its cost of "tombstone" advertisements in financial and other newspapers and journals.

12.   Successors and Assigns

The benefits of this Agreement, together with the separate indemnity agreement, shall inure to the respective successors and permitted assigns of the parties hereto and of the indemnified parties under such indemnity agreement and their respective successors, permitted assigns and representatives, and the obligations and liabilities assumed in this Agreement by the parties hereto shall be binding upon their respective successors and assigns. Notwithstanding the foregoing, this Agreement and the related indemnity agreement may not be assigned without the prior written consent of the nonassigning party (or parties).

Protective Products of America, Inc.
June 16, 2009
Page 8

13.   Amendment or Modification

This Agreement may not be amended or modified except in writing signed by both
parties and shall be governed by and construed in accordance with the laws of the State of
Florida, without regard to its principles of conflicts of laws.

14.   Arbitration of Disputes

Any controversy or claim arising out of or relating to this Agreement, or the breach
thereof, shall be settled by arbitration administered by the American Arbitration
Association in accordance with the Commercial Arbitration Rules, and judgment on the
award rendered by the arbitrator(s) shall be entered in any court having jurisdiction over
such matters.   Within fifteen (15) days after the commencement of arbitration, the
Company and Bayshore shall each select one person to act as an arbitrator and the two
selected arbitrators shall select a third arbitrator within ten (10) days of their appointment.
If the two arbitrators selected are unable or fail to agree upon the third arbitrator, the third
arbitrator shall be selected by the American Arbitration Association.   The place of
arbitration shall be in Broward County, Florida. This Agreement shall be governed by the
laws of the State of Florida, without giving effect to the principles of conflicts of laws.
The arbitrators shall award to the prevailing party, if any, as determined by the
arbitrators, all of its costs and fees. "Costs and fees" shall mean all reasonable pre-award
expenses of the arbitration, including the arbitrators' fees, administrative fees, travel
expenses, out-of-pocket expenses, such as copying and telephone, court costs, witness
fees and attorneys' fees.   Except as may be required by law, neither a party to this
Agreement nor an arbitrator may disclose the existence, content or results of any
arbitration hereunder without the prior written consent of both parties. The award of the
arbitrators shall be in writing, shall be signed by a majority of the arbitrators, and shall
include a statement regarding the reasons for the disposition of any claim.

15.   Limitation of Bayshore's Engagement to the Company

Bayshore services are limited to those specifically provided in this Agreement, or
subsequently agreed-upon, in writing, by the parties hereto.   Bayshore shall have no
obligation or responsibility for any other services including, without limitation, any crisis
management or business consulting services related to, among other things, the
implementation of any operational, organizational administrative, cash management, or
similar activities. The Company acknowledges that Bayshore has been retained only by
the Company, that Bayshore is providing services hereunder as an independent contractor
(and not in any fiduciary or agency capacity) and that the Company's engagement of
Bayshore is not deemed to be on behalf of, and is not intended to confer rights upon any
shareholder, owner or partner of the Company or any other person not a party hereto as
against Bayshore or any of its affiliates, or any of its or their respective officers, directors,
controlling persons (within the meaning of Section 15 of the Act or Section 20 of the
Securities Exchange Act of 1934), employees or agents.   Unless otherwise expressly
agreed in writing by Bayshore, no one other than the Company is authorized to rely upon

Protective Products of America, Inc.
June 16, 2009
Page 9

this engagement or any other statements or conduct of Bayshore, and no one other than the Company is intended to be a beneficiary of this Agreement. The Company acknowledges that any recommendation or advice, written or oral, given by Bayshore to the Company in connection with Bayshore's engagement is intended solely for the benefit and use of the Company's shareholders and directors in considering a possible Transaction, and any such recommendation or advice is not on behalf of, and shall not confer any rights or remedies upon, any other person or be used or relied upon for any other purpose. To the extent Bayshore is requested by the Company to perform any financial advisory or investment banking services which are not within the scope of this engagement (such as rendering a fairness opinion), the Company shall pay Bayshore such fees as shall be mutually agreed upon by Bayshore and the Company in writing, in advance, depending on the level and type of services required, and shall be in addition to the fees and expenses described hereinabove.

16.    Termination

Bayshore's engagement hereunder shall terminate one year from the date hereof unless extended in writing by both parties. This Agreement may be terminated at any time by either party upon thirty days' prior written notice to the other party. Notwithstanding the foregoing, this Agreement may not be canceled by either party within the first sixty days after its execution without cause. The expiration or termination of this Agreement shall not affect Bayshore's right to receive, and the Company's obligation to pay, any and all fees, expenses and other amounts due, whether or not any Transaction shall be consummated prior to or subsequent to the effective date of expiration or termination, as more fully set forth in this Agreement. In addition, notwithstanding the expiration or termination of this Agreement, Bayshore shall be entitled to full payment by the Company of the Transaction Fee described in this Agreement: (i) so long as a Transaction is consummated or announced during the term of this Agreement, or within 12 months after the date of expiration or termination of this Agreement ("Tail Period"), and/or (ii) if an agreement in principle to consummate a Transaction is executed by the Company during the term of this Agreement, or within the Tail Period. A termination of this agreement does not alter the Company's obligations to indemnify Bayshore pursuant to paragraph 7 of this Agreement.

17.    Survival of Terms of Agreement

The provisions of this Agreement shall survive and remain in full force and effect notwithstanding any termination of Bayshore's engagement under paragraph 16 of this Agreement and shall survive the Company's filing bankruptcy, reorganization, or liquidation of the Company's assets under Chapter or 11 of the Bankruptcy Code, or otherwise.

Protective Products of America, Inc.
June 16, 2009
Page 10

---

In acknowledgment that the foregoing correctly sets forth the understanding reached by Bayshore and the Company, please sign in the space provided below, whereupon this letter shall constitute a binding Agreement as of the date indicated above.

Very truly yours,

BAYSHORE PARTNERS, LLC

By: _____

Name:   Michael Turner

Title:   Partner

Accepted and Agreed:

Protective Products of America, Inc.

By: _____

Dated: _____

Protective Products of America, Inc.
June 16, 2009
Page 11

## EXHIBIT A

In connection with Bayshore's engagement to advise and to assist the Company pursuant to the Agreement dated June 16, 2009 which this Exhibit A is attached, the Company agrees to indemnify and to hold harmless Bayshore and each of its affiliates, and their respective officers, directors, controlling persons (within the meaning of Section 15 of the Securities Act of 1933 or Section 20 of the Securities Exchange Act of 1934), employees, affiliates, agents, counsel and other advisors (hereinafter collectively referred to as an "Indemnified Party"), to the fullest extent allowed by law or equity, from and against any and all judgments, losses, claims (whether or not valid), damages, costs, fees, expenses or liabilities, joint or several, to which an Indemnified Party may become subject, related to or arising out of Bayshore's engagement or performance under the Agreement, the transaction contemplated thereby, the services rendered by Bayshore under the Agreement, or any actual or threatened claim, litigation, investigation, proceeding or action in any court or before any regulatory, administrative or other body relating to any of the foregoing (hereinafter referred to collectively as a "Claim"), and shall, upon request, reimburse an Indemnified Party for all legal and other costs, fees and expenses as they are incurred in connection with investigating, preparing or defending a Claim, whether or not such Indemnified Party is ever made party to any legal proceedings or such Claim arose before or after the date hereof; provided, however, that no such indemnification shall be required to be paid to an Indemnified Party with respect to a Claim that is finally determined by a court of competent jurisdiction (after exhaustion of all appeals) or in an arbitration conducted in accordance with this Agreement to have resulted solely from the gross negligence or willful misconduct of such Indemnified Party.

In the event that the foregoing indemnity is unavailable or insufficient for any reason (other than by reason of the terms hereof) to hold any Indemnified Party harmless, then the Company shall contribute to any amounts paid or payable by an Indemnified Party in such proportion as appropriately reflects the relative benefits received by such Indemnified Party and to the Company in connection with the matters to which the Claim relates. If an allocation solely on the basis of benefits is judicially determined to be impermissible, then the Company shall contribute in such proportion as appropriately reflects the relative benefits and relative fault of the Company and such Indemnified Party, as well as any other equitable considerations. In no event shall the Company contribute less than the amount necessary to ensure that the aggregate liability of Bayshore and any other Indemnified Party for contribution pursuant to this paragraph in connection with all Claims does not exceed the amount of fees actually received by Bayshore under the Agreement. For purposes hereof, relative benefits to the Company and Bayshore of the Transaction shall be deemed to be in the same proportion that the total value received or contemplated to be received by the Company and/or its security holders in connection with the Transaction bears to the fees paid to Bayshore under the Agreement in respect of such Transaction, and other relative fault of each Indemnified Party and the Company shall be determined by reference to, among other things, whether the actions and omissions to act were by such Indemnified Party or the Company and the parties' relative intent, knowledge, access to information, and opportunity to correct or prevent such action or omission.

All amounts due to an Indemnified Party hereunder shall be payable by the Company promptly upon request by such Indemnified Party. In addition, the Company agrees to pay all costs and expenses (including attorneys' fees) incurred by an Indemnified Party to enforce the

Protective Products of America, Inc.
June 16, 2009
Page 12

terms of this Exhibit A.

The Company agrees not to enter into any waiver, release or settlement of any Claim (whether or not Bayshore or any other Indemnified Party is a formal party to such Claim) in respect of which indemnification may be sought hereunder without the prior written consent of Bayshore (which consent will not be unreasonably withheld), unless such waiver, release or settlement includes an unconditional release of Bayshore and each Indemnified Party from all liability arising out of such claim.

The provisions of this Exhibit A shall be in addition to any liability which the Company may otherwise have to Bayshore; shall not be limited by any rights that Bayshore or any other Indemnified Party may otherwise have; shall remain in full force and effect regardless of the expiration or any termination of Bayshore's engagement; and shall be binding upon any successors or assigns of Bayshore and the Company.

## Addendum to Engagement Letter

### January 7, 2010

On or about June 16, 2009, Bayshore Partners, LLC ("Bayshore")[1] entered into an engagement agreement (the "Engagement Agreement") with Protective Products of America, Inc., and its wholly owned subsidiaries Protective Products International, Inc., Protective Products International Corp., CPC Holding Corp., Ceramic Protection Corporation of America, and Protective Products of North Carolina LLC (collectively, the "Company"). Pursuant to the Engagement Agreement, Bayshore has been providing investment banking and financial advisory services to the Company since mid-June, 2009. The Company is contemplating seeking relief under the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court") and has requested that Bayshore continue providing the investment banking and financial advisory services contemplated by the Engagement Agreement to the extent such services have not already completed.

In consideration of Bayshore agreeing to continue providing services to the Company post-bankruptcy, the Company shall provide Bayshore with a $50,000 retainer (the "Retainer) prior to seeking relief under the Bankruptcy Code. The Company shall file an application with the Bankruptcy Court seeking authority to employ Bayshore as its financial advisor and investment banker, pursuant to the terms of the Engagement Agreement (as modified by this Addendum) and sections 327 and 328 of the Bankruptcy Code. Bayshore will apply the Retainer to any fees and expenses incurred post-bankruptcy in accordance with terms of the Engagement Agreement and Bayshore's court approved retention. The Retainer is being paid in advance of services being performed and not on account of antecedent debt, and shall be deemed paid in the ordinary course of Bayshore and the Company's business. The Retainer shall be deemed reasonably equivalent value in respect of the services being provided. The Retainer will be held in a trust account on your behalf. At the conclusion of this matter, the remaining Retainer will be applied to you're the last monthly bill or Transaction Fee, as the case may be, and to the extent it has not been utilized in fees and costs related to your representation, upon conclusion of our representation and the entry of a final order awarding Bayshore final compensation, the remaining portion of the Retainer shall be returned to you.

Unless specifically modified herein, all terms and conditions contained in the Engagement Agreement shall remain in full force and effect. In acknowledgment that the foregoing correctly sets forth the understanding reached by Bayshore and the Company, please

---

[1] All capitalized terms shall have the meaning ascribed to them in the Engagement Agreement.

sign in the space provided below, whereupon this letter shall constitute a binding Addendum to the Engagement Agreement as of the date indicated above.

Very truly yours,

BAYSHORE PARTNERS, LLC

By: _____

Name:   Michael Turner

Title:   Partner

Accepted and Agreed:

Protective Products of America, Inc. et. al.

By: _____
Dated:   1/8/10

Court File No.

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE

BETWEEN:

### MICHAEL FRANK

Plaintiff

-and-

### FARLIE, TURNER & CO., LLC, BAYSHORE PARTNERS, LLC, R. PATRICK CALDWELL, STEPHEN GIORDANELLA, LARRY MOELLER, NEIL E. SCHWARTZMAN, JASON A. WILLIAMS, BRIAN L. STAFFORD, HENRY H. SHELTON, FRANK E. JAUMOT, KEITH J. ENGEL, RICHARD P. TORYKIAN, SR., CHARLES E. PETERS, JR., and DEON VAUGHAN

Defendants

Proceeding under the *Class Proceedings Act, 1992*

---

### STATEMENT OF CLAIM

---

**TO THE DEFENDANTS:**

**A LEGAL PROCEEDING HAS BEEN COMMENCED AGAINST YOU** by the plaintiff. The claim made against you is set out in the following pages.

**IF YOU WISH TO DEFEND THIS PROCEEDING,** you or an Ontario lawyer acting for you must prepare a statement of defence in Form 18A prescribed by the Rules of Civil Procedure, serve it on the plaintiff's lawyers or, where the plaintiff does not have a lawyer, serve it on the plaintiff, and file it, with proof of service, in this court office, WITHIN TWENTY DAYS after this statement of claim is served on you, if you are served in Ontario.

If you are served in another province or territory of Canada or in the United States of America, the period for serving and filing your statement of defence is forty days. If you are served outside Canada and the United States of America, the period is sixty days.

Instead of serving and filing a statement of defence, you may serve and file a notice of intent to defend in Form 18B prescribed by the Rules of Civil Procedure. This will entitle you to ten more days within which to serve and file your statement of defence.

Exhibit **B**

2

**IF YOU FAIL TO DEFEND THIS PROCEEDING, JUDGMENT MAY BE GIVEN AGAINST YOU IN YOUR ABSENCE AND WITHOUT FURTHER NOTICE TO YOU. IF YOU WISH TO DEFEND THIS PROCEEDING BUT ARE UNABLE TO PAY LEGAL FEES, LEGAL AID MAY BE AVAILABLE TO YOU BY CONTACTING A LOCAL LEGAL AID OFFICE.**

**IF YOU PAY THE PLAINTIFF'S CLAIM,** and $5,000.00 for costs, within the time for serving and filing your statement of defence, you may move to have this proceeding dismissed by the court. If you believe the amount claimed for costs is excessive, you may pay the plaintiff's claim and $400.00 for costs and have the costs assessed by the court.

Date:                              Issued by

                                                    Local Registrar

                              Address of        393 University Avenue
                              court office:      10th Floor
                                                Toronto, Ontario
                                                M5G 1E6


TO:            Bayshore Partners, LLC
               401 E. Las Olas Boulevard, Ste. 1160
               Fort Lauderdale, FL 33301
               U.S.A.

    AND TO:    Farlie Turner & Co., LLC
               401 E. Las Olas Boulevard, Ste. 1160
               Fort Lauderdale, FL33301
               U.S.A.

    AND TO:    Larry Moeller
               232 Hamptons Green N.W.
               Calgary, AB   T3A 5A8
               CANADA

    AND TO:    Stephen Giordanella
               6250 NW 96th Terrace
               Parkland, FL 33076-1812
               U.S.A.

    AND TO:    Neil E. Schwartzman
               5757 NW 50th Street
               Coral Springs, FL  33067-4010
               U.S.A.

3

AND TO:   R. Patrick Caldwell
          191 SE 20th Avenue
          Deerfield Beach, FL 33441-6120
          U.S.A.

AND TO:   Brian L. Stafford
          1537 Hillsboro Blvd
          Deerfield Beach, FL 33441
          U.S.A.

AND TO:   Jason A. Williams -
          5800 Camino Del So, Unit 2071
          Boca Raton, FL 33433-6593
          U.S.A.

AND TO:   Deon Vaughan
          1227 Weston Pass
          Germantown, TN 38138
          U.S.A.

AND TO:   Henry H. Shelton
          331 Holly Lane
          Newport, NC 28570
          U.S.A.

AND TO:   Frank E. Jaumot
          2851 N. Palm Aire Drive
          Pompano Beach, FL 33069
          U.S.A.

AND TO:   Charles E. Peters, Jr.
          26 Loch Ridge Drive
          Greensboro, NC 27408
          U.S.A.

AND TO:   Keith J. Engel
          389 Valley Road
          Kelowna, BC V1V 2E5
          CANADA

AND TO:   Richard P. Torykian, Sr.
          1 Rockefeller Plaza
          New York, New York 10020
          U.S.A.

4

**DEFINED TERMS**

1.    The following definitions apply for the purpose of this Statement of Claim:

a)    **"APA"** means the asset purchase agreement dated January 12, 2010 and subsequent amendments thereto between PPA and PPE in respect of the Transaction;

b)    **"August 2009 Conference Call"** means a conference call held by PPA and certain other Individual Defendants, among others, on August 14, 2009;

c)    **"Bayshore"** means the defendant Bayshore Partners, LLC;

d)    **"Caldwell"** means the defendant R. Patrick Caldwell;

e)    **"Carter Enterprises"** means Carter Enterprises, LLC;

f)    **"CIBC"** means the Canadian Imperial Bank of Commerce;

g)    **"Class"** or **"Class Members"** means all persons, other than Excluded Persons, who voluntarily or involuntarily disposed of PPA shares during the Class Period;

h)    **"Class Period"** means the period from and including August 14, 2009 to and including March 5, 2010 or such other period as the Court finds appropriate;

i)    **"Closing"** means the closing of the Transaction on March 5, 2010;

j)    **"CJA"** means *Courts of Justice Act*, R.S.O. 1990, c. C.43;

k)    **"CPA"** means *Class Proceedings Act*, 1992, S.O. 1992, c. 6;

5

l)      "**Defendants**" means collectively Bayshore, Farlie Turner, and the Individual Defendants;

m)     "**disclosure**" means full, true and plain disclosure in accordance with the reporting issuer's continuous disclosure obligations to report and publish material changes under Part XVIII of the *Securities Act* and the Regulations;

n)      "**Engel**" means the defendant Keith J. Engel;

o)      "**Excluded Persons**" means PPA's past or present subsidiaries, officers, directors, affiliates, legal representatives, heirs, predecessors, successors and assigns, and all members of the Individual Defendants' families, and any entity in which any of the Individual Defendants has or had a controlling interest;

p)      "**Farlie Turner**" means the defendant Farlie, Turner & Co., LLC;

q)      "**Forbearance Agreement**" means the forbearance agreement entered into between PPA and CIBC in or around January 2009;

r)      "**Fundamental Change Event**" means one of the following events that the Class Members allege fundamentally changed the nature of their investment in PPA:

        i.     The U.S. Bankruptcy Court's approval of the Transaction on February 22, 2010; or

        ii.    the Closing of the Transaction on March 5, 2010.

s)      "**Giordanella**" means the defendant Stephen Giordanella;

t)      "**HUBZones**" means highly under-utilized business zones;

6

u) **"Ibiley Manufacturing"** means Ibiley Manufacturing Corp.;

v) **"ID/IQ"** means "Indefinite Delivery, Indefinite Quantity"

w) **"Individuals Defendants"** means the defendants Caldwell, Giordanella, Schwartzman, Williams, Moeller, Stafford, Shelton, Engel, Jaumot, Peters, Torykian, and Vaughn;

x) **"IOTV"** means Improved Outer Tactical Vest;

y) **"IOTV Contract"** means the contract awarded to PPA on or about December 4, 2009 by the U.S. Army under its US$1.0 billion IOTV Program;

z) **"IOTV Program"** means the solicitation by the U.S. Army for IOTV issued in early 2008 for the production of up to 736,000 IOTV, which would represent US$1.0 billion of industry revenue over three to five years;

aa) **"Jaumot"** means the defendant Frank E. Jaumot;

bb) **"LOI"** means the Non-Binding Letter of Intent entered into between PPA and Sun Capital on December 21, 2009 in respect of the Transaction;

cc) **"Material Change"** means one or more of the following:

i. PPA's decision to file a formal protest with the U.S. Army, on or after August 14, 2009, following the awarding of the IOTV Contract to a competing bidder;

ii. PPA's filing of a formal protest with the U.S. Army, on or after August 14, 2009, following the awarding of the IOTV Contract to a competing bidder;

7

iii.    The awarding of the IOTV Contract to PPA on December 4, 2009;

iv.    The execution of the LOI by PPA and Sun Capital in respect of the Transaction on December 21, 2009;

v.    The conflicts of interest of certain Individual Defendants, including Caldwell, Schwartzman, and Williams, in respect of the Transaction arising from their negotiations to secure future compensation from and/or equity interests in PPE;

vi.    The execution by PPA and CIBC of a second amending agreement to the Forbearance Agreement on or about December 24, 2009 under which CIBC provided an additional US$700,000 in financing to PPA and extended its forbearance through January 8, 2010; and

vii.    The execution of the APA in respect of the Transaction between PPA and PPE on January 12, 2010;

dd)    **"MD&A Q2/09"** means PPA's Management Discussion and Analysis for the quarter ended June 30, 2009, prepared and released at August 14, 2009;

ee)    **"MD&A Q3/09"** means PPA's Management Discussion and Analysis for the quarter ended September 30, 2009, prepared and released at November 16, 2009;

ff)    **"Misrepresentation"** means one or more of the following: