8

i.      the omissions of material facts in PPA core and non-core documents, and
public oral statements of Caldwell and Williams, in August 2009 and November
2009, namely that PPA had reasonable grounds to file, had decided to file and/or
had filed one (or more) formal protest(s) with the U.S. Army in respect of the
awarding of the IOTV Contract to a competing bidder;

ii.  .  .   the omissions of material facts in PPA core and non-core documents, and
public oral statements of Caldwell and Williams, in August 2009, that PPA had
secured partnership agreements with HubZone companies Carter Enterprises and
Ibiley Manufacturing on July 15, 2009 and July 23, 2009, respectively, under
which PPA would serve as the exclusive ballistics provider to these companies;

gg)     "**Moeller**" means the defendant Larry Moeller;

hh)     "**MTV**" means Modular Tactical Vests;

ii)     "**MTV Contracts**" means the contracts with the U.S. Marines obtained by two
corporate partners of PPA, Carter Enterprises and Ibiley Manufacturing, in respect
of which PPA, as exclusive ballistics provider to these two companies, would
serve as sub-contractor;

jj)     "**November 2008 Conference Call**" means a conference call held by PPA and
certain other Individual Defendants, among others, on November 17, 2008;

kk)     "**November 2009 Conference Call**" means a conference call held by PPA and
certain other Individual Defendants, among others, on November 6, 2009;

9

ll) **"Peters"** means the defendant Charles E. Peters, Jr.;

mm) **"Point Blank"** means Point Blank Solutions, Inc.

nn) **"PPA"** or the **"Company"** means Protective Products of America Inc. (and "PPOA Holding, Inc.", to which PPA changed its name on or about March 8, 2010 after the closing of the Transaction pursuant to a term of the APA);

oo) **"PPE"** means Protective Products Enterprises, Inc., an affiliate of Sun Capital;

pp) **"PPI"** means Protective Products International Inc.;

qq) **"Schwartzman"** means the defendant Neil E. Schwartzman;

rr) "SEC" means the Securities & Exchange Commission;

ss) **"Secured Debentures"** means, collectively, Secured C Debentures and Secured Non-C Debentures;

tt) **"Secured C Debentures"** means secured subordinated, convertible debentures;

uu) **"Secured Non-C Debentures"** means secured subordinated, non-convertible debentures;

vv) *"Securities Act"* means the *Securities Act*, R.S.O. 1990 c. S.5, as amended;

ww) **"SEDAR"** means the system for electronic document analysis and retrieval used for electronically filing most securities related information with the Canadian Securities Administrators;

xx) **"Shelton"** means the defendant Henry H. Shelton;

10

yy) **"Stafford"** means the defendant Brian L. Stafford;

zz) **"Sun Capital"** means Sun Capital Partners Group V, Inc., an affiliate of private equity firm Sun Capital Partners, Inc.;

aaa) **"Torykian"** means the defendant Richard P. Torykian, Sr.;

bbb) **"Transaction"** means PPA's sale of substantially all of its assets to PPE;

ccc) **"TSX"** means the Toronto Stock Exchange;

ddd) **"Vaughan"** means the defendant Deon Vaughan; and

eee) **"Williams"** means the defendant Jason A. Williams.

2. All monetary amounts below are in Canadian dollars unless otherwise specified.

**RELIEF SOUGHT**

3. The Plaintiff claims on his own behalf and on behalf of the other Class Members:

a) an order pursuant to the *CPA* certifying this action as a class proceeding and appointing him as representative plaintiff;

b) a declaration that the Individual Defendants authorized, permitted and acquiesced in the release of core documents (as that term is defined in Part XXIII.1 of the *Securities Act*) and other (non-core) documents (as that term is defined in Part XXIII.1 of the *Securities Act*) by PPA that contained misrepresentations (as that term is defined in section 1(1) of the *Securities Act*);

11

c)    a declaration that the defendants Caldwell and Williams made public oral statements that they are alleged herein to have made, that they made such statements with actual, implied and apparent authority to make such statements on behalf of PPA, that such statements related to the business and affairs of PPA, and that such statements contained misrepresentations (as that term is defined in section 1(1) of the *Securities Act*);

d)    a declaration that the Individual Defendants authorized, permitted, and acquiesced in the making of the public oral statements referred to in clause (c) above;

e)    a declaration that, prior to the making of the Misrepresentations alleged herein, the Individual Defendants: (i) failed to conduct, and did not cause to be conducted, a reasonable investigation; and (ii) had reasonable grounds to believe that the documents and public oral statements referred to in clauses (b) and (c) above contained one or more misrepresentations;

f)    a declaration that the Individual Defendants are liable for the Misrepresentations;

g)    a declaration that the Misrepresentations were made negligently, or, in the alternative, recklessly, or, in the further alternative, fraudulently;

h)    a declaration that the Individual Defendants are liable for failures to make timely disclosure of the Material Changes;

i)    a declaration that the Individual Defendants permitted or acquiesced in, or influenced, PPA's failures to make timely disclosure of the Material Changes while knowing that there were failures to make such disclosure;

12

j)      a declaration that one of the following events (the Fundamental Change Event)
        fundamentally changed the nature of shareholders' investment in PPA:

        i.      The U.S. Bankruptcy Court's approval of the Transaction on February 22,
                2010; or

        ii.     the Closing of the Transaction on March 5, 2010.

k)      a declaration that the Fundamental Change Event constituted or resulted in an
        involuntary disposition of PPA shares held by the Plaintiff and other Class
        Members;

l)      a declaration that Part XXIII.1 of the *Securities Act* applies to the involuntary
        disposition of the PPA shares held by the Plaintiff and other Class Members upon
        the Fundamental Change Event;

m)      a declaration that one or more of the Misrepresentations and/or one or more of the
        failures to make timely disclosure of the Material Changes caused or contributed
        to the involuntary disposition of PPA shares for the purpose of Part XXIII.1 of the
        *Securities Act*;

n)      a declaration that Bayshore, Farlie Turner, and the Individual Defendants
        conspired to conceal from PPA's shareholders positive material information
        relating to PPA's business, affairs, and operations (which information was
        required to be disclosed under the *Securities Act*) in order to cause harm to the
        Plaintiff and other Class Members;

13

o)    a declaration that Bayshore and Farlie Turner intentionally and unlawfully interfered with the Plaintiff's and other Class Members' economic relations with and interests in PPA;

p)    a declaration that the Defendants are jointly and severally liable for the full amount of the damages assessed in this action;

q)    assessment of damages in the amount of $100,000,000.00 or such other amount as this Court finds appropriate at the trial of the common issues or at a reference or references;

r)    assessment of punitive damages in the amount of $20,000,000;

s)    an order directing a reference or giving such other directions as may be necessary to determine issues not determined in the trial of the common issues;

t)    pre-judgment interest and post-judgment interest, compounded, or pursuant to sections 128 and 129 of the *CJA*;

u)    costs of the action on a substantial indemnity basis or in an amount that provides full indemnity, plus, pursuant to section 26(9) of the *CPA*, the costs of notice and of administering the plan to distribute the recovery in this action, plus applicable taxes; and,

v)    such further and other relief as this Honourable Court deems just.

14

**THE NATURE OF THIS ACTION**

4.    PPA was, at all material times, a public company and a reporting issuer, as defined in s. 1(1) of the *Securities Act*, in Ontario and other provinces in Canada.  Its shares traded on the TSX under the symbol "PPA" until January 14, 2010, on which date the TSX suspended the trading of PPA's shares immediately following the Company's announcement that it had made a voluntary assignment into bankruptcy for the purpose of the Transaction.  Trading in PPA's shares never resumed and its shares were subsequently delisted on or about February 19, 2010 following an expedited delisting review process by the TSX.

5.    At all material times up to January 13, 2010, PPA was carrying on its business of designing and manufacturing concealable and tactical body armour.  Its primary customers and target market included agencies of the U.S. Government such as the U.S. Marines and the U.S. Army.

6.    During the Class Period, the Individual Defendants conspired with Bayshore and Farlie Turner to make the Misrepresentations and to conceal the Material Changes from the Company's shareholders in order to artificially deflate PPA's share price throughout the Class Period and cause an involuntary disposition of PPA shares at a value of nil, thus harming the Plaintiff and other Class Members.  The Misrepresentations were never corrected nor were the Material Changes ever disclosed as required by the *Securities Act* and its regulations.

7.    One of the most significant Material Changes, which PPA never disclosed at all, or in a full, true, and plain manner consistent with its obligations under the *Securities Act*, was the U.S. Army's awarding of the IOTV Contract to PPA on December 4, 2009.  Throughout 2008 and 2009, PPA and the defendants Caldwell, Williams, and Giordanella had touted the IOTV

15

Contract as a highly valuable opportunity, potentially worth up to US$300,000,000 that would have a significant impact on the Company's revenue and outlook. Indeed, during that time

8.     period, PPA structured its business and operations and made certain expenditures in anticipation of receiving the IOTV Contract.

9.     On August 13, 2009, Point Blank Solutions, Inc., one of PPA's competitors, announced that it been awarded an IOTV contract by the US Army to produce up to 736,000 IOTV. That day, PPA's shares opened at $0.60 and closed at $0.425.

10.    The next day, on August 14, 2009, PPA announced that it had not received the IOTV Contract. Following the announcement, PPA's share price continued to fall hitting a near-term low of $0.28 on August 19, 2009, a more than 50% decline from its price prior to any announcement of the awarding of contracts under the U.S. Army's IOTV Program.

11.    Though PPA's share price subsequently rebounded in late September following PPA's announcement regarding MTV Contracts awarded to two corporate partners, the Plaintiff and Class Members expressly plead that the making of the Misrepresentations and failures to disclose the Material Changes caused PPA's shares to be artificially deflated throughout the Class Period. Moreover, the making of the Misrepresentations and failures to disclose the Material Changes caused or contributed to the involuntary disposition of PPA shares at a value of nil upon the Fundamental Change Event.

12.    At no time during the Class Period did PPA disclose that it had decided to launch a formal protest of the U.S. Army's awarding of the IOTV Contract to a competing bidder or that it had in fact already filed one or more such protests. More significantly, PPA never disclosed during the

16

Class Period that, as a result of its protest(s), the U.S. Army had ultimately awarded the lucrative IOTV Contract to PPA.

13.     The Individual Defendants, with the assistance of Bayshore and Farlie Turner, carried on a scheme to delay or conceal the disclosure of positive material information, including the formal protest(s) to the US Army and ultimate awarding of the IOTV Contract to PPA, for their own self-interest and financial gain. By hiding this highly material and very positive information from shareholders, the values of PPA's shareholder equity and PPA's assets were deflated. In turn, PPA and its assets became more attractive targets for private equity firms and reduced PPA's prospects for refinancing and/or recapitalization. Taking PPA private would benefit certain Individual Defendants owning secured debt of PPA and certain Individual Defendants who could secure favourable compensation arrangements with and/or equity interests in the acquiring entity while having the effect of unnecessarily wiping out shareholder value and causing massive losses to individual Class Members.

14.     The Misrepresentations and the failures to make timely disclosure of the Material Changes artificially deflated PPA's share price during the Class Period and caused or contributed to the Fundamental Change Event. The Plaintiff and the other Class Members voluntarily disposed of their shares at artificially deflated prices and, upon the Fundamental Change Event, involuntarily disposed of their PPA shares at a value of nil and thus suffered damages.

**THE PLAINTIFF**

15.     The Plaintiff, Michael Frank, resides in Thornhill, Ontario. He first acquired PPA shares in 2003 and continued to accumulate shares through late 2009. He voluntarily disposed of

17

10,000 shares on October 7, 2009 (during the Class Period) and involuntarily disposed of 209,565 upon the Fundamental Change Event.

16.     The Plaintiff expressly pleads that the Fundamental Change Event constituted or resulted in an involuntary disposition of his PPA shares.

**THE DEFENDANTS**

17.     The defendant Farlie Turner is an investment bank based in Fort Lauderdale, Florida.

18.     The defendant Bayshore is the broker dealer affiliate of Farlie Turner. Bayshore and Farlie Turner share the same principals and the same corporate headquarters. At all material times, Bayshore was under the direction of Farlie Turner, which had legal and/or de facto control of Bayshore.

19.     The defendant Caldwell was CEO and a director of PPA between in and around July 2009 through January 20, 2010. He joined PPA in or around January 2009 as Senior Vice President, Sales and Marketing. As CEO, he signed Multilateral Instrument 52-109 certifying, among other things, that core documents of PPA did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." As a director and officer, he had control over, and authorized, permitted and/or acquiesced to the release of all documents issued by PPA to the market, the making of all public oral statements relating to PPA that contained a Misrepresentation, and all disclosures and non-disclosures of material information, including the Material Changes, during the Class Period. As described below, he also made certain public oral statements that contained misrepresentations

18

during the Class Period. He had actual, or, in the alternative, apparent or implied, authority to make those statements.

20. The defendant Giordanella was at all material times a promoter of PPA, as defined in section 1(1) of the *Securities Act* and an influential person, as defined by section 138(1) of the *Securities Act*. From on or about May 13, 2009, he was a consultant for PPA and, during the Class Period, held US$2,950,600.90 in Secured Debentures against PPA. He previously served as CEO from September 2006 to March 2009. He was also a director of PPA from in or around September 2006 to on or about June 17, 2009. Giordanella received and had access to undisclosed material information in the ordinary course and, directly or indirectly, exercised, or had the ability to exercise, significant power or influence over the business, operations, capital or development of PPA. He acted in conjunction with the Individual Defendants and, directly or indirectly, took the initiative in substantially reorganizing the business of PPA. During the Class Period, Giordanella knowingly influenced:

    a)    PPA and the other Individual Defendants acting on behalf of PPA to release documents containing the Misrepresentations;

    b)    the other Individual Defendants to authorize, permit or acquiesce in the release of documents containing the Misrepresentations;

    c)    Caldwell and Williams, who made the public oral statements containing the Misrepresentations, to make those public oral statements;

19

d)    the other Individual Defendants to authorize, permit or acquiesce in the making of
the public oral statements containing the Misrepresentations by Caldwell and
Williams; and

e)    PPA and the other Individual Defendants acting on behalf of PPA in the failure to
make timely disclosure of the Material Changes.

21.    The defendant Schwartzman was the Chief Operating Officer of PPA, which position he
had held since in or around July 2009 and became Acting CEO on January 20, 2010. He joined
PPA in April 2007 as its Chief Information Officer. As an officer of PPA, he had control over,
and authorized, permitted and/or acquiesced to the release of all documents issued by PPA to the
market, the making of all public oral statements relating to PPA that contained a
Misrepresentation, and all disclosures and non-disclosures of material information, including the
Material Changes, during the Class Period.

22.    The defendant Williams was at all material times the CFO of PPA, which position he had
assumed in or around May 2008. He joined PPA in August 2007 as the Corporate Controller.
As CFO, he signed Multilateral Instrument 52-109 certifying, among other things, that core
documents of PPA did "not contain any untrue statement of a material fact or omit to state a
material fact necessary to make the statements made, in light of the circumstances under which
such statements were made, not misleading with respect to the period covered by this report."
As an officer of PPA, he had control over, and authorized, permitted and/or acquiesced to the
release of all documents issued by PPA to the market, the making of all public oral statements
relating to PPA that contained a Misrepresentation, and all disclosures and non-disclosures of
material information, including the Material Changes, during the Class Period. As described
below, he also made certain public oral statements that contained misrepresentations during the

20

23.    Class Period. He had actual, or, in the alternative, apparent or implied, authority to make those statements.

24.    The defendant Vaughan was, at all material times, Senior Vice President, General Counsel and Secretary of PPA. She joined the Company in March 2008. As an officer of PPA, she had control over, and authorized, permitted and/or acquiesced to the release of all documents issued by PPA to the market, the making of all public oral statements relating to PPA that contained a Misrepresentation, and all disclosures and non-disclosures of material information, including the Material Changes, during the Class Period.

25.    The defendant Moeller was, at all material times, a director of PPA, which position he had held since November 1995, and had formerly served as the Chairman of the Board. As a director, he had control over, and authorized, permitted and/or acquiesced to the release of all documents issued by PPA to the market, the making of all public oral statements relating to PPA that contained a Misrepresentation, and all disclosures and non-disclosures of material information, including the Material Changes, during the Class Period.

26.    The defendant Stafford was, at all material times, a director of PPA. He also served as Chairman of the Board from on or about August 30, 2008 to March 18, 2009 and re-assumed this position on September 9, 2009. He also served as acting CEO of PPA for the period March 18, 2009 through July, 2009. As a director, he had control over, and authorized, permitted and/or acquiesced to the release of all documents issued by PPA to the market, the making of all public oral statements relating to PPA that contained a Misrepresentation, and all disclosures and non-disclosures of material information, including the Material Changes, during the Class Period.

27.     The defendant Shelton was, at all material times, a director of PPA. Between March 18, 2009 and September 9, 2009 he served as Chairman of the Board for PPA. As a director, he had control over, and authorized, permitted and/or acquiesced to the release of all documents issued by PPA to the market, the making of all public oral statements relating to PPA that contained a Misrepresentation, and all disclosures and non-disclosures of material information, including the Material Changes, during the Class Period.

28.     The defendant Engel was, at all material times, a director of PPA, which position he had held since May 2005. As a director, he had control over, and authorized, permitted and/or acquiesced to the release of all documents issued by PPA to the market, the making of all public oral statements relating to PPA that contained a Misrepresentation, and all disclosures and non-disclosures of material information, including the Material Changes, during the Class Period.

29.     The defendant Jaumot was a director of PPA, which position he had held since January 2009. As a director, he had control over, and authorized, permitted and/or acquiesced to the release of all documents issued by PPA to the market, the making of all public oral statements relating to PPA that contained a Misrepresentation, and all disclosures and non-disclosures of material information, including the Material Changes, during the Class Period.

30.     The defendant Torykian was, at all material times, a director of PPA, which position he had held since May 2007. As a director, he had control over, and authorized, permitted and/or acquiesced to the release of all documents issued by PPA to the market, the making of all public oral statements relating to PPA that contained a Misrepresentation, and all disclosures and non-disclosures of material information, including the Material Changes, during the Class Period.

22

31.    The defendant Peters was, at all material times, a director of PPA which position he had
held since January 2009. As a director, he had control over, and authorized, permitted and/or
acquiesced to the release of all documents issued by PPA to the market, the making of all public
oral statements relating to PPA that contained a Misrepresentation, and all disclosures and non-
disclosures of material information, including the Material Changes, during the Class Period.

32.    All of the Individual Defendants resigned on the Closing Date. On or about the Closing
Date, the defendant Jaumot accepted the role of Chief Restructuring Officer of PPA.

## PPA'S DISCLOSURE OBLIGATIONS

33.    PPA was, at all material times, a "reporting issuer" in Ontario as defined in the *Securities
Act* and, as such, it was required to file, *inter alia*, with SEDAR:

    a)    quarterly interim financial statements, within 60 days from the end of the previous
          quarter, that must include a comparative statement to the corresponding period in
          the previous year;

    b)    annual consolidated financial statements, within 140 days from the end of its last
          financial year, including a comparison to the period covered by the preceding
          financial year; and

    c)    contemporaneously with each of the above, management's discussion and
          analysis of each of the above financial statements.

34.    As a "reporting issuer" in accordance with section 1(1) of the *Securities Act*, PPA is
subject to the continuous disclosure provisions of Part XVIII of the *Securities Act*.

23

35. PPA was, at all material times, a "responsible issuer" in accordance with section 138(1) of the *Securities Act* and is therefore, along with its directors, officers, and influential persons, subject to civil liability provisions for secondary market disclosure of Part XXIII.1 of the *Securities Act.*

## PPA'S HISTORY

36. PPA, together with its subsidiaries, was, at all material times prior to January 13, 2010, engaged in the design, manufacture and marketing of advanced products, including lightweight ceramic armour, composite-based products, and concealable soft body armour, used to provide ballistic protection for personnel and vehicles in the military and law enforcement markets.

37. PPA was originally formed on November 1, 1995, in Alberta through the amalgamation of two Canadian companies and was named "Ceramic Protection Corporation." Prior to 2004, PPA's principal business activities were the manufacture and distribution of alumina and alumina-bonded silicon carbide products and the distribution of polyethylene materials to the industrial wear management and ballistic protection markets.

38. In 2005, PPA expanded its sales of armour products to include ceramic personal armour plates and vehicle armour panels.

39. In May 2006, PPA acquired PPI located in Sunrise, Florida for US$35,000,000 The purchase price was funded by a US$25,000,000 term loan and a US$10,000,000 share issuance. The acquisition of PPI expanded PPA's product portfolio to include a variety of soft armor products and provided PPA with an increased geographic scope and the opportunity for significant growth in the military and police armor markets. Thus, following the acquisition of

24

PPI, PPA shifted its focus toward soft armour and away from its traditional focus of ceramic armor.

40.   Following the acquisition, PPA expanded its sales and marketing efforts to military and law enforcement channels and received significant orders, including an order valued at US$36,200,000 for MTVs from the U.S. Marines.   In 2007, PPA received orders totalling US$63,000,000 from various branches of the U.S. military for soft armour.

41.   On July 31, 2008, PPA completed a U.S. domestication process and incorporated in the State of Delaware.   The domestication was completed by way of a Plan of Arrangement, pursuant to which PPA (then Ceramic Products Corporation) discontinued from the jurisdiction of Alberta into Delaware under the new name "Protective Products of America, Inc".   The arrangement was approved by shareholder vote at a special meeting held on July 28, 2008. According to PPA, the purpose of this process was to enhance the Company's ability to participate in future U.S. military and agency contracts and programs.

42.   On February 12, 2009, PPA announced that on February 10, 2009 it filed a registration statement on Form 10 with the SEC in order to register its common stock to become a reporting company under the Securities and Exchange Act of 1934.

43.   In an "Information Statement" filed with the SEC on April 10, 2009, PPA described its contracting with the U.S. Government as follows:

> We generate the majority of our revenues under contracts with the U.S. Government, including the U.S. military. These contracts generally take one of two forms: a contract that provides for the production and delivery of a fixed quantity of specified products within a fixed timeframe for delivery; or an indefinite delivery/indefinite quantity, or IDIQ, contract, pursuant to which the U.S. Government customer may place orders for certain specified products up to a fixed aggregate dollar value, but which does not specify particular quantities or

25

provide for a fixed delivery schedule at the time the contract is entered into. We generally enter into contracts following an open, competitive solicitation issued by the U.S. Government. An open solicitation by the U.S. Government generally results in contract awards being allocated to a number of successful bidders and not solely to one company. Following entry into an IDIQ contract, the U.S. Government customer places individual delivery orders for specific quantities of products at prices that are agreed upon following submission of the delivery order; the delivery order also specifies the timetable for delivery of the products. Given the length of time required to conduct an open solicitation, a U.S. Government customer may need to purchase additional products prior to a new solicitation being completed, referred to as bridge buy orders. Under a bridge buy order, which we receive from time to time, the U.S. Government customer is able to continue to purchase products from us under a contract that has previously expired, potentially at different pricing than was in effect under the original terms of the contract. There can be no assurance that we will receive any future bridge buy orders, or as to the dollar value of any bridge buy orders we do receive.

## PPA'S LIQUIDITY AND CAPITAL STRUCTURE

44.    At all material times, PPA's authorized capital stock consisted of 40,000,000 shares of common stock, $0.001 par value per share, and 10,000,000 shares of preferred stock, $0.001 par value per share.    At all material times, there were 13,762,557 shares of common stock outstanding. As of January 14, 2010, PPA had approximately 1000 shareholders.

45.    In 2006, PPA's revenue was $76,877,000 or approximately US$67,793,000. In 2007 and 2008, PPA reported record annual revenue of US$73,746,000 and US$85,366,000 respectively. For the nine months ended September 30, 2009, PPA's revenue was US$24,164,000 versus US$65,250,000 for the prior year period.

46.    During the year ended December 31, 2008, PPA derived 82% of its revenue directly from the United States military, and 2% of its revenue from other government agencies. During the year ended December 31, 2007, it generated 92% of its revenues directly from the United States military, and 2% of its revenues from other government agencies.

26

47.    Since the beginning of 2007, PPA relied primarily on debt and equity financing to fund its operations, including a senior secured revolving credit facility with CIBC (the "Credit Facility"). Under the terms of the Credit Facility, CIBC held first priority liens on, and security interests in, substantially all of PPA's assets.

48.    Throughout 2008 and 2009, PPA succeeded in paying down a significant portion of amounts owing under the Credit Facility. The outstanding balance of the Credit Facility was US$12,400,000 as of December 31, 2007. The outstanding balance was US$10,600,000 on September 30, 2008 and, by September 30, 2009, was US$6,600,000.

49.    PPA had also secured a term loan of $25 million in or around May 2006 to facilitate its acquisition of PPI, which acquisition was critical to the Company shifting its focus to the soft armour business and securing contracts with the U.S. military. The balance on this secured term loan was nil as of September 30, 2008.

50.    In August and September 2007, PPA issued US$5,100,000 in principal value of Secured Non-C Debentures at an interest rate of 12.0% per annum, due to mature 2 years from the date of issuance. Of this US$5,100,000 total amount, US$3,400,000 was scheduled to mature in August 2009, and US$1,700,000 was scheduled to mature in September 2009, prior to any renegotiation of terms.

51.    In February and March 2008, PPA also issued $6,000,000 of Secured C Debentures at an annual interest rate of 10.0% per annum, due to mature in February 2011. The debentures had a conversion price of US$6.57 per share.

52.    In or around February 2008, PPA also completed a public offering of common stock for net proceeds of US$14,100,000.

27

53. The Secured Debentures gave holders a security interest in all of PPA's undertaking, business, property and assets, which security interest was subordinate to CIBC's security interest under the Credit Facility. The subordination provisions of the Secured Debentures prohibited payment of interest and principal to holders in the event of PPA's default under the Credit Facility.

54. At all material times, the defendant Giordanella, through the Stephen Giordanella Revocable Trust, held Secured Debentures in the amount of approximately US$2,950,600.90.

55. The defendant Moeller, through Balinhard Corporation, which he directly controlled, held Secured Debentures in the amount of approximately US$2,950,600.90.

56. The defendant Stafford and the defendant Shelton each held Secured Debentures in the amounts of approximately US$216,407.81 and US$162,305.86 respectively.

57. Since at least the time of the issuance of the debt securities in 2008, PPA had been in default of its Credit Facility during certain fiscal quarters and remained in default throughout the Class Period. Due to PPA's defaults with CIBC, the Credit Facility had been amended several times since its inception. In January 2009, the Company and CIBC entered into the Forbearance Agreement which extended the maturity of PPA's credit to on or about June 30, 2009.

58. On or about June 30, 2009, PPA announced that it had entered into a first amending agreement to the Forbearance Agreement under which CIBC agreed not to exercise any remedies with respect to existing defaults by PPA under the Credit Facility until the earliest of (i) October 31, 2009, (ii) any other default by PPA under the Credit Facility, or (iii) any breach by PPA of the Forbearance Agreement.

28

59. PPA and CIBC later executed a second amending agreement to the Forbearance Agreement on or about December 24, 2009, under which CIBC provided an additional US$700,000 in financing to PPA and extended its forbearance through January 8, 2010. This second amended agreement to the Forbearance Agreement and additional financing to PPA was never disclosed to PPA's shareholders.

60. As of September 29, 2009, PPA had total assets valued at US$26,600,000 and total liabilities valued at US$29,100,000.

61. As of January 12, 2010, borrowings under the Credit Facility totalled approximately US$7,602,760.

**THE IMPORTANCE OF THE IOTV CONTRACT**

62. In early 2008, the U.S. Army issued a major solicitation for 736,000 IOTV and PPA participated in the bid. PPA estimated that, if it received a contract under the US$1.0 billion IOTV Program, it could receive up to US$300,000,000 over three to five years. Throughout 2008 and 2009, PPA's senior management represented to shareholders that bidding on the IOTV Contract represented a significant and valuable opportunity for the Company.

63. The IOTV Contract is an ID/IQ contract. Under an ID/IQ contract, the issuer is obligated to purchase certain minimum quantities. Each delivery order is issued as a release against a maximum amount, which, as stated above, PPA estimated would be up to US$300,000,000.

64. The importance of the IOTV Contract to PPA was reflected in the following statement by then CEO Giordanella during the November 2008 Conference Call:

> We continue to be very optimistic about the prospect of participating in the IOTV
> program with the U.S. Army. **We've built the infrastructure needed to execute**

29

the program from tight quality control procedures to solid production capabilities. We are a little disappointed to have seen the process delayed due to protests from a manufacturer who was excluded from the competition. We expect that the protest to be resolved shortly and at the Army's request, we extended our bid by 90 days. In the meantime, we are prepared to meet the aggressive delivery requirements outlined by the Army. **Our planning for the IOTV award has resulted in higher staffing levels than we would have carried based solely on our third-quarter revenues.** We are also looking out to early 2009 in the expectations of a new and sizable solicitation for the Marines for the next generation of MTV. While this staffing has a short-term impact of increasing SG&A, we believe it is critical that we remain fully prepared to meet the demands of two significant opportunities that we believe will provide multiyear revenue streams for our Company.

. . .

While we appreciate that everyone is waiting to hear about an IOTV award and waiting to hear about a more permanent solution to our working capital needs, we are confident that we will see a resolution in both cases.

. . .

. . .We appreciate that our financial results don't yet demonstrate the progress we are making on repositioning this business. We are in a transition and we know our investors have concerns particularly in this kind of market environment. Even so, we are confident that we are well prepared for the challenges in front of us. The recent activity in the stock has made it clear that the market doesn't really understand how much progress we have made and where we're going. **So let me be very clear about our vision and where we are going. We have exited the ceramic manufacturing business and have repositioned ourselves as an integrator of ceramic plates. We are now going to focus on our core competencies around soft armour. I see a clear future that is made up of continuing MTV business, IOTV business, and a market leading domestic law enforcement and DHS business.** The Company has taken steps to enter the international arena and has very definitive opportunities in the near future. (emphasis added)

65.    During the November 2008 Conference Call, the following exchanges in respect of the

IOTV Contract took place between various analysts and Giordanella and Williams:

> **Doug Cooper** (Paradigm Capital): Good, just to remind us, the IOTV program is how much and over what period?

30

**Giordanella:** The IOTV program is – the total program is about $1 billion and it's over a three- to five-year period. And as we noted earlier, the only reason it's been delayed and we heard this from contracting is because of protests in place from another vendor.

. . .

**Robert Catellier** (Clarus Securities):  Okay, then I know it's difficult to really answer this but I'd like a little bit more clarity on your banking situation with CIBC. **In your MD&A, I believe you stated that a new maturity date should be finalized shortly and failing the announcement of the IOTV award, I don't see a big probability of being able to replace that facility.** So I'm curious on two points. One, what are they hearing to be able to have the confidence to leave your line of credit outstanding with no encumbrances. And two, what level of confidence could they possibly have that the line would be replaced?

**Williams:** We are working with CIBC in terms of laying out a very specific plan. In essence a milestone-driven plan to either further reduce our outstanding balances and continue the relationship or to replace the relationship. So it is – we've engaged in active dialogue there. They are aware of the fact that we've brought in investment professionals to assist us in the replacement facility process. **And are again confident or we are expressing our confidence in our ability to participate in future revenue streams, i.e., the IOTV program as well as the MTV program and just demonstrating past performance and our ability to secure programs to lend to our credibility for our future confidence there.**

. . .

**Robert Catellier** (Clarus Securities):  So it is the combination of your proven ability to bring down the bank debt even in difficult circumstances and your positioning vis a vis some of the new awards that is giving them that comfort?

**Giordanella:   They understand the plan in the event — and I clearly understand your position of without an IOTV, where does the company go?** We have shared that plan with CIBC or are in a process of sharing it with them, showing them that we will be with a positive EBITDA and positive profits along that way. **Fortunately, I truly do not believe that's going to be the case at all. I feel very, very confident in IOTV.** But in the event that something does happen, we are sharing our go-forward plan with the bank.

. . .

**Pierre Boucher (Analyst):** Okay. Last question, in terms of the IOTV, if you won a portion of that contract, what kind of an operating line do you think you would need to be able to deal with that contract?

**Williams:** Again, estimating I would say something similar to what we've had, what we've maintained in the past, something between, say, a $15 million, $20 million range.

31

**Pierre Boucher:** Okay.

**Williams:** Pierre, I would guess $15 million would be sufficient. Like I said earlier, we have very, very good working relationships with our vendors and in an award like this, the payment schedule is very quick. We deliver, we get paid in 30 days. So cash flow would be very strong.

(emphasis added)

66.    Further, throughout 2008 and 2009 while PPA awaited the U.S. Army's decision regarding

the awarding of the IOTV Contract, PPA issued news releases to update its shareholders on the

status of its bid for the IOTV Contract. For example, it issued the following release on

December 13, 2008 to disclose to shareholders that the U.S. Army had requested an extension of

the proposal acceptance period for the IOTV Program:

**Protective Products Of America, Inc. Announces Corporate Update And Senior Management Promotion**

Protective Products of America, Inc. (PPA:TSX), a leading manufacturer and distributor of advanced products in ballistics protection, today announced the following update on its corporate strategic initiatives:

. . .

The Company announced that it has received notification from the U.S.Army of an extension of the proposal acceptance period for the Improved Outer Tactical Vest (IOTV) Program until March 30, 2009. The delay is the result of a dispute from a competing manufacturer that had been previously disqualified.

67.    PPA issued another release on March 13, 2009 to disclose to shareholders that the U.S.

Army had requested a further extension of the proposal acceptance period for its IOTV Program:

SUNRISE, FL, March 13 /PRNewswire-FirstCall/ - Protective Products of America, Inc. (PPA:TSX), a leading manufacturer and distributor of advanced products in ballistics protection, today announced that it has received notification from the U.S. Army of an extension of the proposal acceptance period for the Improved Outer Tactical Vest (IOTV) Program until July 31, 2009.

Stephen Giordanella, Chief Executive Officer, said, "Although we are disappointed by the delay in the bidding process, we are still very optimistic about the outcome, as we believe we are one of the few companies that can manufacture the IOTV to U.S. Army specifications. As the sole supplier of the Modular

32

Tactical Vest (MTV) to the U.S. Marine Corps, we have had a successful record with the military and we can quickly ramp up to meet demand once the IOTV contracts are awarded."

68.    PPA issued a release on August 3, 2009, to advise that the U.S. Army had again requested an extension of the proposal acceptance period for its IOTV Program:

SUNRISE, FL, Aug. 3 /CNW/ - Protective Products of America, Inc. (PPA:TSX), a leading manufacturer and distributor of advanced products in ballistics protection, today reported that the U.S. Army has requested an extension of the proposal acceptance period for the Improved Outer Tactical Vest (IOTV) Program until August 15, 2009. PPA will provide a further update on the outcome of its proposal subsequent to the acceptance deadline. . .

## THE RETAINER OF FARLIE TURNER AND BAYSHORE

69.    On or about June 16, 2009, in face of the continuing defaults under the Credit Facility and delays in the awarding of the IOTV Contract, PPA engaged Farlie Turner and Bayshore. PPA issued a press release on or about June 22, 2009 advising that Farlie Turner and Bayshore had been retained "to help the [C]ompany pursue strategic alternatives intended to maximize its value." In this press release, the defendant Williams stated: "We have selected Farlie Turner & Co., LLC given their success in providing valuable advisory expertise and the firm's local presence here in South Florida. We believe they will help us identify and implement the best strategic option to guide our Company through the next phase of our business development."

70.    According to materials filed with the U.S. Bankruptcy Court by PPA on January 13, 2010, Farlie Turner and Bayshore were purportedly retained by PPA "to assist [PPA] in evaluating [its] strategic options with respect to the sale or recapitalization of [its] businesses and related assets both as a going concern outside of bankruptcy or in the context of a potential chapter 11 bankruptcy filing." These materials further indicated that Farlie Turner and Bayshore's mandate

33

"included conducting an extensive marketing process to potential strategic buyers operating within PPA's industry as well as to private equity firms, various lending institutions, and **PPA's existing debt holders and shareholders.**" (emphasis added)

71.   According to materials filed with the U.S. Bankruptcy Court by PPA on January 13, 2010, Farlie Turner and Bayshore were significantly involved in various due diligence activities including creating management presentations, assembling data requests, and answering specific requests by potential buyers and capital providers. It also prepared a confidential investment memorandum with detailed information on PPA's business, strategy, market position, growth opportunities, and historical and projected financial performance.

**MISREPRESENTATIONS IN AUGUST 2009**

72.   In early August 2009, PPA's securities were trading between $0.55 and $0.65. On August 13, 2009, PPA opened at $0.60 and closed at $0.425. That same day, one of PPA's main competitors, Point Blank Solutions, announced that it been awarded an IOTV contract by the US Army to produce up to 736,000 IOTV.

73.   On August 14, 2009, PPA announced that it had not been awarded the IOTV Contract. On this news, the price of PPA shares plummeted from its previous days' close of $0.425 to $0.28 by August 19, 2009. PPA's shares continued to fall, hitting a low of $0.175 on September 29, 2009.

74.   In the MD&A Q2/09, PPA stated that its failure to obtain the IOTV negatively impacted PPA's revenue, outlook, and ability to continue as a going concern. It did not mention, however, that PPA had reasonable grounds to file, had decided to file, or had in fact filed one or more

34

formal protest(s) with the U.S. Army in respect of the awarding of the IOTV Contract to a competing bidder.

75. The "Outlook" section of the MD&A Q2/09 provided:

In early 2008, a major solicitation was issued by the U.S. Army for the IOTV. We bid on the solicitation in April 2008 and recently, upon written request from the U.S. Army, provided an extension of the proposal acceptance period through August 15, 2009. On August 13, 2009, we received written notice from the Army that we were not selected for an award under this solicitation. As a result, we expect our current year revenues from the U.S. military will be substantially lower than 2008 levels.

We currently supply soft armour and other products to federal, state and local law enforcement agencies throughout the United States. With the recent change in the National Institute of Justice standard for ballistic resistance of body armour, we anticipate that the domestic law enforcement market will expand in the latter part of 2009 and beyond. Furthermore, we believe that we will be able to capture additional market share through our expanded sales representation across the United States. We continue to supply protective products to the Department of Homeland Security. We plan to build on this strategic relationship and seek similar opportunities with other federal agencies.

76. Under "Going Concern", the MD&A Q2/09 provided:

For the six months ended June 30, 2009, we incurred a net loss from continuing operations of $4.5 million. Additionally, for the same period, cash used in operating activities of our continuing operations was $1.3 million. We have relied, in part, upon debt financing to fund our operations. As of June 30, 2009, we were not in compliance with any of the financial covenants in our Amended and Restated Credit Agreement. Further, we had outstanding indebtedness of $17.1 million including $5.9 million outstanding under our line of credit, and $0.8 million in cash on hand.

In early 2008, a major solicitation was issued by the U.S. Army for the IOTV. We bid on the solicitation in April 2008 and recently, upon written request from the U.S. Army, provided an extension of the proposal acceptance period through August 15, 2009. On August 13, 2009, we received written notice from the Army that we were not selected for an award under this solicitation. As a result, we expect our current year revenues from the U.S. military will be substantially lower than 2008 levels.

35

77.   Under "Revenue", the August MD&A provided:

> In early 2008, a major solicitation was issued by the U.S. Army for the IOTV. We
> bid on the solicitation in April 2008 and recently, upon written request from the
> U.S. Army, provided an extension of the proposal acceptance period through
> August 15, 2009. On August 13, 2009, we received written notice from the Army
> that we were not selected for an award under this solicitation. As a result, we
> expect our current year revenues from the U.S. military will be substantially lower
> than 2008 levels.

78.   Under "Risks Relating to Our Business and Operations", the August MD&A stated as

follows:

> We depend on the U.S. Government for a substantial amount of our sales, and the
> loss of, or a significant reduction in, U.S. military business could have a material
> adverse effect on our business, financial condition, results of operations and
> liquidity.
>
> . . .
>
> In early 2008, a major solicitation was issued by the U.S. Army for the IOTV. We
> bid on the solicitation in April 2008 and recently, upon written request from the
> U.S. Army, provided an extension of the proposal acceptance period through
> August 15, 2009. On August 13, 2009, we received written notice from the Army
> that we were not selected for an award under this solicitation. As a result, we
> expect our current year revenues from the U.S. military will be substantially lower
> than 2008 levels.
>
> Additionally, the U.S. military funds much of its contracts in annual increments,
> which require subsequent authorization and appropriation that may not occur or
> that may be greater than or less than the total amount of the contract. Changes in
> the U.S. military's budget, spending allocations and the timing of such spending
> could adversely affect our ability to receive future contracts. Due to our relatively
> modest size, our winning or losing a large contract may have the effect of
> substantially changing or distorting our overall financial results.
>
> Reductions in our sales under government contracts, unless offset by other military
> and commercial opportunities, could have a material adverse effect on our
> business, financial condition, results of operations and liquidity.

79.   In a press release issued on August 14, 2009 in conjunction with PPA's Q2/09 financial

results, Caldwell made the following statement:

> We have been notified by the U.S. Army that we were not a recipient of the
> Improved Outer Tactical Vest (IOTV) Program contract. While this was not the
> outcome we had hoped for, we remain confident that the strategies we are
> implementing to diversify our sales mix will position us to increase market share
> in higher margin areas of the business. We have made notable progress with other
> near-term military contracts as well as government agency domestic and
> international programs, which we believe could generate considerable revenue in
> the coming quarters. . . As we move through the second half of the year, we are
> beginning to see signs of an improved sales environment supported by our
> expanded sales force and aggressive marketing efforts. We are further escalating
> our presence in the ballistics market through several key strategic distribution
> partnerships with multinational security providers. We believe these relationships
> will bolster our ability to capture additional sales at the local law enforcement
> level, with government agencies, and in certain commercial sectors where we
> continue to see opportunity.

80.   During the August 2009 Conference Call, Caldwell had the following exchange with an

analyst from Nicusa Capital:

> **Paul Johnson (Nicusa Capital):** I guess my last question is on IOTV. I know the
> Company was very keen on at least winning part of the business. Obviously,
> you've got the announcement they weren't. I just want to make sure I've calibrated
> this. It sounds like, the best we can tell, is that price became a bit of a driver in this
> and perhaps, as they often say, it would've been -- the good news, bad news.
> Given your other efforts, winning the contract, obviously, would've been nice,
> particularly at the pricing you submitted. I get the sense, though, that some of the
> competitors were awfully aggressive in their bids. I assume you'd just as soon not
> win it at their price. You would've been happy to win it at your price.
>
> **Caldwell:** I think that's a pretty good assessment, Paul, even though we don't
> have all of the information yet. But, in all candour, we were very aggressive when
> we submitted our bid. **We priced our vests in such a way that we could earn a
> reasonable level of profit and help the return for our shareholders. We believe
> our price was a fair price to the Army and to our Company and, equally as
> important, to our shareholders.** Our analysis suggests, right now, that one of the
> factors in the award is that other vendors submitted bids that were significantly
> lower than ours. We don't have any particular information to back it up, but we
> think that's what happened. And while not having a significant, if any cost
> advantage, to us, it would've been challenging for our organization to earn a
> reasonable profit, or any profit, at the price that we believe where the award came
> in. **And so, although we are somewhat disappointed, I guess, to a small degree,**

37

not to be selected, we feel strongly that we followed a strategy that was in the best interests of all of our stakeholders. And we just look forward to the opportunities that are coming down the road. (emphasis added)

81.    During the August 2009 Conference Call, Caldwell and Williams had the following

exchange with Patrick Potvin, an analyst with Fiera Capital:

   **Patrick Potvin (Fiera Capital):** Second question, still on the balance sheet. The inventory got increased by not quite but very close to $1 million. Could you explain how come you increased your inventory, even though the contracts were -- it's not IOTV, obviously. You didn't start before you, if you were, awarded the contract or not. So how come the inventory is increasing?

   **Williams:** Very fair. Very good question, Patrick. The increase is principally attributable to the sales order that got pushed quarter over quarter, in terms of timing. We had a shipment that went out at the end of second-quarter 2009. But because of revenue recognition rules here in the States, we could not confirm delivery in advance of the period close. So we had to push that revenue into the third quarter. So, as such, it's shown as inventory in transit, and essentially the reason for the increase there. So we build specific to an order with the Marine Corps, and it does basically represent our cost of -- that's shipped in the second quarter, but will be recognized in the third quarter.

   **Patrick Potvin:** Pat, you just said -- well, no, we got turned down by one pretty girl, but there are others. And to describe the other ones, you had the domestic market and the international market, and I get the picture of those markets and those opportunities, but do you have still hopes or do you still have some other pretty girls in the military in the U.S.?

   **Caldwell:** No question about it. We have opportunities that are coming down the road very shortly, and right now, we are preparing proposals on one opportunity. We've completed a proposal on another opportunity, and are just waiting to hear back, which -- there is no way we can put a date certain on it, as we've already learned through the IOTV process. But we've -- we're excited about the possibilities, but we don't want to count on any particular business coming down the road. We're going to pursue all three markets as hard as we can -- the military, domestic, and international, and just continue to develop our business.

82.    Based on the facts particularized in paragraphs (70) through (79) above, PPA had

represented to its shareholders that it had failed to receive the IOTV Contract and, with no

further prospect of receiving the IOTV Contract, the Company was turning the corner. However,

38

it omitted the material fact that PPA had reasonable grounds to file, had decided to file or had in fact filed one or more formal protests with the U.S. Army in respect of the awarding of the IOTV Contract to a competing bidder. This positive material fact was necessary to make PPA's statements regarding its inventory levels, revenue, financial condition and outlook not misleading in the light of the circumstances in which those statements were made.

83.    Further, the "Outlook" section of the MD&A Q2/09 also provided:

> Our contract with the U.S. Marine Corps is expected to be substantially completed during the third quarter of 2009. **As such, we have identified a number of opportunities for sales of our, or complimentary, product lines under U.S. military programs. These opportunities include open bid solicitations with the U.S. militaries, and subcontractors thereof, for products related, or similar, to the MTV.** We cannot provide assurances as to the timing or quantity of new orders that may materialize from our initiatives. (emphasis added)

84.    PPA omitted the material fact that it had secured potentially lucrative partnership agreements with HUBZone-certified companies Carter Enterprises and Ibiley Manufacturing on July 15, 2009 and July 23, 2009 respectively. Certain contracts for U.S. Government agencies are only available to contracting companies located in HUBZones in order to promote job growth, capital investment and economic development in those areas. Since PPA did not operate in a HUBZone, it sought out partnerships with certified HUBZone companies. The positive material facts that it had successfully entered into such partnerships were necessary to make PPA's statements regarding its financial condition and outlook not misleading in light of the circumstances in which those statements were made. Full particular's of PPA's agreements with Carter Enterprises and Ibiley Manufacturing are unknown to the Plaintiff.

39

## CARTER AND IBILEY ARE AWARDED THE MTV CONTRACTS

85.   On or about September 29, 2019, after markets had closed, PPA announced that the two companies with whom it had partnered under previously undisclosed partnership agreements, Carter Enterprises and Ibiley Manufacturing. would be participating in the U.S. Marine's MTV Program. The value of Carter Enterprises' MTV Contract was US$414,427,770 and it received an initial delivery order in the amount of US$78,936,987. Ibiley also received a significant initial delivery order.

86.   Based on its partners Carter Enterprises and Ibiley Manufacturing having received the MTV Contracts, PPA estimated that it could receive up to a maximum value of US$289,000,000 through 2014 by acting as the sub-contractor to the MTV Contracts. Based on its partnership agreements with Carter Enterprises and Ibiley Manufacturing, under which PPA would serve as the exclusive ballistics provider to each company, PPA estimated that it would receive between US$50,000,000 and US$60,000,000 in revenue on these orders over a twelve to twenty-four month period commencing in the early portion of 2010. Full particulars of the MTV Contracts are unknown to the Plaintiff.

87.   As a result of the announcement, PPA's shares rocketed from its closing price of $0.33 on September 29, 2009 (having hit an intraday low of $0.175) to a high of $2.20 by October 5, 2009.

## MISREPRESENTATIONS IN NOVEMBER 2009

88.   In its MD&A Q3/09, PPA again represented that its failure to obtain the IOTV Contract had negatively impacted PPA's revenue, outlook, and ability to continue as a going concern. It did not state, however, that PPA had decided to file or had in fact filed one or more formal

40

protests with the U.S. Army in respect of the awarding of the IOTV Contract to a competing

bidder.

89.    Both the "Outlook" and "Revenue" sections of the MD&A Q3/09 provided:

> In early 2008, a major solicitation was issued by the U.S. Army for the IOTV. We
> bid on the solicitation in April 2008 and on August 13, 2009, we received written
> notice from the U.S. Army that we were not selected for an award under this
> solicitation.

90.    Under "Risks Relating to Our Business and Operations", the August MD&A stated as

follows:

> We depend on the U.S. Government for a substantial amount of our sales, and the
> loss of, or a significant reduction in, U.S. military business could have a material
> adverse effect on our business, financial condition, results of operations and
> liquidity.
>
> . . .
>
> In early 2008, a major solicitation was issued by the U.S. Army for the IOTV. We
> bid on the solicitation in April 2008 and recently, upon written request from the
> U.S. Army, provided an extension of the proposal acceptance period through
> August 15, 2009. On August 13, 2009, we received written notice from the Army
> that we were not selected for an award under this solicitation.  As a result, we
> expect our current year revenues from the U.S. military will be substantially lower
> than 2008 levels.
>
> Additionally, the U.S. military funds much of its contracts in annual increments,
> which require subsequent authorization and appropriation that may not occur or
> that may be greater than or less than the total amount of the contract. Changes in
> the U.S. military's budget, spending allocations and the timing of such spending
> could adversely affect our ability to receive future contracts. Due to our relatively
> modest size, our winning or losing a large contract may have the effect of
> substantially changing or distorting our overall financial results.
>
> Reductions in our sales under government contracts, unless offset by other military
> and commercial opportunities, could have a material adverse effect on our
> business, financial condition, results of operations and liquidity.

41

91.    Based on the facts particularized in paragraphs (87) and (88) above, PPA had represented

to its shareholders that it had failed to receive the IOTV Contract, had absolutely no prospect of

receiving it, and that this would have a materially adverse effect on its business, financial

condition and outlook. However, PPA omitted the material fact that it had decided to file or had

in fact filed one or more formal protests with the U.S. Army in respect of the awarding of the

IOTV Contract to a competing bidder.  This fact was necessary to make PPA's statements

regarding its business, financial condition and outlook not misleading in the light of the

circumstances in which those statements were made.

## PPA IS AWARDED THE IOTV CONTRACT

92.    On or about December 4, 2009, PPA was notified by the U.S. Army that it had been

awarded the IOTV Contract.   PPA never disclosed this significant positive information to its

shareholders. The U.S. Army awarded the IOTV Contract to PPA after having received one or

more formal protests from the Company on or after August 14, 2009. Full particulars of the

IOTV Contract are unknown to the Plaintiff.

## PPA AND SUN CAPITAL EXECUTE A LETTER OF INTENT

93.    On December 21, 2009, PPA and Sun Capital executed the LOI pursuant to which Sun

Capital proposed to acquire, subject to due diligence, substantially all of PPA's assets, including

the IOTV Contract and PPA's subcontracting rights under the MTV contracts, for approximately

US$8,000,000 in cash. The LOI permitted PPA to retain its interest in several tax refunds valued

at approximately US$5,500,000. The execution of the LOI by Sun Capital was never disclosed

to PPA's shareholders.

42

## PPA'S FORBEARANCE AGREEMENT IS EXTENDED

94.    Following the expiry of the Forbearance Agreement on or about October 31, 2009, PPA did not provide its shareholders with any update on material developments in respect of PPA's financing situation, including the status of its Credit Facility with CIBC.

95.    Unbeknownst to PPA's shareholders, PPA and CIBC executed a second amending agreement to the Forbearance Agreement on or about December 24, 2009 under which CIBC provided an additional US$700,000 in financing to PPA and extended its forbearance through January 8, 2010. This extension of the Forbearance Agreement and additional financing to PPA was never disclosed to PPA's shareholders.

## THE INCORPORATION OF PROTECTIVE PRODUCTS ENTERPRISES

96.    On January 7, 2010, Sun Capital incorporated an affiliate company, PPE, in Delaware to serve as the acquiring entity of PPA. The defendant Schwartzman is the President, Secretary and a Director of PPE. The defendant Williams is the Vice President and Treasurer of PPE. Thomas Taylor and and Donald Mueller, both of Sun Capital, are also directors of PPE. At no time during the Class Period did PPA or the Individual Defendants disclose the potential or actual conflicts of interest of certain Individual Defendants, including Caldwell, Schwartzman, and Williams, arising from their negotiations for future compensation from or equity interests in PPE, which negotiations were collateral to negotiations relating to the Transaction.

43

## PPA AND PPE ENTER INTO THE ASSET PURCHASE AGREEMENT

97.  On January 12, 2010, PPA entered into an APA with PPE pursuant to which they agreed to enter into the Transaction. PPE entered the APA as a "stalking horse" bidder, and the purchase of the assets was subject to PPA's solicitation of higher or otherwise better offers pursuant to specified bidding procedures and an auction process to be conducted under the supervision of the U.S. Bankruptcy Court.

98.  The APA for the sale of substantially all of PPA's assets to PPE was not subjected to a vote of the common shareholders.

99.  The existence of the APA was not disclosed to PPA's shareholders until on or about January 14, 2010, the day after PPA's voluntary assignment into bankruptcy for the purpose of the Transaction.

## PPA'S VOLUNTARY ASSIGNMENT INTO BANKRUPTCY

100. On January 13, 2010, PPA and each of its four subsidiaries filed a voluntary petition for Chapter 11 reorganization and obtained approval for the Transaction from the U.S. Bankruptcy Court for the Southern District of Florida. The terms of the Transaction were for PPA to sell substantially all of its assets and businesses as a going concern for approximately US$8,000,000. Excluded from the sale were certain tax refunds valued by PPA at US$5,500,000. These refunds were to remain with PPA for the benefit of its creditors, including the defendants Giordanella, Moeller, Shelton, and Stafford who held Secured Debentures, subordinate to CIBC's security interest, in the total amount of approximately US$6,279,915. The Transaction was subject to any higher bid that PPA might receive within 35 days via a stalking horse auction process.

44

101. On January 13, 2010, PPA shares closed at approximately $0.59. On January 14, 2010, PPA issued a press release in which it announced that it had filed for Chapter 11 the previous day. Upon PPA's announcement, the TSX suspended the trading of PPA shares effective immediately and announced an expedited delisting review of PPA's shares.

102. In support of the bankruptcy filing on January 13, 2010, the defendant Schwartzman swore an 87-paragraph declaration on January 12, 2010, only one paragraph of which addressed the IOTV Contract under the heading "Prior Cost-Cutting Initiatives" as follows (at para. 27):

> In early 2008 a major solicitation was issued by the U.S. Army for the IOTV. PPA bid on the solicitation in April 2008 and on August 13, 2009, PPA received written notice from the U.S. army that PPA was not selected for an award under this solicitation. **After the filing of protest(s) concerning such award, on December 4, 2009, PPA was notified by the U.S. Army that PPA would be participating in the IOTV award. Since the award would be pursuant to an IDIQ (Indefinite Delivery Indefinite Quantity) contract, PPA is unable to estimate the amount, if any, that would be awarded to PPA.** (emphasis added)

103. The awarding of the IOTV Contract to PPA was never disclosed to PPA shareholders. PPA released the body of the APA but did not release the schedules thereto that described the acquired assets (and would have revealed that PPA had been awarded the IOTV Contract) and indicated that, for purposes of the Transaction, PPA had refused to value the IOTV Contract and its exclusive partnership agreements with Carter Enterprises and Ibiley Manufacturing. These schedules were only filed with the U.S. Bankruptcy Court on February 22, 2010, on which date the U.S. Bankruptcy Court approved the Transaction. In any event, they were never disclosed to the Plaintiff or the other Class Members during the Class Period.

### POST-FILING ARRESTS OF CALDWELL AND GIORDANELLA

104. On January 18, 2010, five days after the Company's voluntary bankruptcy filing, Caldwell and Giordanella, along with twenty other executives and employees of companies in the military

45

and law enforcement products industry, were arrested and indicted for engaging in schemes to
bribe foreign government officials to obtain and retain business between in or around May 2009
through in or around September 2009. The indictments stemmed from an FBI undercover
operation that focused on allegations of foreign bribery in the military and law enforcement
products industry.

105. Following his arrest and indictment, Caldwell was placed on administrative leave from his
position as CEO and as a member of the Board of Directors. Schwartzman assumed the position
of Acting CEO as of January 20, 2010.

106. As a result of the indictments of Caldwell and Giordanella, and the increased risk of the
Transaction, PPA and PPE executed an amended and restated APA on February 4, 2010, under
which PPE would pay the same purchase price of approximately US$8,000,000 and, in addition
to the assets PPE would have received under the original APA, it would also receive the first
US$2,000,000 of tax refunds and 57% of any additional refunds in excess of US$2,000,000.
PPA would no longer retain all of the tax refunds (estimated at $5.5 million) as contemplated by
the original APA.

**PPA SELLS SUBSTANTIALLY ALL OF ITS ASSETS TO PPE**

107. Following a stalking horse auction process held on February 18, 2010, PPA and PPE
executed a further amended APA on February 19, 2010 under which PPE agreed to pay an
increased purchase price of approximately US$10,700,000 for substantially all of PPA's assets
including its previously agreed upon share of PPA's tax refunds. Under the terms of the further
amended APA, PPE was able to offset the purchase price of US$10,700,000 with some
(unknown) amount to be determined after closing.

46

108. The further amended APA was subsequently approved by the U.S. Bankruptcy Court on or about February 22, 2010. In support of the approval motion, PPA filed for the first time certain schedules to the APA which revealed

a)    PPA had refused to place a value on its partnership agreements with Carter Enterprises and Ibiley Manufacturing, indicating that their value was "not known until orders placed". PPA refused to value these partnership agreements despite the fact that it had previously represented that, as exclusive ballistics provider thereunder, PPA could generate revenue of up to US$289,000,000 through 2014 and would receive between US$50,000,000 and US$60,000,000 in revenue over a twelve to twenty-four month period commencing in the early portion of 2010 because of the MTV Contracts awarded to its partners Carter Enterprises and Ibiley Manufacturing.

b)    PPA had refused to value the IOTV Contract because its value was "not known until orders placed." It refused to value the IOTV Contract despite the fact that PPA and certain Individual Defendants had touted the IOTV Contract as a highly valuable opportunity for the Company and represented to shareholders that the IOTV Contract could result in up to US$300,000,000 of revenue to PPA over three to five years.

109. The approved APA and the schedules thereto filed with the U.S. Bankruptcy Court on February 22, 2010 were never disclosed to shareholders during the Class Period.

110. The Closing of the Transaction occurred on March 5, 2010.

111. On or about March 8, 2010, the acquiring entity PPE issued the following press release regarding its purchase of PPA's assets, which includes a statement by the defendant Schwartzman:

Sun Capital Partners, Inc. ("Sun Capital"), a leading private investment firm specializing in leveraged buyouts and investments in underperforming companies, today announced that its affiliate Protective Products Enterprises has acquired substantially all of the assets of Protective Products of America through a 363 bankruptcy sale. The sale was approved by the Bankruptcy Court of the Southern District of Florida on February 19, 2010. The company, which ranks among the top qualified U.S. providers of soft body armour for military and law enforcement personnel, will continue to operate under its recognized brand, "Protective Products".

**"We are delighted with our agreement to be acquired by an affiliate of Sun Capital"** said Neil Schwartzman, Acting CEO, Protective Products Enterprises [the acquiring entity]. "As a result of the reorganization, our company re-enters the market with a simplified business model and stronger capital structure, and is better positioned overall to continue to supply our customers with the highest quality, certified protective ballistic products. With Sun Capital's financial support and extensive manufacturing experience, Protective Products now has the necessary resources to invest in our business and pursue the numerous domestic and international growth opportunities that exist in the current marketplace. (emphasis added)

112. On or about November 3, 2010, PPA filed a Plan of Liquidation with the U.S. Bankruptcy Court.

**TRADING OF PPA SHARES**

113. As a result of the Misrepresentations and failures to disclose the Material Changes, PPA's shares were artificially deflated during the Class Period.

114. Following PPA's announcement on January 14, 2010 that it had filed a voluntary assignment into bankruptcy the previous day, the TSX immediately suspended the trading of PPA shares and commenced an expedited delisting review process. PPA's shares had closed at $0.59 the day prior to this announcement.

115. On January 21, 2010, the TSX issued a "Delisting Review" Notice indicating that it had determined to delist the common shares of PPA at the close of market on February 19, 2010 for

48

failure to meet the continued listing requirements of TSX and that, for the interim, PPA shares would remain suspended from trading.

## MISREPRESENTATION AND NON-DISCLOSURE

116. The Individual Defendants were in a special relationship with the Plaintiff and other Class members. The Misrepresentations and non-disclosures of the Material Changes were intended to discourage the investing public from purchasing PPA shares and encourage the sale by existing shareholders. It was reasonably foreseeable that such statements and omissions would be relied upon by the Plaintiff and other Class Members in making the decision to purchase or sell PPA's shares. It was reasonable, and in fact expected, that the Plaintiff and other Class Members would rely on the Misrepresentations and non-disclosures of the Material Changes. The Individual Defendants owed the Plaintiff and Class Members a duty to ensure that the documents and public oral statements were accurate and truthful.

117. The Plaintiff pleads, on his own behalf and on behalf of the other Class Members, that the Individual Defendants were under an obligation to disclose the Material Changes to them and they further state that, under such circumstances, their failure to disclose the Material Changes amounts to negligent or, in the alternative, fraudulent misrepresentation or non-disclosure at common law.

118. PPA's news releases, quarterly reports, and MD&A contained the Misrepresentations, whether implicitly or explicitly, and such Misrepresentations were materially false and/or materially misleading when made.

119. The Individual Defendants made the Misrepresentations by issuing, or authorizing, permitting, and/or acquiescing in the issuance of the documents and statements referenced above,

49

and, in the case of Caldwell and Williams, by signing certifications on Multilateral Instrument 52-109 Form F2 for PPA's quarterly filings that contained the Misrepresentations.

120. The Individual Defendants acted negligently, recklessly, or fraudulently in making the Misrepresentations and not disclosing the Material Changes, as particularlized above. The Defendants knew or ought to have known or were grossly negligent or reckless in not knowing the Misrepresentations were false and/or materially misleading.

121. As further particularized below, as a result of their reliance on the Misrepresentations, the Plaintiff and other Class Members suffered damages and loss.

## THE MISREPRESENTATIONS, FAILURES TO DISCLOSE, AND THE PRICE OF PPA'S SECURITIES

122. PPA's securities were publicly traded on the TSX, which is a highly efficient and automated market. Any and all public information regarding PPA was promptly incorporated into, and had a direct effect upon, the price of PPA's shares. As such, the price of PPA's publicly-traded securities was directly affected by the news releases, quarterly reports, MD&A and public oral statements described herein.

123. The disclosure documents and statements referenced above, and all the information contained therein, which included the Misrepresentations, were immediately made available to the Plaintiff, other Class Members, other members of the investing public, financial analysts, and the financial press. The Individual Defendants were aware of this fact at all material times, as evidenced by the following:

   a)   The disclosure documents were filed with SEDAR and the TSX and were immediately accessible to the public; and

50

b)     PPA and certain Individual Defendants regularly communicated with the

investing public and financial analysts through news releases on newswire

services and other established market communication mechanisms.

124. Any and all analysis undertaken by the Plaintiff and other Class Members in determining

whether to purchase, hold, or sell PPA securities was directly influenced by the disclosure

documents and statements referenced above, which incorporated the Misrepresentations and

failed to incorporate the Material Changes.

125. The Material Changes were changes in the business, operations or affairs of PPA that

would be considered important by a reasonable investor in determining whether to purchase, sell,

or to hold PPA's shares.

126. The Misrepresentations were omissions of material facts that were necessary in order to

make statements (both in documents and in public oral statements) about PPA's business, affairs,

operations, revenue, outlook, and ability to continue as a going concern, not misleading in light

of the circumstances in which those statements were made. As such, they constituted

Misrepresentations under section 1(1) of the Securities Act.

127. Therefore, as a result of the Misrepresentations and the failures to make timely or any

disclosure of the Material Changes, the PPA's shares were artificially deflated throughout the

Class Period.

128. The Plaintiff, on behalf of himself and the other Class Members, expressly plead that the

Misrepresentations and the failures to make timely disclosure of the Material Changes caused or

contributed to the Fundamental Change Event which constituted or resulted in an involuntary

51

disposition of the shares of PPA held by the Plaintiff and the other Class Members as of January 14, 2010.

129. The Individual Defendants are liable to the Plaintiff and the other Class Members who disposed of or were forced to dispose of their shares during the Class Period, without regard to whether the Plaintiff or other Class Members relied on the Misrepresentations or the failures to disclose the Material Changes, pursuant to s. 138.3 of the *Securities Act*.

**CONSPIRACY**

130. PPA retained Farlie Turner and Bayshore in order to to help it pursue strategic alternatives intended to maximize its value.

131. Under their engagement with PPA, the defendants Farlie Turner and Bayshore were to, among other things, prepare a confidential investment memorandum to assist in the marketing of PPA and PPA's assets for sale or in raising additional debt or equity capital.

132. As part of their engagement, Farlie Turner and Bayshore also were required to conduct an extensive marketing process to potential strategic buyers operating within PPA's industry as well to seek out options for refinancing and recapitalization through private equity firms, lending institutions, and PPA's existing debt holders and shareholders.

133. As such, Farlie Turner and Bayshore had knowledge of the Misrepresentations and Material Changes yet, during the Class Period, did not market appropriately or at all PPA to existing shareholders in accordance with its engagement by PPA, and knowingly assisted the Individual Defendants in carrying out their unlawful object and common design to deflate the

52

value of PPA shares by making the Misrepresentations and by not disclosing the Material Changes to the Plaintiff and the Class Members in violation of the *Securities Act*.

134. Prior to and during the Class Period, at Fort Lauderdale and Sunrise, Florida, and in other locations currently unknown to the Plaintiff, Farlie Turner, Bayshore and PPA, and its servants and agents, including the Individual Defendants, wrongfully, unlawfully, maliciously, and lacking *bona fides*, agreed together, the one with the other and with persons unknown to, among other things, conceal from PPA's shareholders positive information relating to PPA's business, affairs, and operations, which information was required to be disclosed under the *Securities Act*.

135. Some, but not all, of the Defendants' predominant purposes, concerns, and motivations were to:

a)   injure the Plaintiff and the other Class Members;

b)   artificially deflate PPA's share price in the secondary market in circumstances where they knew or ought to have known that injury to the Plaintiff and the other Class members would result;

c)   authorize, permit, acquiesce in, or assist with, the violation of the provisions of the *Securities Act* relating to secondary market disclosure, where they knew or ought to have known that injury to the Plaintiff and the other Class Members would result;

d)   artificially deflate PPA's share price to prevent or reduce the prospect of a refinancing or recapitalization of the Company, where they knew or ought to have known that injury to the Plaintiff and the other Class Members would result; and

53

e)     artificially deflate PPA's equity value to make the Company a more attractive target for prospective bidders in order to "go private" for the benefit of certain Individual Defendants holding secured debt in PPA and to provide an opportunity for certain Individual Defendants, including Caldwell, Schwartzman, and Williams, to secure favourable compensation arrangements with or equity interests in the acquiring entity, where they knew or ought to have known that injury to the Plaintiff and the other Class Members would result.

136.   In furtherance of the conspiracy, the following are some, but not all, of the intentional acts carried out or caused to be carried out by the Defendants, or some of them:

a)     they made the Misrepresentations and failed to disclose the Material Changes;

b)     they authorized statements, announcements, press releases, filings, and other documents containing the Misrepresentations;

c)     they refused to disclose the Material Changes;

d)     they concealed positive material information about PPA and its assets from shareholders;

e)     they prevented a valuation of PPA's equity based on the wide dissemination to all market participants of all material information that the Company was required to disclose on a timely basis pursuant to the *Securities Act*;

f)     they did not take any or appropriate steps to market PPA to its existing shareholders inconsistent with the purported mandate for which PPA had retained Farlie Turner and Bayshore; and

54

g)    they did not take any or appropriate steps to refinance or recapitalize PPA inconsistent with the purported mandate for which PPA retained Farlie Turner and Bayshore.

137. The Defendants, by carrying out the above conspiracy, were aware that their actions would or were likely to harm PPA itself by hindering the Company's prospects for refinancing or recapitalization (by suppressing PPA's share price) and preventing the Company from maximizing its value.

138. The Plaintiff and other Class Members have suffered damages as a result of the above conspiracy, which had the effect of artificially deflating the value of their shares in PPA during the Class Period.

## INTENTIONAL INTERFERENCE WITH ECONOMIC RELATIONS

139. The Plaintiff, on behalf of himself and the other class members, pleads that the acts particularized in paragraphs (128) through (136) in respect of the alleged participation of Farlie Turner and Bayshore in a conspiracy, constituted a breach of an express or implied agreement between Farlie Turner and Bayshore, on the one hand and PPA, on the other hand, in respect of Farlie Turner and Bayshore's mandate to assist the Company in pursuing strategic alternatives intended to maximize its value.

140. The acts particularlized in paragraphs (128) through (136) were unlawful acts against PPA that were undertaken by Farlie Turner and Bayshore with the significant, predominant, or exclusive intent to injure the Plaintiff and the Class, or Farlie Turner and Bayshore knew that

55

such injury would be a necessary consequence of their interference, and they are liable for the tort of intentional interference with the Class Members' economic relations with the Company and their economic interests and expectancy as shareholders.

141.   Farlie Turner and Bayshore knew or ought to have known that the Plaintiff and the other Class Members, as shareholders of PPA, had an expectancy interest that the value of their equity would be based on a wide dissemination to all market participants of all material information that PPA was required to disclose on a timely basis pursuant to the *Securities Act* and the Defendants intentionally interfered with that expectancy.

142.   The Class suffered damages as a direct or proximate result of the Defendants' intentional and unlawful interference with their economic interests and expectancy as shareholders of PPA.

**DAMAGES**

143.   As a result of the Misrepresentations and failures to disclose, in a timely manner or at all, the Material Changes, the Plaintiff and other Class Members voluntarily disposed of their PPA shares at artificially deflated prices and, upon the Fundamental Change Event, involuntarily disposed of their shares at a value of nil during the Class Period.   The Misrepresentations were never corrected, nor were the Material Changes ever disclosed, and there was never an upward adjustment in the price of PPA's shares to reflect the Company's true value.

144.   As a result of the facts pleaded above, the Plaintiff and other Class Members have suffered damages equivalent to the increase in the market value that would have occurred had PPA corrected the Misrepresentations and made timely disclosure of the Material Changes.

56

145. The Plaintiff and Class Members claim damages calculated pursuant to sections 138.5 and 138.6 of the *Securities Act*. The Plaintiff and Class Members further plead and rely on section 138.1 of the *Securities Act* in support of their claim for damages.

146. The Plaintiff and other Class Members are also entitled to recover, as damages or costs in accordance with the *CPA*, the costs of administering the plan to distribute the recovery in this action.

147. In addition, the Plaintiff and Class Members claim punitive and exemplary damages against the Defendants. The conduct of the Defendants was of a reprehensible nature, deserving of the sanction of this Honourable Court to deter other directors, officers and executive members of other companies, publicly-traded on a Canadian stock exchange, from engaging in similar misconduct. The Defendants deliberately placed their financial self-interests above the interests of the Plaintiff and other Class Members in maintaining artificially low share prices and causing an involuntary disposition to the detriment of the interests of shareholders. The Defendants' actions were wanton, outrageous, disgraceful and showed a callous disregard for the rights of ordinary investors. The Defendants acted in a high-handed manner towards the Plaintiff and the other Class Members, deserving a civil sanction aimed at specific deterrence.

148. Furthermore, certain Individual Defendants, including Caldwell, Schwartzman, Williams, Moeller, Giordanella, Stafford, and Shelton, placed themselves in a conflict of interest when they chose not to disclose the Material Changes. The Individual Defendants carried on this scheme to cover up and delay disclosures in order to take the Company private for their own self-interest and financial gain.

57

149. By concealing positive material information from PPA's shareholders and deflating the value of PPA's equity, PPA became a more attractive target for private equity firms. Moreover, a low share price prevented or reduced the prospect of refinancing or recapitalization.

150. Through the Defendants' efforts to take PPA private, the defendants Moeller, Giordaniella, Stafford, and Shelton sought to recover most or all of their secured debt in PPA and certain Individual Defendants, including Caldwell, Schwartzman, and Williams, sought to secure favourable compensation arrangements with or equity interests in the acquiring entity.

## PART XXIII.1 OF THE SECURITIES ACT

151. The Plaintiff intends to deliver a notice of motion seeking, among other things, an order for leave to assert the statutory causes of action particularized in Part XXIII.1 of the *Securities Act*.

## REAL AND SUBSTANTIAL CONNECTION WITH ONTARIO

152. This action has a real and substantial connection with Ontario because, among other things:

    a)    PPA is a reporting issuer in Ontario;

    b)    the shares of PPA traded on the TSX, which is located in Toronto;

    c)    the Misrepresentations were disseminated in Ontario;

    d)    a substantial proportion of the Class Members reside in Ontario; and

    e)    a substantial portion of the damages sustained by the Class were sustained by persons and entities domiciled in Ontario.

58

## SERVICE OUTSIDE OF ONTARIO

153. This originating process may be served without court order outside Ontario in that the claim is:

    a)    in respect of a tort committed in Ontario (rule 17.02(g));

    b)    in respect of damages sustained in Ontario arising from a tort wherever committed (rule 17.02(h)); and

    c)    authorized by statute to be made against a person outside Ontario by a proceeding commenced in Ontario (rule 17.02(n)).

## THE RELEVANT LEGISLATION

The Plaintiff pleads and relies on the *Securities Act*, the *CJA* and the *CPA*, all as amended.

## PLACE OF TRIAL

154. The Plaintiff proposes that this action be tried in the City of Toronto, in the Province of Ontario.

Date:   December 6, 2010

                    **ROCHON GENOVA LLP**
                    Barristers • Avocats
                    121 Richmond Street West
                    Suite 900
                    Toronto, ON  M5H 2K1

                    **John Archibald (LSUC#: 48221L)**
                    Tel: 416.363.1867
                    Fax: 416.393.0263

                    Lawyers for the Plaintiff

## EXHIBIT "C"

### Summary of Professional and Paraprofessional
### Time Total per Individual for this Period Only

[If this is a final application, and does not cumulate fee details from prior interim applications, then a separate Exhibit C showing cumulative time summary from all applications is attached as well.]

**Meland, Russin & Budwick, P.A.**

| Name | Partner, Associate, or Paraprofessional | Year Licensed | Total Hours | Hourly Rate | Total Fees |
|---|---|---|---|---|---|
| Peter D. Russin | Partner | 1988 | 7.3 | $550.00 | $ 4,015.00 |
| James C. Moon | Partner | 2000[1] | 17.5 | $395.00 | $ 6,912.50 |
| Katherine H. Minchener | Paraprofessional | N/A | 4.7 | $145.00 | $ 681.50 |
| Irene Hernandez | Paraprofessional | N/A | 2.8 | $135.00 | $ 378.00 |
| Blended Hourly Rate | | | | $306.25 | |
| **Total Fees** | | | 32.3 | | $11,987.00 |

**McMillan LLP[2]**

| Name | Partner, Associate, or Paraprofessional | Year Licensed | Total Hours | Hourly Rate | Total Fees |
|---|---|---|---|---|---|
| David W. Kent | Partner | 1983 | 13.9 | $808.00 | $11,195.48 |
| **Total Fees** | | | 13.9 | | $11,195.48 |

---

[1] James C. Moon was admitted in 2000 in Connecticut, 2001 in New York, and 2004 in Florida.
[2] McMillan LLP's invoice reflects amounts owed in Canadian dollars. However, the amounts listed herein reflect U.S. dollars, using a currency exchange rate of $1 U.S. dollar to $1.0099 Canadian dollars as of February 8, 2011.

**EXHIBIT "C"**

## EXHIBIT D

**Summary of Professional and Paraprofessional Time
by Activity Code Category for this Time Period Only**

| Meland, Russin & Budwick, P.A. Litigation | | | | | |
|---|---|---|---|---|---|
| | **Name** | | **Rate** | **Hours** | **Amount** |
| Partners | PDR | Peter D. Russin | $550.00 | 7.3 | $ 4,015.00 |
| | JCM | James C. Moon | $395.00 | 17.5 | $ 6,912.50 |
| Paralegal | KHM | Katherine H. Minchener | $145.00 | 4.7 | $    681.50 |
| | IH | Irene Hernandez | $135.00 | 2.8 | $    378.00 |
| | | **CATEGORY TOTALS:** | | **32.3** | **$11,987.00** |

| McMillan LLP Litigation[1] | | | | | |
|---|---|---|---|---|---|
| | **Name** | | **Rate** | **Hours** | **Amount** |
| Partners | Kent, D.W. | David W. Kent | $808.00 | **13.9** | $11,195.48 |
| | | **CATEGORY TOTALS:** | | **13.9** | **$11,195.48** |

[1] McMillan LLP's invoice reflects amounts owed in Canadian dollars. However, the amounts listed herein reflect
U.S. dollars, using a currency exchange rate of $1 U.S. dollar to $1.0099 Canadian dollars as of February 8, 2011.

**EXHIBIT "D"**

## EXHIBIT "E"

Summary of Requested Reimbursement of Expenses for this Time Period Only

[If this is a final application which does not cumulate prior interim applications, a separate summary showing cumulative expenses for all applications is attached as well.]

| | | Meland, Russin & Budwick, P.A. | McMillan LLP |
|---|---|---|---|
| 1. | Filing Fees | $0.00 | $0.00 |
| 2. | Process Service Fees | $0.00 | $0.00 |
| 3. | Witness Fees | $0.00 | $0.00 |
| 4. | Court Reporter & Transcripts | $0.00 | $0.00 |
| 5. | Lien and Title Searches | $0.00 | $0.00 |
| 6. | Photocopies (in-house copies) (509 copies @ 15¢) as to Meland, Russin & Budwick, P.A. and (0 copies @ 15¢) as to McMillan LLP | $76.35 | $0.00 |
| 7. | Photocopies (outside copies) | $0.00 | $0.00 |
| 8. | Postage | $0.00 | $0.00 |
| 9. | Overnight Delivery Charges | $0.00 | $0.00 |
| 10. | Outside Courier/Messenger Services | $0.00 | $0.00 |
| 11a. | Long Distance (a) Telephone Charges | $0.00 | $0.00 |
| 11b. | Long Distance (b) Conference Calls | $0.00 | $0.00 |
| 12. | Long Distance Fax Transmission @ $1.00/pg. | $0.00 | $0.00 |
| 13. | Computerized Research | $0.00 | $0.00 |
| 14. | Out of Southern District of Florida Travel<br>   A.  Transportation<br>   B.  Lodging<br>   C.  Meals | $0.00 | $0.00 |
| 15. | Other (Not specifically disallowed; must specify and justify) | $0.00 | $0.00 |
| **TOTAL "GROSS" AMOUNT OF REQUESTED DISBURSEMENTS** | | **$76.35** | **$0.00** |

**EXHIBIT "E"**

# MELAND RUSSIN & BUDWICK
### PROFESSIONAL ASSOCIATION

3000 WACHOVIA FINANCIAL CENTER
200 SOUTH BISCAYNE BOULEVARD
MIAMI, FLORIDA 33131

TELEPHONE (305) 358-6363

FACSIMILE (305) 358-1221

FID# 65-0340687

February 8, 2011

Farlie Turner & Co., LLC
c/o Steven B. Zuckerman
401 E. Las Olas Blvd.☐Suite 1160
Ft. Lauderdale, FL 33301

Attention:

| | |
|---|---|
| Matter #: | 5386-1 |
| Invoice #: | 43251 |

RE:    In re: Protective Products of America, Inc., Case No. 10-10711-BKC-JKO

| DATE | LAWYER | DESCRIPTION | RATE | HOURS | FEE |
|---|---|---|---|---|---|
| January 21, 2011 | PDR | TC w Steven Zuckerman re: Bayshore indemnification claims in the PPO bankruptcy case and related background matters; | $550.00 | 0.80 | $440.00 |
| January 22, 2011 | PDR | Review email and attachments from Steven Zuckerman re: PPO case and related matters; | $550.00 | 1.10 | $605.00 |
| January 24, 2011 | JCM | Meeting with Ms. Zuckerman regarding litigation dispute (.2); review documents related to same (.5) | $395.00 | 0.70 | $276.50 |
| January 25, 2011 | IH | Receipt and review correspondence; organize file. | $135.00 | 0.60 | $81.00 |
| January 26, 2011 | JCM | Review documents; call with Mr. Zuckerman regarding same. | $395.00 | 1.10 | $434.50 |
| January 27, 2011 | IH | Review court docket; docket pleadings filed; calendar dates and deadlines accordingly. | $135.00 | 0.80 | $108.00 |
| | IH | Review court docket; docket pleadings filed. | $135.00 | 0.80 | $108.00 |
| January 28, 2011 | PDR | Review numerous pleadings including provisions of disclosure statement and plan and review | $550.00 | 1.40 | $770.00 |

"EXHIBIT F"

| | | | | | |
|---|---|---|---|---|---|
| | | indemnification and order approving retention and indemnification; Consider enforcement of same, plan issues and related strategic issues; | | | |
| January 31, 2011 | JCM | Review and analyze plan and disclosure statement; analyze case strategy on indemnification. | $395.00 | 2.00 | $790.00 |
| | IH | Review deadlines re: ECF No. 381; calendar dates and deadlines accordingly. | $135.00 | 0.60 | $81.00 |
| February 1, 2011 | PDR | Prepare for and attend conference call w/ Craig L. Farlie & Steve B. Zuckerman re: legal and strategic issues; | $550.00 | 1.50 | $825.00 |
| | JCM | Meeting with Mr. Russin regarding strategy on indemnification issue (.4); call with clients regarding legal strategy (.7) | $395.00 | 1.10 | $434.50 |
| February 4, 2011 | PDR | Review insert of background for motion from Steven Zuckerman; | $550.00 | 0.40 | $220.00 |
| | JCM | Review background information forwarded by Mr. Zuckerman (.3) ; review M&A nomination deal information (.1); research for and drafting of Application and Motion regarding indemnification fees and costs (2.7) | $395.00 | 3.10 | $1,224.50 |
| February 6, 2011 | PDR | Review and revise fee application and related motion; Consider related issues; | $550.00 | 1.30 | $715.00 |
| | JCM | Research for and drafting of Application / Motion regarding indemnification fees and costs; attention to correspondence regarding same. | $395.00 | 6.00 | $2,370.00 |
| February 7, 2011 | PDR | Review final draft of application, motion and exhibits; | $550.00 | 0.80 | $440.00 |
| | JCM | Attention to correspondence with Mr. Kent regarding need for time records (.2); call with Mr. Kent regarding | $395.00 | 3.50 | $1,382.50 |

| | | | | |
|---|---|---|---|---|
| | | same (.2); attention to correspondence regarding application / motion exhibits and filing issues (.2); research related to compliance with UST Guidelines on fee applications (1.2); calls with US Trustees regarding same (.4); call to Mr. Guso and Ms. Galler regarding Application and Motion (.1); calls with Ms. Harmon and Mr. Moses regarding Application and Motion and issues related to plan confirmation (.7); revise and edit Applicaiton / Motion (.5). | | | |
| | KHM | Draft Application for Compensation and its exhibits. (4.7) | $145.00 | 4.70 | $681.50 |
| | Totals | | | 32.30 | $11,987.00 |

| DISBURSEMENTS | Disbursements | Receipts |
|---|---|---|
| | 76.35 | |
| DUPLICATION EXPENSE | | |
| Totals | $76.35 | $0.00 |

| Client Name | Farlie, Turner & Co., LLC |
|---|---|
| Matter Name | Michael Frank |
| Matter Number | 201450 |

| | | Proforma Number | 24236 |
|---|---|---|---|
| | | Joint Group Number | |
| | | Proforma Run Date | 02/07/2011 |
| | | Page Number | Page 4 of 5 |

## Proforma

### General Information

**Client / Matter Information**

| Client Name | Farlie, Turner & Co., LLC |
|---|---|
| Client Number | 1000335 |
| Matter Name | Michael Frank |
| Matter Number | 201450 |
| Billing Lawyer | D.W Kent, D.W. |
| Billing Lawyer Office | McMillan LLP - Toronto |

**Proforma Information**

| Proforma Number | 24236 |
|---|---|
| Joint Group Number | |
| Proforma run Date | 2/7/2011 |

**Selection Date Range (Work Values)**

| Time (From - To) | Unspecified | - | 02/04/2011 |
|---|---|---|---|
| Cost (From - To) | Unspecified | - | 02/04/2011 |
| Charge (From - To) | Unspecified | - | 02/04/2011 |

### Proforma Unbilled Fee Summary by Descending WIP Amount

| Timekeeper Number | Timekeeper Name | Title | Office | Hours | WIP Rate | WIP Amount | National Rate |
|---|---|---|---|---|---|---|---|
| 0140 | Kent, D.W. | Partner | McMillan LLP - Toronto | 13.90 | 800.00 | 11,120.00 | 800.00 |
| | Grand Total | | | 13.90 | | 11,120.00 | |

### Proforma Unbilled Fee Details by Work Date

| Date | Timekeeper Name | Timekeeper Number | Task Code | Activity Code | Description | WIP Hours | WIP Amount | Index |
|---|---|---|---|---|---|---|---|---|
| 01/05/2011 | Kent, D.W. | 0140 | | | Review claim; telephone call from clients. | 0.80 | 640.00 | 6403895 |
| 01/10/2011 | Kent, D.W. | 0140 | | | Email to S. Zucherman; letter to J. Archibald. | 0.30 | 240.00 | 6403908 |
| 01/11/2011 | Kent, D.W. | 0140 | | | Review correspondence; review draft response to plaintiffs. | 0.20 | 160.00 | 6403907 |
| 01/12/2011 | Kent, D.W. | 0140 | | | Review bankruptcy correspondence; review claim; review draft FT letter to plaintiffs; review engagement letter. | 1.50 | 1,200.00 | 6403904 |

| Client Name | Farfie, Turner & Co., LLC | | | | | Proforma Number | 24236 |
| Matter Name | Michael Frank | | | | | Joint Group Number | |
| Matter Number | 201450 | | | | | Proforma Run Date 02/07/2011 | |
| | | | | | | Page Number   Page 5 of 5 | |

| Date | Timekeeper Name | Timekeeper Number | Task Code | Activity Code | Description | WIP Hours | WIP Amount | Index |
|------|-----------------|-------------------|-----------|---------------|-------------|-----------|------------|-------|
| 01/13/2011 | Kent, D.W. | 0140 | | | Review bankruptcy materials; review draft FT letter; email from and to J. Archibald; review further Florida motion material. | 1.30 | 1,040.00 | 6403903 |
| 01/14/2011 | Kent, D.W. | 0140 | | | Email from J. Archibald with additional materials. | 0.30 | 240.00 | 6403909 |
| 01/20/2011 | Kent, D.W. | 0140 | | | Review draft letter; emails to and from S. Zuckerman. | 0.20 | 160.00 | 6406090 |
| 01/21/2011 | Kent, D.W. | 0140 | | | Review draft letter to plaintiffs; prepare for client call. | 0.70 | 560.00 | 6409377 |
| 01/24/2011 | Kent, D.W. | 0140 | | | Prepare for and conference call with C. Farfie and S. Zuckerman. | 1.10 | 880.00 | 6409440 |
| 01/27/2011 | Kent, D.W. | 0140 | | | Email from J. Chapman. | 0.20 | 160.00 | 6411988 |
| 01/31/2011 | Kent, D.W. | 0140 | | | Telephone call from J. Chapman. | 0.60 | 480.00 | 6418063 |
| 02/01/2011 | Kent, D.W. | 0140 | | | Email from J. Chapman; research. | 0.40 | 320.00 | 6418159 |
| 02/02/2011 | Kent, D.W. | 0140 | | | Revise response letter to plaintiffs. | 2.00 | 1,600.00 | 6438188 |
| 02/03/2011 | Kent, D.W. | 0140 | | | Work on response letter to plaintiffs. | 2.80 | 2,240.00 | 6438237 |
| 02/04/2011 | Kent, D.W. | 0140 | | | Further revise draft response letter; email to and from clients with same; finalize and deliver letter. | 1.50 | 1,200.00 | 6438337 |
| | | | | | **Grand Total** | **13.90** | **11,120.00** | |

Client Name    Farlie, Turner & Co., LLC
Matter Name    Michael Frank
Matter Number    201450

Proforma Number    24236
Joint Group Number
Proforma Run Date   02/07/2011
Page Number   Page 3 of 5

# Billing Instruction

The billing address on file is:
    Farlie, Turner & Co., LLC
    401 E. Las Olas Blvd, Suite 1160
    Fort Lauderdale, FL 33301

The statement address on file is:
    Farlie, Turner & Co., LLC
    401 E. Las Olas Blvd., Suite 1160
    Fort Lauderdale, FL 33301

Contact Info: Craig L. Farlie, Managing Director
Indicate if change required

## Invoice Template Options

Based on the matter setups, the following details will be disclosed on the invoice:

| Template Option | Template Option Value |
|---|---|
| Time Detail | Date,Des,Hrs,Amt |
| Time Summary | Tk,Rate,Hrs,Amt |
| Cost Detail | Date, Desc, Amt |
| Cost Summary | Description, Amount |

If disclosure details should change, check appropriate code below.

**Time Summary**

[ ] TS00 - Do Not Show Time Summary
[ ] TS01 - Tk, Rate, Hrs, Amt
[ ] TS02 - Tk, Hrs
[ ] TS03 - Tk, Rate, Hrs
[ ] TS04 - Tk, Department, Rate, Hrs, Amt
[ ] TS05 - Tk, Task Code, Rate, Hrs, Amt

**Time Detail**

[ ] TD00 - Do Not Show Time Detail
[ ] TD01 - Date, Des, Hrs, Amt
[ ] TD02 - Date, Des, Hrs
[ ] TD03 - Date, Des
[ ] TD04 - Date, Des, Activity, Task, Hrs, Amt

**Cost Summary**

[ ] CS00 - Do Not Show Cost Summary
[ ] CS01 - Des, Task Code, Amt
[ ] CS02 - Des, Amt

**Cost Detail**

[ ] CD00 - Do Not Show Cost Summary
[ ] CD01 - Date, Des, Amt
[ ] CD02 - Date, Des, Task Code, Amt

## Foreign Exchange

[ ] Bill in US Currency.

**Additional Instructions / Comments (attach separate document).**

## CERTIFICATION

1.     I have been designated by Meland Russin & Budwick, P.A., ("MRB") as the professional with responsibility in this case for compliance with the current Mandatory Guidelines on Fees and Disbursements For Professionals In The Southern District of Florida Bankruptcy Cases (the "Guidelines"). Additionally, I have reviewed the information provided by McMillan LLP ("McMillan") to ensure their compliance with the Guidelines.

2.     I have read Bayshore Partners, LLC's (the "Applicant" or "Bayshore") application for compensation and reimbursement of indemnification fees and costs (the "Application").

3.     To the best of my knowledge, information, and belief formed after reasonable inquiry, the Application complies with the Guidelines to the extent required for an application for indemnification fees and costs.

4.     To the best of my knowledge, information, and belief formed after reasonable inquiry, the fees and disbursements sought fall within the Guidelines, except as specifically noted in this Certificate and described in the Application.

5.     Except to the extent that fees or disbursements are prohibited or restricted by the Guidelines, the fees and disbursements sought are billed at rates and in accordance with practices customarily employed by MRB and generally accepted by MRB's clients.

6.     In providing a reimbursable service or disbursement (other than time charged for paraprofessionals and professionals), MRB does not make a profit on that service or disbursement (except to the extent that any such profit is included within the permitted allowable amounts set forth in the Guidelines for photocopies and facsimile transmission).

1

**"EXHIBIT G"**

7.     In charging for a particular service or disbursement, MRB does not include in the amount for which reimbursement is sought the amortization of the cost of any investment, equipment or capital outlay (except to the extent that any such amortization is included within the permitted allowable amounts set forth herein for photocopies and facsimile transmission).

8.     In seeking reimbursement for a service which the Applicant justifiably purchased or contracted for from a third party, the Applicant is requesting reimbursement only for the amount billed to the Applicant by the third-party vendor and paid by the Applicant to such vendor. Specifically, the amounts invoiced to Applicant by MRB.

9.     The trustee, the examiner (if any), the chairperson of each official committee (if any), the debtor, the U.S. Trustee, and their respective counsels, will be mailed, simultaneously with the filing of the Application with the Court, a complete copy of the Application (including all relevant exhibits).

10.     The following are the variances with the provisions of the Guidelines, the date of the specific Court approval of such departure, and the justification for the departure: None.

11.     MRB was retained by Bayshore to give advice with respect to enforcement of the indemnification provisions of its Engagement letter with the Debtors, and which have been triggered as a results of the litigation filed against Bayshore by Michael Frank in Ontario, Canada[1]. Such advice includes preparation of motions, applications and other legal documents necessary in the case, to protect the interest of Bayshore in all matters pending before the Court. The issues involved are both novel and difficult.

12.     MRB submits that the attorneys assigned to this matter have the requisite experience, seniority and skills necessary to effectively and efficiently meet the requirements of

[1] *Frank v. Farlie, Turner & Co., LLC et al*, Court File No. CV-10-415821-CPOO, Ontario Sup. Ct. Jus.

2

**"EXHIBIT G"**

the task of these matters. MRB believes it has demonstrated the requisite professional skills to skillfully deal with the novel problems encountered in these matters and has handled all legal issues in an efficient and effective manner.

13.     MRB was not precluded as the result of its representation in this matter from accepting other matters. Matters were treated by MRB in an expeditious and professional manner.

14.     The rates charged by the attorneys providing services to Bayshore are well within the reasonable range for hourly rates charged by attorneys of comparable skills in bankruptcy proceedings in the Southern District of Florida.

15.     MRB has been required to expend considerable time within short periods in this matter.

16.     MRB is a specialized commercial litigation and transactional firm having substantial experience in bankruptcy. MRB represents clients throughout the Southern District of Florida and appears regularly in the Southern District Bankruptcy Courts. The quality of work performed by MRB in this proceeding attests to the firm's experience, reputation and ability.

17.     I obtained my B.A. degree with departmental honors in 1985 from Tulane University. I received my J.D. degree in 1988 from The George Washington University National Law Center, where I was a member of the Moot Court Board and was the winner of the 1987 Van Vleck Advanced Moot Court Competition. I was admitted to the Florida Bar in 1988, and am admitted to practice before the United States District Court and United States Bankruptcy Court for the Southern District of Florida. I am a member of the Dade County Bar Association and was the President of the Bankruptcy Bar Association of the Southern District of Florida, and a member of the UCC/Bankruptcy Committee of the Business Law Section of the Florida Bar. I

3

**"EXHIBIT G"**

have lectured throughout the State of Florida on bankruptcy topics and have published several articles on bankruptcy issues. I am AV rated by Martindale Hubbell.

18.     James C. Moon obtained his B.G.S. from the University of Connecticut in 1995. He received his J.D., with Honors, in 2000 from the University of Connecticut School of Law and was admitted to the Connecticut Bar the same year. In 2001, Mr. Moon was admitted to the New York Bar and, in 2004, was admitted to the Florida Bar to practice before the United States District Court and United States Bankruptcy Court for the Southern District of Florida. He is also currently the sitting President of the Bankruptcy Bar Association for the Southern District of Florida. Mr. Moon has published several articles on bankruptcy issues.

19.     MRB does not deem this case to be undesirable and is honored to have been retained by Bayshore.

20.     MRB has not represented Bayshore previously in other unrelated matters prior to this case.

21.     The amount requested by Applicant with respect to MRB's fees and costs is reasonable in terms of awards in cases of similar magnitude and complexity. The compensation which MRB is requesting from Applicant comports with the mandate of the Bankruptcy Code, which directs that services be evaluated in light of comparable services performed in non-bankruptcy cases in the community. The fee requested by Applicant in the amount of $11,987.00 reflects a blended hourly rate of $306.25 for 32.3 hours of services. Considering the results obtained, this fee request is entirely appropriate. Likewise, as with all major law firms, MRB's overhead expenses are substantial.

4

**"EXHIBIT G"**

**I HEREBY CERTIFY** that the foregoing is true and correct.

Dated this 8th day of February, 2011.

> _s/ Peter D. Russin_
> Peter D. Russin, Esquire
> Florida Bar No. 765902
> prussin@melandrussin.com
> MELAND RUSSIN & BUDWICK, P.A.
> 3000 Wachovia Financial Center
> 200 South Biscayne Boulevard
> Miami, Florida 33131
> Telephone: (305) 358-6363
> Telecopy: (305) 358-1221
>
> Attorneys for Bayshore Partners, LLC
>
>
> MELAND, RUSSIN & BUDWICK, P.A.
>
>
> _____
> Peter D. Russin, Esq.

5

{Firm Clients/5386/5386-1/00850215.DOC.}

**"EXHIBIT G"**

## CERTIFICATION

1.      I have been designated by McMillan LLP, ("McMillan") as the professional with responsibility in this case.

2.      I have read Bayshore Partners, LLC's (the "Applicant" or "Bayshore") application for compensation and reimbursement of indemnification fees and costs (the "Application").

3.      The fees and disbursements sought are billed at rates and in accordance with practices customarily employed by McMillan and generally accepted by McMillan's clients.

4.      In providing a reimbursable service or disbursement (other than time charged for paraprofessionals and professionals), McMillan does not make a profit on that service or disbursement (except to the extent that any such profit is included within the permitted allowable amounts set forth in the Guidelines for photocopies and facsimile transmission).

5.      In charging for a particular service or disbursement, McMillan does not include in the amount for which reimbursement is sought the amortization of the cost of any investment, equipment or capital outlay (except to the extent that any such amortization is included within the permitted allowable amounts set forth herein for photocopies and facsimile transmission).

6.      McMillan was retained by Bayshore to give advice with respect to *Frank v. Farlie, Turner & Co., LLC et al*, Court File No. CV-10-415821-CPOO, Ontario Superior Court of Justice, including preparation of motions, pleadings, orders, applications and other legal documents necessary in the case, to protect the interest of Bayshore in all matters pending before the Ontario Court. The issues involved are both novel and difficult.

7.      McMillan submits that the attorney assigned to this matter has the requisite experience, seniority and skills necessary to effectively and efficiently meet the requirements of

1

**"EXHIBIT H"**

the task of these matters. McMillan believes it has demonstrated the requisite professional skills to skillfully deal with the novel problems encountered in these matters and has handled all legal issues in an efficient and effective manner.

8.    McMillan was not precluded as the result of its representation in this matter from accepting other matters. Matters were treated by McMillan in an expeditious and professional manner.

9.    The rate charged by the attorney providing services to Bayshore is well within the reasonable range for hourly rates charged by attorneys of comparable skills in proceedings in the Ontario Superior Court of Justice.

10.    McMillan has been required to expend considerable time within short periods in this matter.

11.    I specialize in complex litigation involving competition, intellectual property, commercial, regulatory and securities and governance disputes in a wide variety of industries. I represent clients throughout Canada, and appear regularly in the Ontario Superior Court of Justice. The quality of work performed by McMillan in this proceeding attests to the firm's experience, reputation and ability.

12.    I obtained my B.A. degree in 1976 from Carleton University. I received my LL.B. in 1981 from the University of Toronto and was called to the Ontario Bar in 1983. I am admitted to practice before the Ontario Superior Court of Justice and have published several articles on practice issues.

13.    McMillan does not deem this case to be undesirable and is honored to have been retained by Bayshore.

2

**"EXHIBIT** H**"**

14.     McMillan has not represented Bayshore previously in other unrelated matters prior to this case.

15.     The amount requested by Applicant with respect with McMillan's fees and costs is reasonable in terms of awards in cases of similar magnitude and complexity.     The compensation which McMillan is requesting from Applicant is consistent with that which would be charged for comparable services performed in non-bankruptcy cases in the community.     I understand that the fee requested by Applicant is in the amount of $11,195.48[1], which is for 13.9 hours of our services.     Considering the results obtained, this fee is entirely appropriate.     Likewise, as with all major law firms, McMillan's overhead expenses are substantial.

**I HEREBY CERTIFY** that the foregoing is true and correct.

Dated this 8th day of February, 2011.

MCMILLAN LLP

David W. Kent, Esq.

---

[1] McMillan LLP's invoice reflects amounts owed in Canadian dollars.  However, the amounts listed herein reflect U.S. dollars, using a currency exchange rate of $1 U.S. dollar to $1.0099 Canadian dollars as of February 8, 2011.

3

**"EXHIBIT H"**

Albricas, LLC
c/o Gary S. Phillips
Phillips Cantor & Shalek, PA
4000 Hollywood Blvd., Suite 375-S
Hollywood, FL 33021

Argo Partners
12 W 37th St 9th Fl
New York, NY 10018

Broward County Records,Taxes &
Treasury
c/o Hollie N Hawn
115 So. Andrews Ave.
Ft. Lauderdale, Fl 33301

CPC Holding Corporation of America
1649 NW 136th Avenue
Sunrise, FL 33323

Canadian Imperial Bank of Commerce
c/o Robert G Fracasso
201 S Biscayne Blvd #1500
Miami, FL 33131

Ceramic Protection Corporation of
America
1649 NW 136th Avenue
Sunrise, FL 33323

Creditor Committee
Fiera Capital Inc
1501 McGill College #800
Montreal, QC
CANADA

N/S Sawgrass Office Associates
c/o Frank Weinberg Black, P.L.
7805 S.W. 6th Court
Plantation, FL 33324

PPOA Holding, Inc.
c/o Ahearn Jasco & Company
Attn. Frank E. Jaumot, CPA
190 Southeast 19th Avenue
Pomano Beach, FL 33060

Protective Products International Corp.
1649 NW 136th Avenue
Sunrise, FL 33323

Protective Products of America, Inc.
c/o Ahearn Jascoe & Co
190 SE 19 Ave
Pompano Beach, FL 33060

Protective Products of North Carolina,
LLC
1649 NW 136th Avenue
Sunrise, FL 33323

Randal Perkins Living Trust
c/o William G. Salim, Jr., Esq.
Moskowitz, Mandell, Salim & Simowitz, PA
800 Corporate Drive, Suite 500
Fort Lauderdale, FL 33334

S.J. Metals INC
c/o 1499 W Palmetto Pk Rd #416
Boca Raton, FL 33486

Turner Strategic Technologies
3465 Chandler Creek Rd #102
Virginia Beach, VA 23453

United States Test Laboratories, Inc
c/o Cynthia R. Maher
501 Sally Place
Fullerton, CA 92831

ADT Security Services, Inc
14200 E Exposition Ave
Aurora, CO 80012

Alvin S. Church
c/o Hirschler Fleischer PC
P.O. Box 500
Richmond, VA 23218-0500

Amethyst Arbitrage Fund
c/o Crystalline Management Inc
1002 Sherbrooke St W #2110
Montreal Quebec, Canada H3A 3L6

Amethyst Arbotrace Trading LTD
c/o Crystalline Management Inc.
1002 Sherbrooke St W #2110
Montreal Quebec Canada H3A3L6

Argo Partners
12 West 37th Street, 9th Floor
New York, NY 10018

Balinhard Capital Corporation
3220 255 5 Ave SW
Calgary, AB, Canada
T2P366

Bowne of Atlanta, Inc
c/o Bowne & Co., Inc
attn: Amy Braun
55 Water St
New York, NY 10041

Brian Karst
260 Gariepy Crescent
Edmonton AB Canada T6M 1A3

Broward County Records,Taxes & Treasury
Div.
Tax Collector-Gov't Center Annex
Attn: Litigation Dept.
115 So. Andrews Avenue
Ft. Lauderdale, Fl. 33301

CT Corporation
1200 S. Pine Island Rd
Team 1
Plantation, FL 33324

Canadian Imperial Bank of Commerce
c/o Jack S. McMurray, General
Manager, S
199 Bay Street 6 Fl
Toronto, ON M5L 1A2

Canandian Imperial Bank of Commerce
BEC Place
161 Bay Street
8th Floor
Toronto, Ontario

Central Telephone Company
North Carolina
POB 7971
Shanee Mission KS 66207-0971

Charles E Peters Jr.
6537 Wakefalls Dr
Wake Forest NC 27587

Exhibit **1**

Delmarva Power
Pepco Holdings Inc.
5 Collins Dr #2133
Carneys Point NJ 08069

Deon Vaughan
1197 S Nangosa Trail
Suttons Bay, MI 49682

Douglas J Cerson
1135 Rivers Edge Dr
West Montrose ON Canada NOB 2V0

Edco Financial Holdings, Ltd.
255 S Avenue
Suite 3220
Calgary, ALB T2P 3G6
Canada

Expedited World Cargo, Inc
9667 NW 33 St
Miami FL 33172

Fairholme Capital Management
4400 Biscayne Blvd.
9th Floor
Miami, FL 33137

FedEx Customer information Services
FedEx Express -FedEx Ground
attn: Revenue Recovery Bankruptcy
3965 Airways Blvd Module G, 3FL
Memphis TN 38116

Fiera Capital, Inc.
1501 McGill College Avenue
Suite 900
Montreal, Quebec H3A 3M8

Frank Jaumot
190 SE 19 Ave
Pompano Beach FL 33060

Frank Pennisi
102 Ascot Ct
Bear DE 19701

Global Tax Management
Radnor Financial Center
150 N.Radnor-Chester Road
Suite C-200
Radnor, PA 19087

Gowling Lafleur Henderson LLP
1400, 700-2 St SW
Calgary, AB T2P4V5
Canada

Gowlings Lafleur Henderson LLP
700 2nd Street SW
Suite 1400
Calgary,
Alberta, CA T2P4V5

Hartford Fire Ins Co
# T 1 55
Hartford Plaza
Hartford CT 06115

Henry Hugh Shelton
331 Holly Lane
Newport NC 28570

Internal Revenue Service
Centralized Insolvency Operation
P.O. Box 21126
Philadelphia, PA 19114

Jason Williams
5800 Camino Del Sol
Unit 207
Boca Raton, FL 33433

Jean Marc Lang
#PH-1947 Pendrell St
Vancouver BC VGGITS Canada

Jeffrey R. Knight
12490 NW 65 Dr
Parkland, FL 33076

KDH Defence Systems, Inc. (4,282.42)
401 Broad Street
Johnstown, PA 15906

Larry Moeller
3220 255 5th Ave SW
Calgary, Alberta, Canada
T2P 3G6

Laser Label Technologies
Diversified Credit Service, Inc.
POB 21726
Cleveland, OH 44121

Marcus Treiber
c/o Hirschler Fleischer PC
P.O. Box 500
Richmond,VA 23218-0500

McMaster-Carr
POB 7690
Chicago IL 60680

N/S Sawgrass Office Associates
c/o Stiles Property Management
300 SE 2nd Street, 8th Floor
Fort Lauderdale, FL 33301

Neil E. Schwartzman
5757 NW 50th Street
Coral Springs, FL 33067

Nicusa Investment Advisors
17 State Street, 16th Floor
New York, NY 10004

Office Depot
6600 N Military Trail - S413G
Boca Raton, FL 33496

Office of the US Trustee
51 S.W. 1st Ave.
Suite 1204
Miami, FL 33130

Pencader V Limited Partnership
c/o Steven M. Williams, Esq.
240 N. Third St 7th Fl.
Harrisburg PA 17101

Pencader V. Limited Partnership
c/o Emory Hill Real Estate
10 Corporate Circle
New Castle, DE 19720

Pencader X Limited Partnership
c/o Steven M. Williams, Esq.
240 N. Third St 7th FL.
Harrisburg PA 17101

PriceWaterhouseCoopers LLP-US
P.O. Box 932011
Atlanta, GA 31193-2011

Pricewaterhouse Coopers LLP
Attn: Adrea Clark Smith
225 S 6 St
Minneapolis MN 55402

PricewaterhouseCoopers LLP
111 5 Avenue SW, Suite 3100
ALBERTA, AB AB T2P 5L3

R. Patrick Caldwell
191 SE 20th Avenue
Deerfield Beach, FL 33441

Randal Perkins Living Trust
c/o Jose A Loredo Esq
POB 019101
Miami FL 33131

Richard P Torykian Sr
56 Arrandvale Rd
Rockville Centre NY 11570

Salomon and Flor Melgen
12096 Captains Landing
North Palm Beach, FL 33408

Savannah Luggage Works
POB 447
Vidalia GA 30475

Sidley Austin LLP
One South Dearborn
Chicago IL 60603

Skadden,Arps,Slate,Meagher
& Flom LLP
1440 New York Avenue N.W.
Washington, DC 20005-2111

South Carolina Elastic Company
211 Columbia Ave
Pawtucket, RI 02862

Sprint Nextel Correspondence
Attn Bankruptcy Dept
PO Box 7949
Overland Park KS 66207-0949

Sprint Nextel Distribution
Attn: Bankruptcy Dept
P.O. Box 3326
Englewood, CO 80155-3326

State of New Jersey Dept of Treasury
Division of Taxation
POB 245
Trenton NJ 08695

Stephen Giordanella
6250 NW 96th Terrace
Parkland, FL 33076

Stephen Giordanella
c/o Gary S. Phillips, Esq., Phillips Can
4000 Hollywood Blvd.,Suite 375-S
Hollywood, FL 33021

Stephen Giordanella Revocable Trust Dated
October
c/o Gary S. Phillips, Esq.
Phillips Cantor & Shalek, PA
4000 Hollywood Blvd., Suite 375-S
Hollywood, FL 33021

Telus
P.O. Box 7575
Vancouver, BC V6B 8N9

The Corporation Trust Company
Corporation Trust Center
1209 Orange Steet
Wilmington, DE 19801

The Home Insurance Co. in Liquidation
Sharon Bergeron
55 S Commercial St
Manchester, NH 03101

The Lee Family Trust
1122-4th St SW 6th Fl
Calgary, Alberta T2R 1M1 Canada

Turner Strategic Technologies LLC
3465 Chandler Creek Rd #102
Virginia Beach, VA 23453

Valiant Trust Company
606 4th Street SW
Suite 310
Calgary, Alberta T2P 1T1

Verizon Wireless
POB 3397
Bloomington IL 61702

Alvin S Church
c/o Sheila deLa Cruz
POB 500
Richmond, VA 23218-0500

Andrew Silfen
1675 Broadway
New York, NY 10019

Debi Evans Galler Esq
200 S Biscayne Blvd #1000
Miami, FL 33131

Flor Melgen
Horowitz & Burnett, PC
1660 Lincoln St.
Suite 1900
Denver, CO 80264

Frank E. Jaumot
Ahearn Jasco & Company
190 SE 19th Avenue
Pompano Beach, FL 33060

Jordi Guso Esq.
200 S Biscayne Blvd #1000
Miami, FL 33131

Serkes Ibrahim
45 Seclusion Cres
Brampton ON L6R 1L5
CANADA

Glenn Moses
100 SE 2nd Street #4400
Miami, FL 33131

Marcus Trieber
c/o Sheila deLa Cruz
POB 500
Richmond, VA 23218-0500

Solomon Melgen
Horowitz & Burnett, PC
1660 Lincoln St
Suite 1900
Denver, CO 80264

Heather Nisbeth
One Clearlake Centre #900
West Palm Beach, FL 33401

Michael F Tuner
401 E Las Olas Blvd #1160
Fort Lauderdale, FL 33301

Todd Lair
c/o Leading Technology Composites,
Inc.
2626 W May
Wichita, KS 67213

Case 11-01731-JKO    Doc 1-2    Filed 02/24/11    Page 73 of 107

CM/ECF LIVE - U.S. Bankruptcy Court-10711-JKO    Doc 408    Filed 02/28/11    Page 1 of 6    ...uscourts.gov/cgi-bin/MailList.pl?948477882881145-L...

# Mailing Information for Case 10-10711-JKO

## Electronic Mail Notice List

The following is the list of **parties** who are currently on the list to receive e-mail notice/service for this case.

- **David W Black**    dblack@fwblaw.net
- **Robert G Fracasso Jr**    rfracasso@shutts.com
- **Debi Evans Galler**    dgaller@bergersingerman.com,
  jalvarez@bergersingerman.com,efile@bergersingerman.com
- **Larry I Glick**    lglick@shutts.com
- **Jordi Guso**    jguso@bergersingerman.com,
  efile@bergersingerman.com;fsellers@bergersingerman.com
- **Heather L Harmon**    HHarmon@gjb-law.com, gjbecf@gjb-law.com
- **Hollie N Hawn**    hhawn@broward.org
- **Harris J. Koroglu**    hkoroglu@shutts.com, jgoodwin@shutts.com
- **Luder F Milton**    sdelacruz@hf-law.com
- **Glenn D Moses**    gmoses@gjb-law.com, gjbecf@gjb-law.com
- **Kevin S Neiman**    kneiman@hblegal.net
- **Office of the US Trustee**    USTPRegion21.MM.ECF@usdoj.gov
- **Gary S Phillips**    gphillips@phillipslawyers.com
- **Ariel Rodriguez**    ariel.rodriguez@usdoj.gov
- **William G Salim Jr**    wsalim@mmsslaw.com, cleibovitz@mmsslaw.com
- **Laura J. Varela**    lvarela@phillipslawyers.com

Exhibit **2**

**Exhibit "D"**

## CHIEF RESTRUCTURING OFFICER
## ENGAGEMENT LETTER AGREEMENT

Dated as of March 5, 2010

<u>Via Electronic Mail Delivery</u>

Mr. Neil E. Scwartzman
Acting Chief Executive Officer
Protective Products of America, Inc.
1649 NW 136 Avenue
Sunrise, FL 33323

Re:   Engagement of Frank E. Jaumot as Chief Restructuring Officer ("CRO") for Protective
      Products of America, Inc., CPC holding Corporation of America, Ceramic Protection
      Corporation of America, Protective International Corp., and Protective Products of North
      Carolina, LLC, each as a debtor and debtor in possession (collectively, the "Company").

Dear Mr. Schwartzman:

This letter confirms and sets forth the terms and conditions of my engagement as the Chief
Restructuring Officer by the Company, including the scope of the services to be performed and
the basis of compensation for those services. The Company is currently operating as a debtor
in possession under Chapter 11 of title 11 (the "Bankruptcy Code") in the United States
Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court"), in Case No. 10-
10722-BKC-JKO (Jointly Administered) (the "Chapter 11 Cases"). Upon execution of this letter
by each of the parties below, and entry of the Approval Order (as defined below), this letter
shall constitute an agreement between the Company and myself. The Company sold
substantially all of its assets on March 5, 2010, and is pursuing an orderly liquidation of its
remaining assets in the Chapter 11 Cases (the "Orderly Liquidation").

    1.    <u>Description of Services</u>

        a.    <u>Duties and Powers.</u>

                I currently serve and will continue to serve as a director of the Company.
In addition, I shall serve as the CRO of the Company and shall supervise
and oversee the Orderly Liquidation (and over all aspects thereof). In this
capacity, I shall have the authorization to: (a) to open and close bank
accounts for the Company, (b) to transfer funds of the Company, (c) to
cause the Company to modify, amend, terminate and/or enforce  any of

its any contractual rights; (c) to cause the Company to enter into any agreement or contract that is reasonably necessary to the completion of the Orderly Liquidation; (d) cause the Company to comply with all Guidelines of the Office of the United States Trustee, (e) to cause the Company to pursue, settle or compromise any litigation, controversy or other dispute involving the Company, (f) to cause the Company to exercise the Company's rights under the Company's agreements and other agreements in favor of the Company; (g) to cause the Company to prepare one or more plans of reorganization, or to take any all action in the Chapter 11 Cases.

2.   Compensation

    a.   I shall bill the Company on Friday of each week for my services during that week. I will be paid by the Company for the services of the CRO at the rate of $385 per hour. I have the right to hire additional personnel to assist me. Services provided to the Company by any additional such personnel to support the CRO in carrying the services outlined herein shall be paid by the Company at the standard hourly rates of such personnel, and their rates will not exceed $325 per hour. Such hourly rates shall be referred to as the "standard hourly rates". The aggregate changes for all services at the standard hourly rates shall not exceed $15,000 per week.

    b.   In addition, I will be reimbursed by the Company for the reasonable out-of-pocket expenses of the CRO, and if applicable, other personnel, incurred in connection with this assignment, such as reasonable out-of-town travel, reasonable out-of-town lodging, duplications, computer research, messenger and telephone charges. All fees and expenses due to me will be billed on a weekly basis and be due and payable on each Wednesday during the Term of this Agreement for the prior calendar week.

    c.   Upon the execution of this Agreement, and entry of an order in the Chapter 11 Cases approving this Agreement under Section 363(b) of the Bankruptcy Code (the "Approval Order"), the Company shall pay a retainer of $15,000 which shall be retained and applied against my final invoice. Any funds remaining on deposit after the conclusion of our services shall be returned to the Company, or as otherwise directed by the Court.

3.   Term

The engagement will commence effective as of March 5, 2010 and may be terminated by either party without cause by giving 7 days written notice to the other party. In the event of any such termination, any fees and expenses due to me through the effective date of such termination shall be applied to the remaining balance of the advance payment to the extent a balance exists and then any additional fees and expenses shall be remitted promptly (including fees and expenses that accrued prior to but were invoiced subsequent to such termination). The Company may immediately terminate my services hereunder at any time for Cause (hereinafter defined) by giving written notice to me. My services may be immediately terminated hereunder at any time for Good Reason

2 of 5

(hereinafter defined) by giving written notice to the Company.   Upon any such termination, the Company shall be relieved of all of its payment obligations under this Agreement, except for the payment of fees and expenses through the effective date of termination (including fees and expenses that accrued prior to but were involced subsequent to such termination) and its obligations under paragraph 8. For purposes of this Agreement, "Cause" shall mean if (i) the CRO is convicted of, admits guilt in a written document filed with a court of competent jurisdiction to, or enters a plea of nolo contendere to, an allegation of fraud, embezzlement, misappropriation or any felony; or (ii) a material breach of any of my material obligations under this Agreement which is not cured within 30 days of the Company's written notice thereof to me describing in reasonable detail the nature of the alleged breach. For purposes of this Agreement, termination for "Good Reason" shall mean termination caused by a breach by the Company of any of its material obligations under this Agreement that is not cured within 5 days of my having given written notice of such breach to the Company describing in reasonable detail the nature of the alleged breach.

4.   Confidentiality / Non-Solicitation.

I shall keep as confidential all non-public information received from the Company in conjunction with this engagement, except (i) as requested by the Company or its legal counsel; (ii) as required by legal proceedings or (iii) as reasonably required in the performance of this engagement.  All obligations as to non-disclosure shall cease as to any part of such information to the extent that such information is or becomes public other than as a result of a breach of this provision.

5.   Indemnification.

The Company shall indemnify me to the same extent as the most favorable indemnification it extends to its officers or directors, whether under the Company' bylaws, its certificate of incorporation, or otherwise, and no reduction or termination in any of the benefits provided under any such indemnities shall affect the benefits provided to me.  The CRO shall be covered as an officer under the Company's existing director and officer liability insurance policies, to the extent that same remain in full force and effect.  The Company shall also maintain any such insurance coverage for the CRO for a period of not less one year following the date of the termination of such officer's services hereunder. The attached indemnity provisions are incorporated herein and the termination of this agreement or the engagement shall not affect those provisions, which shall survive termination.   The provisions of this section 5 are in the nature of contractual obligations and no change in applicable law or the Company' charter, bylaws, or other organizational documents or policies shall affect my rights hereunder.

6.   Miscellaneous.

This Agreement shall (together with the attached indemnity provisions) be: (a) governed and construed in accordance with the laws of the State of Florida, regardless of the laws that might otherwise govern under applicable principles of conflict of laws thereof; (b) incorporates the entire understanding of the parties with respect to the subject matter thereof; and (c) may not be amended or modified except in writing executed by each of the signatories hereto.   The

3 of 5

Company and I agree to waive trial by jury in any action, proceeding or counterclaim brought by or on behalf of the parties hereto with respect to any matter relating to or arising out of the performance or non-performance of the Company or me hereunder.    Any disputes arising from or relating to this Agreement shall adjudicated by the Court.

If the foregoing is acceptable to you, kindly sign the enclosed copy to acknowledge your agreement with its terms.

Very truly yours,

Frank E. Lalmot

Accepted and Agreed:

PROTECTIVE PRODUCTS OF AMERICA, INC., on behalf of itself and the Entities listed on Schedule 1

By:
Name:
Title:

2671205-3

# Schedule 1

## LIST OF AFFILIATED ENTITIES

CPC holding Corporation of America
Ceramic Protection Corporation of America
Protective International Corp.
Protective Products of North Carolina, LLC

2671205-3

Exhibit "E"

# BYLAWS
## OF
## PROTECTIVE PRODUCTS OF AMERICA, INC.

### SECTION 1.  OFFICES

The principal office of the corporation shall be located at its principal place of business or such other place as the Board of Directors (the "Board") may designate. The corporation may have such other offices, either within or without the state of Delaware, as the Board may designate or as the business of the corporation may require from time to time.

### SECTION 2.  STOCKHOLDERS

#### 2.1    Annual Meeting

The annual meeting of the stockholders for the purpose of electing directors and transacting such other business as may properly come before the meeting shall be held at such place, date and hour as shall be designated by the Board.

#### 2.2    Special Meetings

The Board, the chairman of the Board, the chief executive officer, or, in the absence of a chief executive officer, the president, may call special meetings of the stockholders for any purpose.

#### 2.3    Place of Meeting

All meetings of stockholders shall be held at the principal office of the corporation, or at such other place within or without the State of Delaware designated by the Board.

#### 2.4    Notice of Meeting

All notices of meetings of stockholders shall be sent or otherwise given in accordance with these bylaws not less than ten (10) nor more than sixty (60) days before the date of the meeting to each stockholder entitled to vote at such meeting, except as otherwise required by applicable law, including, without limitation, Section 230 of the General Corporation Law of the State of Delaware, as now or hereafter amended (the "DGCL"); and provided that, so long as the corporation is a Public Company (as defined below), notices of meetings of stockholders shall also comply with the requirements of any exchange on which the securities of the corporation are then listed or any applicable securities laws; and, further provided that, if the corporation is listed on a Canadian exchange, notices of meetings of stockholders shall also comply with the requirements under applicable Canadian securities laws.  The notice shall specify the place, if any, date and hour of the meeting, the means of remote communication, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, and, in the case of a special meeting, the purpose or purposes for which the meeting is called.

Notice of any meeting of stockholders shall be given (i) if mailed, when deposited in the official government mail, postage prepaid, properly addressed to the stockholder at such stockholder's address as it appears on the stock transfer books of the corporation, (ii) if by facsimile telecommunication, when directed to a number at which the stockholder has consented to receive notice, (iii) if by electronic mail, when directed to an electronic mail address at which the stockholder has consented to receive notice, (iv) if by posting on an electronic network together with separate notice to the stockholder of such specific posting, upon the later of (A) such posting, and (B) the giving of such separate notice, or (v) otherwise, when delivered. Any consent given by a stockholder to receive notice by electronic transmission shall be revocable by the stockholder by written notice to the corporation. Any such consent shall be deemed revoked if (a) the corporation is unable to deliver by electronic transmission two consecutive notices given by the corporation in accordance with such consent, and (b) such inability becomes known to the secretary of the corporation or to the transfer agent or other person responsible for the giving of notice; provided, however, that the inadvertent failure to treat such inability as a revocation shall not invalidate any meeting or other action.

An affidavit of the secretary of the corporation or of the transfer agent or any other agent of the corporation that the notice has been given shall, in the absence of fraud, be prima facie evidence of the facts stated therein. Notice may be waived in accordance with Section 2.6 of these bylaws.

### 2.5 Business for Stockholders' Meetings

#### 2.5.1 Business at Annual Meetings

In addition to the election of directors, only such business shall be conducted at the annual meeting of stockholders as shall have been properly brought before such meeting. To be properly brought before an annual meeting, business must be (a) brought by or at the direction of the Board, or (b) brought before the meeting by a stockholder of record (both on the date of the giving of the notice provided for in Section 2.5.3 of these bylaws and on the record date for the determination of stockholders entitled to vote at such annual meeting) pursuant to written notice thereof given in accordance with subsection 2.5.3 hereof and received by the secretary not later than the close of business on the 90th day and not earlier than the close of business on the 120th day prior to the anniversary date of the immediately preceding annual meeting (or, if no annual meeting was held in the previous year or if the annual meeting is called for a date that is not within 30 days before or after such anniversary date, such notice must be so received not later than the close of business on the 10th day following the day on which the notice of the date of the annual meeting was mailed or public disclosure of the date of the meeting was made, whichever occurs first). No business shall be conducted at any annual meeting of stockholders except in accordance with this subsection 2.5.1, unless the application of this subsection 2.5.1 to a particular matter is waived in writing by the Board. If the facts warrant, the Board, or the chairman of an annual meeting of stockholders, may determine and declare that (a) a proposal does not constitute proper business to be transacted at the meeting, or (b) business was not properly brought before

2

the meeting in accordance with the provisions of this subsection 2.5.1 and, if it is so determined in either case, any such business shall not be transacted. The procedures set forth in this subsection 2.5.1 for business to be properly brought before an annual meeting by a stockholder are in addition to, and not in lieu of, the requirements set forth in Rule 14a-8 under Section 14 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or any successor provision. Notwithstanding the foregoing, with respect to a proposal brought before the meeting at the request of a stockholder, if the stockholder (or a qualified representative of the stockholder) does not appear at the annual meeting of stockholders of the corporation to present the item of business, such proposed business shall not be transacted, notwithstanding that proxies in respect of such vote may have been received by the corporation.

### 2.5.2   Business at Special Meetings

At any special meeting of the stockholders, only such business as is specified in the notice of such special meeting given by or at the direction of the Board in accordance with subsection 2.4 hereof shall come before such meeting.

### 2.5.3   Notice to Corporation

Any written notice required to be delivered by a stockholder to the corporation pursuant to subsection 2.2 or subsection 2.5.1 hereof must be given, either by personal delivery or by registered or certified mail, postage prepaid, to the secretary at the corporation's executive offices. Any such stockholder notice shall set forth (i) the name and record address of the stockholder proposing such business; (ii) a representation that the stockholder is a holder of record of stock of the corporation entitled to vote at such meeting and a statement of the number of shares of capital stock of the corporation that are owned beneficially or of record by such stockholder; (iii) a representation that the stockholder intends to appear in person or by proxy at the meeting to propose such business; (iv) as to each matter the stockholder proposes to bring before the meeting, a brief description of the business desired to be brought before the meeting, the reasons for conducting such business at the meeting, the language of the proposal (if appropriate), and any material interest of the stockholder in such business; and (v) any other information that is required to be provided by the stockholder pursuant to Regulation 14A under the Exchange Act or any successor provision. Notwithstanding the foregoing, in order to include information with respect to a stockholder proposal in the proxy statement and form of proxy for a stockholders' meeting, stockholders must provide notice as required by, and otherwise comply with the requirements of, the Exchange Act and the regulations promulgated thereunder.

## 2.6   Waiver of Notice

### 2.6.1   Waiver in Writing

Whenever any notice is required to be given to any stockholder under the provisions of these bylaws, the certificate of incorporation, or the DGCL, a waiver

thereof in writing, signed by the person or persons entitled to such notice, or a waiver by electronic transmission by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the stockholders need be specified in any written waiver of notice or any waiver by electronic transmission unless so required by the certificate of incorporation or these bylaws.

### 2.6.2   Waiver by Attendance

The attendance of a stockholder at a meeting shall constitute a waiver of notice of such meeting, except when a stockholder attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

## 2.7   Fixing of Record Date for Determining Stockholders

### 2.7.1   Meetings

For the purpose of determining stockholders entitled to notice of and to vote at any meeting of stockholders or any adjournment thereof, the Board may fix, in advance, a record date, which record date shall not precede the date on which the resolution fixing the record date is adopted by the Board, and which record date shall not be more than 60 (or the maximum number permitted by applicable law) nor less than 10 days before the date of such meeting, provided that, so long as the corporation is a Public Company, the record date fixed by the Board shall also comply with the requirements of any exchange on which the securities of the corporation are then listed or any applicable securities laws; and, further provided that, if the corporation is listed on a Canadian exchange, the record date fixed by the Board shall also comply with the requirements under applicable Canadian securities laws. If the Board does not fix a record date in accordance with these bylaws and applicable law, the record date for determining stockholders entitled to notice of and to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.   A determination of stockholders of record entitled to notice of and to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board may fix a new record date for the adjourned meeting.

### 2.7.2   Consent to Corporate Action Without a Meeting

For the purpose of determining stockholders entitled to consent to corporate action in writing without a meeting, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board, and which record date shall not be more than 10 (or the maximum number permitted by applicable law) days after the date upon which the resolution fixing the record date is adopted by the Board. If the Board does not fix a record date in accordance with these bylaws and applicable law, the record date for determining stockholders

4

entitled to consent to corporate action in writing without a meeting, when no prior action by the Board is required by the DGCL, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the corporation. If no record date has been fixed by the Board and prior action by the Board is required by the DGCL, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the Board adopts the resolution taking such prior action.

### 2.7.3   Dividends, Distributions and Other Rights

For the purpose of determining stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than 60 (or the maximum number permitted by applicable law) days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board adopts the resolution relating thereto.

### 2.8   Voting List

At least 10 days before each meeting of stockholders, a complete list of the stockholders entitled to vote at such meeting, or any adjournment thereof, shall be made, arranged in alphabetical order, with the address and number of shares registered in the name of each stockholder. The corporation shall not be required to include electronic mail addresses or other electronic contact information on such list. This list shall be open to examination by any stockholder, for any purpose germane to the meeting, for a period of at least 10 days prior to the meeting, (i) during ordinary business hours, at the principal place of business of the corporation, or (ii) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting. If the corporation determines to make the list available on an electronic network, the corporation may take reasonable steps to ensure that such information is available only to stockholders of the corporation  If the meeting is to be held at a place, the list shall also be produced and kept at the time and place of such meeting, during the whole time thereof, for inspection by any stockholder who is present. If the meeting is to be held solely by means of remote communication, then the list shall also be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of the meeting.

### 2.9   Quorum

Unless otherwise provided in the certificate of incorporation or required by law, a majority of the outstanding shares of the corporation entitled to vote, present in person or represented by proxy at the meeting, shall constitute a quorum at a meeting of the stockholders; provided, that where a separate vote by a class or series is required, a majority of the outstanding

shares of such class or series, present in person or represented by proxy at the meeting, shall constitute a quorum entitled to take action with respect to the vote on that matter. If a quorum is not present or represented at any meeting of the stockholders, then the chairman of the meeting or the stockholders representing a majority of the voting power of the capital stock at the meeting, present in person or represented by proxy, may adjourn the meeting from time to time until a quorum is present or represented. When a meeting is adjourned to another time or place, unless these bylaws otherwise require, notice need not be given of the adjourned meeting if the time, place (if any), and the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such adjourned meeting are announced at the meeting at which the adjournment is taken. If the adjournment is for more than 30 days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting in accordance with Section 2.4 of these bylaws. At the adjourned meeting at which a quorum is present or represented, any business may be transacted that might have been transacted at the meeting as originally noticed. The stockholders present at a duly called meeting at which a quorum is initially present or represented may continue to transact business until adjournment, notwithstanding the withdrawal of enough stockholders to leave less than a quorum.

### 2.10   Manner of Acting

In all matters other than the election of directors, if a quorum is present, the affirmative vote of a majority of the outstanding shares present in person or represented by proxy at the meeting and entitled to vote on the matter shall be the act of the stockholders, unless the vote of a greater number is required by these bylaws, the certificate of incorporation or the DGCL. Where a separate vote by a class or series is required, if a quorum of such class or series is present, the affirmative vote of a majority of outstanding shares of such class or series present in person or represented by proxy at the meeting and entitled to vote on the matter shall be the act of such class or series, unless the vote of a greater number is required by these bylaws, the certificate of incorporation or the DGCL. Directors shall be elected by a plurality of the votes of the shares present in person or represented by proxy at the meeting and entitled to vote on the election of directors. The stockholders of the corporation shall not have the right to cumulate their votes for the election of directors of the corporation.

### 2.11   Proxies

#### 2.11.1   Appointment

Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by proxy. Such authorization may be accomplished by (a) the stockholder or such stockholder's authorized officer, director, employee or agent executing a writing or causing his or her signature to be affixed to a writing authorizing another person or persons to act for such stockholder as proxy by any reasonable means, including, but not limited to, facsimile signature, or (b) transmitting or authorizing the transmission of an electronic transmission to the intended holder of the

6

proxy or to a proxy solicitation firm, proxy support service or similar agent duly authorized by the intended proxy holder to receive such transmission; provided, that any such electronic transmission must either set forth or be submitted with information from which it can be determined that the electronic transmission was authorized by the stockholder. Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission by which a stockholder has authorized another person to act as proxy for such stockholder may be substituted or used in lieu of the original writing or transmission for any and all purposes for which the original writing or transmission could be used, provided that such copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission.

### 2.11.2 Delivery to Corporation; Duration

A proxy shall be filed with the secretary before or at the time of the meeting or the delivery to the corporation of the consent to corporate action in writing. A proxy shall become invalid three years after the date of its execution unless otherwise provided in the proxy. A proxy with respect to a specified meeting shall entitle the holder thereof to vote at any reconvened meeting following adjournment of such meeting but shall not be valid after the final adjournment thereof.

### 2.12    Voting of Shares

Except as otherwise set forth in the certificate of incorporation or these bylaws, each stockholder entitled to vote with respect to a matter submitted to a vote of stockholders shall be entitled to one (1) vote for each share of stock entitled to vote on such matter.

### 2.13    Voting for Directors

Each stockholder entitled to vote at an election of directors may vote, in person or by proxy, the number of shares owned by such stockholder for as many persons as there are directors to be elected and for whose election such stockholder has a right to vote; provided, however, that no cumulative voting shall be permitted in the election of directors.

### 2.14    Action by Stockholders Without a Meeting

Any action that is properly brought before the stockholders by or at the direction of the Board and that could be taken at an annual or special meeting of stockholders may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall (a) be signed by the holders of outstanding shares of capital stock entitled to be voted with respect to the subject matter thereof having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted, and (b) be delivered to the corporation by delivery to its registered office in the State of Delaware, its principal place of business, or an officer or agent of the corporation having custody of the records of proceedings of meetings of stockholders. Delivery made to the corporation's registered office shall be by hand or by certified mail or registered mail, return receipt requested. Every written

consent shall bear the date of signature of each stockholder who signs the consent, and no written consent shall be effective to take the corporate action referred to therein unless written consents signed by the requisite number of stockholders entitled to vote with respect to the subject matter thereof are delivered to the corporation, in the manner required by this Section 2, within 60 (or the maximum number permitted by applicable law) days of the earliest dated consent delivered to the corporation in the manner required by this Section 2. Any such consents shall be placed in the minute book of the corporation as if they were the minutes of a meeting of the stockholders. An electronic transmission consenting to an action to be taken and transmitted by a stockholder or proxy holder, or by a person authorized to act for a stockholder or proxy holder, shall be deemed to be written, signed, and dated for purposes of this Section 2.14, provided that any such electronic transmission sets forth or is delivered with information from which the corporation can determine (i) that the electronic transmission was transmitted by the stockholder or proxy holder or by a person authorized to act for the stockholder or proxy holder, and (ii) the date on which such stockholder or proxy holder or authorized person transmitted such electronic transmission. The date on which such electronic transmission is transmitted shall be deemed to be the date on which such consent was signed. Any copy, facsimile or other reliable reproduction of a consent in writing may be substituted or used in lieu of the original writing for any and all purposes for which the original could be used, provided that such copy, facsimile or other reproduction shall be a complete reproduction of the entire original writing. Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing and who, if the action had been taken at meeting, would have been entitled to notice of the meeting if the record date for such meeting had been the date that written consents signed by a sufficient number of stockholders to take the action were delivered to the corporation as provided above.

### 2.15    Inspectors of Election

#### 2.15.1  Appointment

In advance of any meeting of stockholders held while this corporation is a Public Company, the Board shall appoint one or more persons (who may include individual(s) who serve the corporation in other capacities, including without limitation, as officers, employees or agents, to act as inspectors of election at such meeting and to make a written report thereof. The Board may designate one or more persons to serve as alternate inspectors in place of any inspector who is unable or fails to act. If no inspector or alternate has been appointed or is able to act at a meeting of stockholders, the chairman of such meeting shall appoint one or more persons to act as inspector of elections at such meeting.    The corporation shall be a "Public Company" if (a) the Board of the corporation has designated the corporation a Public Company, (b) a registration statement has been filed by the corporation under the Securities Act of 1933, as amended, in connection with an offering of the corporation's securities to the public and has become effective, or (c) the corporation's securities have been registered pursuant to Section 12 of the Securities Exchange Act of 1934, as amended.

#### 2.15.2  Duties

8

The inspectors of election shall:

(a)     ascertain the number of shares of the corporation outstanding and the voting power of each such share;

(b)     determine the shares represented at the meeting and the validity of proxies and ballots;

(c)     count all votes and ballots;

(d)     determine and retain for a reasonable period of time a record of the disposition of any challenges made to any determination by them; and

(e)     certify their determination of the number of shares represented at the meeting and their count of the votes and ballots.

The validity of any proxy or ballot shall be determined by the inspectors of election in accordance with the applicable provisions of these bylaws and the DGCL as then in effect. In determining the validity of any proxy transmitted by electronic transmission, the inspectors shall record in writing the information upon which they relied in making such determination. Each inspector of elections shall, before entering upon the discharge of his or her duties, take and sign an oath to faithfully execute the duties of inspector with strict impartiality and according to the best of his or her ability. The inspectors of election may appoint or retain other persons or entities to assist them in the performance of their duties.

### 2.16    Administration of Meetings

Meetings of stockholders shall be presided over by the chairman of the Board or, in the absence thereof, by such person as the chairman of the Board shall appoint, or in the absence thereof or in the event that the chairman shall fail to make such appointment, any officer of the corporation elected by the Board. In the absence of the secretary of the corporation, the secretary of the meeting shall be such person as the chairman of the meeting appoints.

The Board shall be entitled to make such rules or regulations for the conduct of meetings of stockholders as it shall deem necessary, appropriate or convenient. Subject to such rules and regulations, if any, the chairman of the meeting shall have the right and authority to prescribe such rules, regulations and procedures and to do all acts as, in the judgment of such chairman, are necessary, appropriate or convenient for the proper conduct of the meeting, including, without limitation, establishing an agenda of business of the meeting, rules or regulations to maintain order, restrictions on entry to the meeting after the time fixed for commencement thereof, and the fixing of the date and time of the opening and closing of the polls for each matter upon which the stockholders will vote at a meeting (and announce such at the meeting).

9

## SECTION 3.  BOARD OF DIRECTORS

### 3.1    General Powers

Subject to the provisions of the DGCL and any limitations in the certificate of incorporation, the business and affairs of the corporation shall be managed, and all corporate powers shall be exercised, by or under the direction of the Board.

### 3.2    Number and Tenure

The authorized number of directors shall be determined from time to time by resolution of the Board, provided that the Board shall consist of not less than three (3) directors.  No decrease in the number of directors shall have the effect of shortening the term of any incumbent director. Each director shall serve for the term for which he or she was elected, or until his or her successor shall have been elected and qualified, or until his or her death, resignation or removal. Directors need not be stockholders of the corporation nor residents of the State of Delaware.  The certificate of incorporation or these bylaws may prescribe other qualifications for directors.  The directors shall be divided into classes, as and to the extent set forth in the corporation's certificate of incorporation.

### 3.3    Nomination and Election

#### 3.3.1    Nomination

Only persons who are nominated in accordance with the following procedures shall be eligible for election as directors.  Nominations for the election of directors may be made (a) by or at the direction of the Board, or (b) by any stockholder of the corporation who is a stockholder of record on the date of the giving of the notice provided for in this Section 3.3.1 and on the record date for the determination of stockholders entitled to vote for the election of directors at such meeting; provided, however, that a stockholder may nominate persons for election as directors only if written notice (in accordance with subsection 2.5.3 hereof) of such stockholder's intention to make such nominations is received by the secretary (i) with respect to an election to be held at an annual meeting of stockholders, in accordance with the provisions of Section 2.5.1, and (ii) with respect to an election to be held at a special meeting of stockholders for the election of directors, not later than the close of business on the tenth day following the date on which notice of such special meeting was mailed or public disclosure of the date of the special meeting was made, whichever occurs first.  Any such stockholder's notice shall set forth (a) as to such stockholder giving notice, the information required to be provided pursuant to Section 2.5.3, and (b) as to each person the stockholder proposes to nominate for election or re-election as a director, the name, age, and address of such person and, if the corporation is then a Public Company, such other information regarding such nominee as would be required in a proxy statement filed pursuant to the proxy rules of the Securities and Exchange Commission had such nominee been nominated by the Board, and a description of any arrangements or understandings, between the stockholder and such nominee and any other persons (including their

names), pursuant to which the nomination is to be made; and (c) the consent of each such nominee to serve as a director if elected. If the facts warrant, the Board, or the chairman of a stockholders' meeting at which directors are to be elected, may determine and declare that a nomination was not made in accordance with the foregoing procedure and, if it is so determined, the defective nomination shall be disregarded. The procedures set forth in this subsection 3.3 for nomination for the election of directors by stockholders are in addition to, and not in limitation of, any procedures now in effect or hereafter adopted by or at the direction of the Board or any committee thereof.

### 3.3.2    Election

All elections of directors shall be by written ballot, unless otherwise provided in the certificate of incorporation. If authorized by the Board, such requirement of a written ballot may be satisfied by a ballot submitted by electronic transmission, provided any such electronic transmission must be either set forth or be submitted with information from which it can be determined that the electronic transmission was authorized. At each election of directors, the persons receiving the greatest number of votes shall be the directors.

### 3.4    Annual and Regular Meetings

An annual Board meeting shall be held without notice immediately after and at the same place as the annual meeting of stockholders, or, at such other time and place, within or without the State of Delaware, as shall be determined from time to time by the Board. By resolution, the Board or any committee designated by the Board may specify the time and place, within or without the State of Delaware, for holding regular meetings without notice other than such resolution; provided that notice shall be given, at least three (3) days prior to an annual or regular meeting, if the time or place of such meeting, as set forth in these bylaws or in a resolution, shall be changed.

### 3.5    Special Meetings

Special meetings of the Board or any committee appointed by the Board may be called by or at the request of the chairman of the Board, the chief executive officer, the president, the secretary or, in the case of special Board meetings, any two directors, and, in the case of any special meeting of any committee appointed by the Board, by the chairman thereof. The person or persons authorized to call special meetings may fix the time and place, either within or without the State of Delaware, for holding any special meeting called by them.

### 3.6    Meetings by Telephone

Members of the Board or any committee designated by the Board may participate in a meeting of such Board or committee by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other. Participation by such means shall constitute presence in person at a meeting.

11

### 3.7    Notice of Special Meetings

Notice of a special Board or committee meeting stating the place, day and hour of the meeting shall be given to a director in one of manners set forth below in this Section 3.7. Neither the business to be transacted at, nor the purpose of, any special meeting need be specified in the notice of such meeting.

#### 3.7.1    Personal Delivery

If notice is given by personal delivery of a written notice, the notice shall be effective if delivered to a director at least twenty-four hours before the meeting.

#### 3.7.2    Delivery by Mail

If notice is delivered by mail, the notice shall be deemed effective if deposited in the official government mail properly addressed to a director at his or her address shown on the records of the corporation with postage prepaid at least four days before the meeting.

#### 3.7.3    Delivery by Private Courier

If notice is given by private courier, the notice shall be deemed effective if delivered to a director at his or her address shown on the records of the corporation at least twenty-four hours before the meeting.

#### 3.7.4    Facsimile Notice

If notice is delivered by wire or wireless equipment that transmits a facsimile of the notice, the notice shall be deemed effective when sent at least twenty-four hours before the meeting to a director at his or her facsimile number appearing on the records of the corporation.

#### 3.7.5    Delivery by Electronic Transmission

If notice is delivered by electronic transmission, the notice shall be deemed effective if sent at least twenty-four hours before the meeting to a director at his or her electronic mail address shown on the records of the corporation.

#### 3.7.6    Oral Notice

If notice is delivered orally, by telephone or in person, the notice shall be deemed effective if personally given to the director at least twenty-four hours before the meeting.

### 3.8    Waiver of Notice

#### 3.8.1    In Writing

12

Whenever any notice is required to be given to any director under the provisions of these bylaws, the certificate of incorporation or the DGCL, a waiver thereof in writing, signed by the person or persons entitled to such notice, or a waiver by electronic transmission by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board or any committee appointed by the Board need be specified in any written waiver of notice or any waiver by electronic transmission of notice of such meeting, unless so required by the certificate of incorporation or these bylaws.

### 3.8.2   By Attendance

The attendance of a director at a Board or committee meeting shall constitute a waiver of notice of such meeting, except when a director attends a meeting solely for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

### 3.9   Quorum

A majority of the total number of directors fixed by or in the manner provided in these bylaws or, if vacancies exist on the Board, a majority of the total number of directors then serving on the Board (provided, however, that such number may be not less than one-third of the total number of directors fixed by or in the manner provided in these bylaws) shall constitute a quorum for the transaction of business at any Board meeting. If a quorum is not present at a meeting, a majority of the directors present may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present.

### 3.10   Manner of Acting

The vote of a majority of the directors present at a Board at which a quorum is present shall be the act of the Board or committee, unless the vote of a greater number is required by these bylaws, the certificate of incorporation or the DGCL. A meeting at which a quorum is initially present may continue to transact business notwithstanding the withdrawal of directors, if any action taken is approved by at least a majority of the directors present at that meeting.

### 3.11   Presumption of Assent

A director of the corporation present at a Board or committee meeting at which action on any corporate matter is taken shall be presumed to have assented to the action taken unless his or her dissent is entered in the minutes of the meeting, or unless such director files a written dissent to such action with the person acting as the secretary of the meeting before the adjournment thereof, or forwards such dissent by registered mail to the secretary of the corporation immediately after the adjournment of the meeting. A director who voted in favor of such action may not dissent.

### 3.12   Action by Board or Committee Without a Meeting

Any action required or permitted to be taken at any meeting of the Board or of any committee of the Board may be taken without a meeting if all of the members of the Board or of the committee of the Board, as the case may be, consent thereto in writing or by electronic transmission as provided in the DGCL and the writing or writings or electronic transmission or transmissions are filed with the minutes of proceedings of the Board or committee. Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

### 3.13   Resignation

Any director may resign at any time upon delivery of written notice or electronic transmission to the corporation. Any such resignation shall take effect at the time specified therein, or if the time is not specified, upon delivery thereof and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

### 3.14   Removal

Any director or the entire Board may be removed at any time, but only for cause and then only by the affirmative vote of the holders of not less than a majority of the total voting power of all outstanding capital stock of the corporation then entitled to vote generally in the election of directors, voting together as a single class, and the vacancies thus created may be filled in accordance with Section 3.15 herein. As used in this Section 3.14 and in Article VI of the corporation's certificate of incorporation, "for cause" shall mean any of the following: (i) a director's crime against the corporation (including theft or embezzlement or attempted theft or embezzlement of money from the corporation), or activity adverse to the corporation involving the director's moral turpitude, gross negligence, willful misconduct, breach of fiduciary duty, breach of duty of loyalty, fraud, or knowing violation of the law; or (ii) a director's violation of any law (whether foreign or domestic) that results in a felony indictment (other than a felony resulting from a minor traffic violation) or similar judicial proceeding.

### 3.15   Vacancies

Unless otherwise provided in the certificate of incorporation, vacancies on the Board resulting from death, resignation, removal or otherwise and newly created directorships resulting from any increase in the number of directors may be filled solely by a majority of the directors then in office (although less than a quorum) or by the sole remaining director. Each director so elected shall hold office for a term that shall coincide with the term of the class to which such director shall have been elected. If there are no directors in office, then an election of directors may be held in accordance with the DGCL. Unless otherwise provided in the certificate of incorporation, when one or more directors shall resign from the Board, effective at a future date, a majority of the directors then in office, including those who have so resigned, shall have the power to fill such vacancy or vacancies, the vote thereon to take effect when such resignation or resignations shall become effective, and each director so chosen shall hold office as provided in the filling of the other vacancies.

14

### 3.16   Committees

#### 3.16.1 Creation and Authority of Committees

The Board may, pursuant to the authority granted in subsection (2) of section 141(c) of the DGCL, designate one or more standing or temporary committees, each committee to consist of one or more directors of the corporation. The Board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. In the absence or disqualification of a member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board to act at the meeting in the place of any such absent or disqualified member. Any such committee, to the extent provided in the resolution of the Board establishing such committee or as otherwise provided in these bylaws, shall have and may exercise such lawfully delegable powers and duties as the Board may confer; but no such committee shall have the power or authority in reference to (a) amending the certificate of incorporation (except that a committee may, to the extent authorized in the resolution or resolutions providing for the issuance of shares of stock adopted by the Board as provided in Section 151(a) of the DGCL, fix the designation and any of the preferences or rights of such shares relating to dividends, redemption, dissolution, any distribution of assets of the corporation or the conversion into, or the exchange of shares for, shares of any other class or classes or any other series of the same or any other class or classes of stock of the corporation or fix the number of shares of any series of stock or authorize the increase or decrease of shares of any series, (b) adopting an agreement of merger or consolidation under Section 251, 252, 254, 255, 256, 257, 258, 263, or 264 of the DGCL, (c) recommending to the stockholders the sale, lease or exchange of all or substantially all of the corporation's property and assets, (d) recommending to the stockholders a dissolution of the corporation or a revocation of a dissolution, (e) amending these bylaws, or (f) approving or adopting, or recommending to the stockholders, any action or matter expressly required by the DGCL to be submitted to the stockholders for approval. During such time as the corporation is a Public Company, each committee will comply with all applicable provisions of the Sarbanes-Oxley Act of 2002, the rules and regulations of the Securities and Exchange Commission, and the rules and regulations of any securities exchange on which the securities of the corporation are listed for trading (and, if the corporation is listed on a Canadian exchange, the requirements under applicable Canadian securities laws), and will have the right to retain independent legal counsel and other advisors at the corporation's expense. The Board may adopt rules for the government of any committee not inconsistent with the provisions of these bylaws.

### 3.16.2  Minutes of Meetings

All committees so appointed shall keep regular minutes of their meetings and shall cause them to be recorded in books kept for that purpose and will report to the Board when required.

### 3.16.3  Quorum and Manner of Acting

A majority of the number of directors comprising any committee of the Board, as established and fixed by resolution of the Board, shall constitute a quorum for the transaction of business at any meeting of such committee, and, if less than a majority are present at a meeting, a majority of such directors present may adjourn the meeting from time to time without further notice. The act of a majority of the members of a committee present at a meeting at which a quorum is present shall be the act of such committee.

### 3.16.4  Resignation

Any member of any committee may resign at any time by delivering written notice to the corporation or the chairman of such committee. Any such resignation shall take effect at the time specified therein or, if the time is not specified, upon delivery thereof and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

### 3.16.5  Removal

The Board may remove from office any member of any committee elected or appointed by it.

### 3.17  Compensation

By Board resolution, directors and committee members may be paid their expenses, if any, of attendance at each Board or committee meeting, a fixed sum for attendance at each Board or committee meeting, or a stated salary as director or a committee member, or a combination of the foregoing. No such payment shall preclude any director or committee member from serving the corporation in any other capacity and receiving compensation therefor.

### 3.18  Corporate Governance Compliance

Without limiting the powers of the Board set forth in these bylaws, and provided that securities of the corporation are listed for trading on a national securities exchange, the corporation shall comply with the corporate governance rules and requirements of such exchange.

### 3.19    Reliance upon Records

Every director, and every member of any committee of the Board, shall, in the performance of his or her duties, be fully protected in relying in good faith upon the records of the corporation and upon such information, opinions, reports or statements presented to the corporation by any of its officers or employees, or committees of the Board, or by any other person as to matters the director or member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation, including, but not limited to, such records, information, opinions, reports or statements as to the value and amount of the assets, liabilities and/or net profits of the corporation, or any other facts pertinent to the existence and amount of surplus or other funds from which dividends might properly be declared and paid, or with which the corporation's capital stock might properly be purchased or redeemed.

### 3.20    Interested Directors

A director who is directly or indirectly a party to a contract or transaction with the corporation, or is a director or officer of or has a financial interest in any other corporation, partnership, association or other organization which is a party to a contract or transaction with the corporation, may be counted in determining whether a quorum is present at any meeting of the Board or a committee thereof at which such contract or transaction is considered or authorized, and such director may participate in such meeting and vote on such authorization to the extent permitted by applicable law, including Section 144 of the DGCL.

## SECTION 4.    OFFICERS

### 4.1    Number

The officers of the corporation shall be a chairman of the Board, chief executive officer, president, and secretary, each of whom shall be elected by the Board. The corporation may also have, at the discretion of the Board, a vice chairman of the Board, a chief financial officer, a treasurer, one or more vice presidents, one or more assistance vice presidents, one or more assistant treasurers, one or more assistant secretaries, and any other officers and assistant officers as may be elected or appointed by the Board, such officers and assistant officers to hold office for such period, have such authority and perform such duties as are provided in these bylaws or as may be provided by resolution of the Board. Any officer may be assigned by the Board any additional title that the Board deems appropriate. The Board may delegate to any officer or agent the power to appoint any such subordinate officers or agents and to prescribe their respective terms of office, authority and duties. Any two or more offices may be held by the same person.

### 4.2    Election and Term of Office

The officers of the corporation shall be elected annually by the Board at the Board meeting held after the annual meeting of the stockholders. If the election of officers is not held at such meeting, such election shall be held as soon thereafter as a Board meeting conveniently

may be held. Unless an officer dies, resigns or is removed from office, he or she shall hold office until the next annual meeting of the Board or until his or her successor is elected and qualified. A failure to elect officers shall not dissolve or otherwise affect the corporation.

### 4.3   Resignation

Any officer may resign at any time by delivering written notice to the corporation. Any resignation shall take effect on the date of receipt of such notice of resignation or at any later time specified in such notice. Unless otherwise specified in the notice of resignation, the acceptance of the resignation shall not be necessary to make it effective. Any resignation is without prejudice to the rights, if any, of the corporation under any contract to which the officer is a party.

### 4.4   Removal

Any officer or agent elected or appointed by the Board may be removed, either with or without cause, by an affirmative vote of the majority of the Board at any regular or special meeting of the Board, or, except in the case of an officer appointed by the Board, by any officer upon whom such power of removal may be conferred by the Board, subject to the contract rights, if any, of the person so removed.

### 4.5   Vacancies

A vacancy in any office because of the death, resignation, removal, disqualification, creation of a new office or any other cause may be filled by the Board for the unexpired portion of the term, or for a new term established by the Board.

### 4.6   Chairman of the Board

If elected, the chairman of the Board shall perform such duties as shall be assigned to him or her by the Board from time to time and shall preside over meetings of the Board and stockholders unless another officer is appointed or designated by the Board as chairman of such meeting.

### 4.7   Chief Executive Officer

The chief executive officer shall be the chief executive officer of the corporation, shall preside over meetings of the Board and stockholders in the absence of a chairman of the Board and, subject to the Board's control, shall, together with the president of the corporation, have general supervision, direction and control of the business and affairs of the corporation and shall see that all orders and resolutions of the Board are carried out. The chief executive officer may sign certificates for shares of the corporation, deeds, mortgages, bonds, contracts or other instruments, except when the signing and execution thereof have been expressly delegated by the Board or by these bylaws to some other officer or agent of the corporation or are required by law to be otherwise signed or executed by some other officer or in some other manner. In general,

18

the chief executive officer shall perform all duties incident to the office of chief executive officer and such other duties as are prescribed by the Board from time to time.

### 4.8 President

In the event of the death of the chief executive officer or his inability to act, the president shall perform the duties of the chief executive officer, except as may be limited by resolution of the Board, with all the powers of and subject to all the restrictions upon the chief executive officer. The president may sign with the chief financial officer or secretary certificates for shares of the corporation. The president shall have, to the extent authorized by the chief executive officer or the Board, the same powers as the chief executive officer to sign deeds, mortgages, bonds, contracts or other instruments. The president shall perform such other duties as from time to time may be assigned to him or her by the chief executive officer or the Board.

### 4.9 Vice President

In the event of the absence or death of the president or his or her inability to act, the vice president (or if there is more than one vice president, the vice president who was designated by the Board as the successor to the president, or if no vice president is so designated, the vice president first elected to such office), if any, shall perform the duties of the president, except as may be limited by resolution of the Board, with all the powers of and subject to all the restrictions upon the president. Any vice president may sign with the chief financial officer or secretary certificates for shares of the corporation. Vice presidents shall have, to the extent authorized by the president or the Board, the same powers as the President to sign deeds, mortgages, bonds, contracts or other instruments. Vice presidents shall perform such other duties as from time to time may be assigned to them by the president or the Board.

### 4.10 Secretary

The secretary shall be responsible for preparation of minutes of meetings of the Board and stockholders, maintenance of the corporation's records and stock registers, and authentication of the corporation's records, and shall, in general, perform all duties incident to the office of secretary and such other duties as from time to time may be assigned to him or her by the president or the Board. The secretary shall give, or cause to be given, notice of all meetings of stockholders and of the Board required to be given by law or by these bylaws. In the absence of the secretary, an assistant secretary may perform the duties of the secretary.

### 4.11 Chief Financial Officer and/or Treasurer

The chief financial officer and/or treasurer shall keep and maintain, or cause to be kept and maintained, adequate books and records of accounts of the properties and business transactions of the corporation, including accounts of its assets, liabilities, receipts, disbursements, gains, losses, capital, retained earnings and shares. The books of account shall at all reasonable times by open to inspection by any director. The chief financial officer and/or treasurer shall have charge and custody of and be responsible for all funds and securities of the corporation; receive and give receipts for moneys due and payable to the corporation from any

source whatsoever, and deposit all such moneys in the name of the corporation in banks, trust companies or other depositories selected in accordance with the provisions of these bylaws; sign certificates for shares of the corporation; render to the Board and the chief executive officer or president, whenever requested by them, an account of all of his or her transactions as chief financial officer or treasurer of the corporation and of the financial condition of the corporation, and in general perform all of the duties incident to the office of chief financial officer and treasurer and such other duties as from time to time may be assigned to him or her by the president or by the Board. In the absence of the treasurer, an assistant treasurer may perform the duties of the treasurer. The chief financial officer may be the treasurer of the corporation.

### 4.12    Salaries

The salaries of the officers shall be fixed from time to time by the Board or by any person or persons to whom the Board has delegated such authority. No officer shall be prevented from receiving such salary by reason of the fact that he or she is also a director of the corporation.

## SECTION 5.  CONTRACTS, CHECKS AND DEPOSITS

### 5.1    Contracts

Except as otherwise provided in these bylaws, the Board, or any officers of the corporation authorized by the Board, may authorize any officer or officers, or agent or agents, to enter into any contract or execute and deliver any instrument in the name of and on behalf of the corporation. Such authority may be general or confined to specific instances.

### 5.2    Checks, Drafts, Etc.

All checks, drafts or other orders for the payment of money, notes or other evidences of indebtedness issued in the name of the corporation shall be signed or endorsed by such officer or officers, or agent or agents, of the corporation and in such manner as is from time to time determined by resolution of the Board.

### 5.3    Deposits

All funds of the corporation not otherwise employed shall be deposited from time to time to the credit of the corporation in such banks, trust companies or other depositories as the Board may select.

## SECTION 6.  CERTIFICATES FOR SHARES AND THEIR TRANSFER

### 6.1    Issuance of Shares

No shares of the corporation shall be issued unless authorized by the Board, which authorization shall include the maximum number of shares to be issued and the consideration to be received for each share.

### 6.2   Issuance

The shares of the corporation shall be represented by certificates, provided that the Board may provide by resolution or resolutions that some or all of any or all classes or series of its stock shall be uncertificated shares (book entry ownership). Any such resolution shall not apply to shares represented by a certificate until such certificate is surrendered to the corporation. Certificates representing shares of the corporation shall be signed by the chief executive officer or the president, or a vice president, and by the chief financial officer or treasurer or the secretary, any of whose signatures may be a facsimile. The Board may in its discretion appoint responsible banks, trust companies or other professionals from time to time to act as transfer agents and registrars of the stock of the corporation, and, when such appointments shall have been made, no stock certificate shall be valid until countersigned by one of such transfer agents and registered by one of such registrars. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the corporation with the same effect as if such person were such officer, transfer agent or registrar at the date of issue. All certificates shall include on their face written notice of any restrictions that may be imposed on the transferability of such shares and shall be consecutively numbered or otherwise identified. If the corporation is authorized to issue more than one class of stock or more than one series of any class, then the powers, designations, preferences, and relative, participating, optional or other special rights of each class or series and the qualifications, limitations or restrictions of such preferences and/or rights shall be set forth in full or summarized on the face or back of the certificate that the corporation shall issue to represent such class or series of stock. Provided, however, that, in lieu of the foregoing requirements there may be set forth on the face or back of the certificate that the corporation issues to represent such class or series of stock a statement that the corporation will furnish without charge to each stockholder who so requests the powers, designations, preferences, and relative, participating, optional or other special rights of each class or series of stock and the qualifications, limitations or restrictions of such preferences and/or rights.

### 6.3   Stock Records

The stock transfer books shall be kept at the registered office or principal place of business of the corporation or at the office of the corporation's transfer agent or registrar. The name and address of each person to whom certificates for shares are issued, together with the class and number of shares represented by each such certificate and the date of issue thereof, shall be entered on the stock transfer books of the corporation. The person in whose name shares stand on the books of the corporation shall be deemed by the corporation to be the owner thereof for all purposes, including, without limitation, to receive dividends and to vote as such owner, and the corporation shall not be bound to recognize any equitable or other claim to or interest in such shares on the part of any other person or entity, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of Delaware.

6.4     Restriction on Transfer

Except to the extent that the corporation has obtained an opinion of counsel acceptable to the corporation that transfer restrictions are not required under applicable securities laws, or has otherwise satisfied itself that such transfer restrictions are not required, all certificates representing shares of the corporation shall bear a legend on the face of the certificate, or on the reverse of the certificate if a reference to the legend is contained on the face, that reads substantially as follows:

> "The securities evidenced by this certificate have not been registered under the Securities Act of 1933 or any applicable state law, and no interest therein may be sold, distributed, assigned, offered, pledged or otherwise transferred unless (a) there is an effective registration statement under such Act and applicable state securities laws covering any such transaction involving said securities or (b) this corporation receives an opinion of legal counsel for the holder of these securities (concurred in by legal counsel for this corporation) stating that such transaction is exempt from registration or this corporation otherwise satisfies itself that such transaction is exempt from registration. Neither the offering of the securities nor any offering materials have been reviewed by any administrator under the Securities Act of 1933 or any applicable state law."

If any securities of the corporation are issued pursuant to Regulation S ("Regulation S") of the Securities Act of 1933, as amended (the "1933 Act"), the corporation will refuse to register any subsequent transfer of such securities if such transfer is not made in accordance with Regulation S, pursuant to registration under the 1933 Act or pursuant to an available exemption from registration under the 1933 Act.

6.5     Transfer of Shares

The transfer of shares of the corporation shall be made only on the stock transfer books of the corporation kept at an office of the corporation or by transfer agents designated to transfer shares of the stock of the corporation, pursuant to authorization or document of transfer made by the holder of record thereof or by his or her legal representative, who shall furnish proper evidence of authority to transfer, or by his or her attorney-in-fact authorized by power of attorney duly executed and filed with the secretary of the corporation. All certificates surrendered to the corporation for transfer shall be canceled and no new certificate shall be issued until the former certificates for a like number of shares shall have been surrendered and canceled.

6.6     Lost or Destroyed Certificates

In the case of a lost, destroyed or mutilated certificate, a new certificate may be issued therefor upon such terms and indemnity to the corporation as the transfer agent and Board may prescribe.

22

### 6.7    Shares of Another Corporation

Any officer or agent designated by the Board or in the absence of such designation, the chairman of the Board, the chief executive officer, the president or any vice president of the corporation, is authorized to vote, represent, and exercise on behalf of the corporation all rights incident to any and all shares or other equity interests of any other corporation or entity standing in the name of the corporation. The authority granted herein may be exercised either by such person directly or by any other person authorized to do so by proxy or power of attorney duly executed by such person having the authority.

### 6.8    Stock Transfer Agreements

The corporation shall have the power to enter into and perform any agreement with any number of stockholders of any one or more classes or series of stock of the corporation to restrict the transfer of shares of stock of the corporation of any one or more classes or series owned by such stockholders in any manner not prohibited by the DGCL.

## SECTION 7.  BOOKS AND RECORDS

The corporation shall, either at its principal executive office or at such other place or places as designated by the Board, keep a record of its stockholders, listing their names and addresses and the number and class of shares held by each stockholder, a copy of these bylaws, as may be amended to date, minute books, accounting books and other records. Any such records maintained by the corporation may be kept on, or by means of, or be in the form of, any information storage device or method, provided that the records so kept can be converted into clearly legible paper form within a reasonable time. The corporation shall so covert any records so kept upon the request of any person entitled to inspect such records pursuant to the provisions of the DGCL. When records are kept in such manner, a clearly legible paper form produced from or by means of the information storage device or method shall be admissible in evidence, and accepted for all other purposes, to the same extent as an original paper form accurately portrays the record.

## SECTION 8.  ACCOUNTING YEAR

The accounting year of the corporation shall be the calendar year, provided that if a different accounting year is at any time selected by resolution of the Board, the accounting year shall be the year so selected.

## SECTION 9.  SEAL

The seal of the corporation, if any, shall consist of the name of the corporation, the state of its incorporation and the year of its incorporation.

## SECTION 10. INDEMNIFICATION

### 10.1    Right to Indemnification

The corporation shall indemnify and hold harmless, to the fullest extent permitted by law as in effect on the date of adoption of these bylaws or as it may thereafter be amended (it being intended that, to the extent permitted by law, no subsequent change in laws resulting in less favorable indemnification of a director, officer, employee, or agent of the corporation than that in effect on the date of adoption of these bylaws shall apply), any person who was or is made or is threatened to be made a party or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (a "proceeding") by reason of the fact that he or she, or a person for whom he or she is the legal representative, is or was a director, officer, employee or agent of the corporation or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust, or other enterprise, against any and all liability and loss (including judgments, fines, penalties and amounts paid in settlement) suffered or incurred and expenses reasonably incurred by such person; provided that any standard of conduct applicable to whether a director or officer may be indemnified shall be equally applicable to an employee or agent under this Section 10. The corporation may also indemnify any and all other persons whom it shall have power to indemnify under any applicable law from time to time in effect to the extent authorized or permitted by such law. The indemnification provided by this Section 10 shall not be deemed exclusive of any other rights to which any person may be entitled under any provision of the certificate of incorporation, other bylaw, agreement, vote of stockholders or disinterested directors, or otherwise, both as to action in an official capacity and as to action in another capacity while holding such office, and shall be contract rights and continue as to a person who has ceased to be a director, manager, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a person. The corporation shall not be required to indemnify a person in connection with a proceeding initiated by such person, including a counterclaim or crossclaim, unless the proceeding was authorized by the Board.

For purposes of this Section 10: (i) any reference to the "corporation" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had the power and authority to indemnify its directors or officers, so that any person who is or was a director or officer of such constituent corporation, or is or was a director or officer of such constituent corporation serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust, employee benefit plan, or other enterprise, shall stand in the same position under the provisions of this Section 10 with respect to the resulting or surviving corporation as such person would have with respect to such constituent corporation if its separate existence had continued; (ii) any reference to "other enterprise" shall include all plans, programs, policies, agreements, contracts and payroll practices and related trusts for the benefit of or relating to employees of the corporation and its related entities ("employee benefit plans"); (iii) any reference to "fines", "penalties", "liability" and "expenses" shall include any excise taxes, penalties, claims, liabilities and reasonable expenses (including reasonable legal fees and related expenses) assessed against or incurred by a person with respect to any employee benefit plan; (iv) any reference to "serving

24

at the request of the corporation" shall include any service as a director, manager, officer, employee or agent of the corporation or trustee or administrator of any employee benefit plan which imposes duties on, or involves services by, such director, manager, officer, employee or agent with respect to an employee benefit plan, its participants, beneficiaries, fiduciaries, administrators and service providers; and (v) any reference to serving at the request of the corporation as a director, officer, employee or agent of a partnership or trust shall include service as a partner or trustee.

### 10.2    Expenses Payable in Advance

The corporation shall pay or reimburse the reasonable expenses incurred in defending any proceeding in advance of its final disposition if the corporation has received an undertaking by the person receiving such payment or reimbursement to repay all amounts advanced if it should be ultimately determined that he or she is not entitled to be indemnified under this Section 10 or otherwise.

### 10.3    Right of Claimant to Bring Suit

If a claim for indemnification or payment of expenses under this Section 10 is not paid in full within 60 days after a written claim therefor has been received by the corporation, except in the case of a claim for an advancement of expenses, in which case the applicable period shall be twenty days, the claimant may file suit to recover the unpaid amount of such claim and, if successful in whole or in part, shall be entitled to be paid the expense of prosecuting such claim. In any such action, the corporation shall have the burden of proving that the claimant was not entitled to the requested indemnification or payment of expenses under applicable law.

### 10.4    Insurance, Contracts and Funding

To the fullest extent permitted by the DGCL or any other applicable law, the corporation may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the corporation, or is or was a director, officer, employee or agent of the corporation serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust, employee benefit plan, or other enterprise against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such, whether or not the corporation would have the power or the obligation to indemnify such person against such liability under the provisions of this Section 10. The corporation, without further stockholder approval, may enter into contracts with any director, officer, employee or agent respecting indemnification and advances, to the fullest extent not prohibited by the DGCL or by any other applicable law, and may create a trust fund, grant a security interest or use other means (including, without limitation, a letter of credit) to ensure the payment of such amounts as may be necessary to effect indemnification as provided in this Section 10.

### 10.5   Other Indemnification

The corporation's obligation, if any, to indemnify any person who was or is serving at its request as a director, officer, employee, partner or agent of another corporation, partnership, joint venture or other enterprise shall be reduced by any amount such person may collect as indemnification from such other corporation, partnership, joint venture or other enterprise.

### 10.6   Effect of Amendment or Repeal

Any repeal or modification of the foregoing provisions of this Section 10 shall not adversely affect any right or protection hereunder of any person in respect of any act or omission occurring prior to the time of such repeal or modification.

### SECTION 11. GENERAL MATTERS

### 11.1   Provisions of Certificate Govern

In the event of any inconsistency between the terms of these bylaws and those of the certificate of incorporation of the corporation, the terms of the certificate of incorporation will govern and control.

### 11.2   Construction

Unless the context requires otherwise, the general provisions, rules of construction, and definitions in the DGCL shall govern the construction of these bylaws. Without limiting the generality of the foregoing, the singular number includes the plural, the plural number includes the singular, and the term "person" includes both an entity and a natural person. References in these bylaws to "certificate of incorporation" shall mean the certificate of incorporation of the corporation, unless the context otherwise dictates.

### 11.3   Dividends

The Board, subject to any restrictions contained in the DGCL or the certificate of incorporation, may declare and pay dividends upon the shares of its capital stock. Dividends may be paid in cash, in property, or in shares of the corporation's capital stock. The Board may set apart out of any of the funds of the corporation available for dividends a reserve or reserves for any proper purpose and may abolish any such reserve.

### 11.4   Notice by Electronic Transmission

Without limiting the manner by which notice otherwise may be given effectively to stockholders pursuant to the DGCL, the certificate of incorporation or these bylaws, any notice to stockholders given by the corporation under any provision of the DGCL, the certificate of incorporation or these bylaws shall be effective if given by a form of electronic transmission consented to by the stockholder to whom the notice is given, and otherwise complying with the requirements of Section 232 of the DGCL, as it may be amended from time to time. For

26

purposes of these bylaws, "electronic transmission" means any form of communication, not directly involving the physical transmission of paper, that creates a record that may be retained, retrieved and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

### 11.5   Dispensation with Notice

#### 11.5.1   Unknown Location of Stockholder

Whenever notice is required to be given by law, the certificate of incorporation or these bylaws to any stockholder to whom (i) notice of two consecutive annual meetings of stockholders, or (ii) all, and at least two, payments (if sent by first class mail) of dividends or interest on securities of the corporation during a 12-month period, have been mailed addressed to such stockholder at the address of such stockholder as shown on the records of the corporation and have been returned undeliverable, the giving of such notice to such stockholder shall not be required. Any action or meeting which shall be taken or held without notice to such stockholder shall have the same force and effect as if such notice had been duly given. If any such stockholder shall deliver to the corporation a written notice setting forth the then current address of such stockholder, the requirement that notice be given to such stockholder shall be reinstated.

#### 11.5.2   Unlawful Communication

Whenever notice is required to be given by law, the certificate of incorporation or these bylaws to any person with whom communication is unlawful, the giving of notice to such person shall not be required, and there shall be no duty to apply to any governmental authority or agency for a license or permit to give such notice to such person. Any action or meeting which shall be taken or held without notice to any such person with whom communication is unlawful shall have the same force and effect as if such notice had been duly given.

## SECTION 12. AMENDMENTS

The Board shall have the power to adopt, amend or repeal the bylaws of this corporation; provided, however, the Board may not repeal or amend any bylaw that the stockholders have expressly provided may not be amended or repealed by the Board. The stockholders shall also have the power to adopt, amend or repeal the bylaws of this corporation, as permitted by Delaware law.